# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| 1. GREG ERICKSON, | ) |
| | ) Case No. CIV-12-631-W |
| Plaintiff, | ) |
| v. | ) Relating to: |
| | ) ALL ACTIONS |
| 1. AUBREY K. MCCLENDON, | ) |
| 2. RICHARD K. DAVIDSON, | ) DEMAND FOR JURY TRIAL |
| 3. V. BURNS HARGIS, | ) |
| 4. FRANK KEATING, | ) |
| 5. BREENE M. KERR, | ) |
| 6. CHARLES T. MAXWELL, | ) |
| 7. DON NICKELS, | ) |
| 8. FREDERICK B. WHITTEMORE, | ) |
| 9. MERRILL A. MILLER, JR., | ) |
| 10. KATHLEEN M. EISBRENNER, | ) |
| 11. LOUIS A. SIMPSON, | ) |
| | ) |
| Defendants, | ) |
| | ) |
| and, | ) |
| | ) |
| 12. CHESAPEAKE ENERGY | ) |
| CORPORATION, | ) |
| | ) |
| Nominal Defendant. | ) |

# SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTIES, WASTE OF CORPORATE ASSETS, UNJUST ENRICHMENT, AND VIOLATIONS OF THE SECURITIES AND EXCHANGE ACT OF 1934

# TABLE OF CONTENTS

Page

I.  NATURE OF THE ACTION ........................................................................................1

II.  JURISDICTION AND VENUE ..................................................................................9

III.  THE PARTIES..........................................................................................................10

    A.  Shareholder Plaintiff........................................................................................10

    B.  Nominal Defendant..........................................................................................10

    C.  Director Defendants .........................................................................................10

IV.  THE INDIVIDUAL DEFENDANTS' DUTIES.......................................................13

V.  DEFENDANT MCCLENDON'S EGREGIOUS 2008 COMPENSATION
    PACKAGE................................................................................................................17

    A.  Defendant McClendon's History as Chesapeake's Chairman and CEO ...............17

    B.  Shareholders Adopt the FWPP under the Pretext It Would Align
        Defendant McClendon's Interests with Those of the Company .........................18

    C.  Defendant McClendon's Employment Agreement and Stock Ownership
        History...............................................................................................................21

    D.  Defendant McClendon and Chesapeake's Dreadful 2008 Performance
        Leads to Margin Calls for McClendon and the Forced Sale of 94% of His
        Chesapeake Stock .............................................................................................23

    E.  Notwithstanding Defendant McClendon's Breach of Contract and
        Chesapeake's 2008 Performance, the Board Rewarded McClendon with a
        $124 Million Compensation Package .................................................................26

    F.  Defendant McClendon's $124 Million Compensation Package Was
        Designed to Bail McClendon Out and Bore No Relation to Chesapeake's
        2008 Performance .............................................................................................29

    G.  An Examination of the Compensation of Fellow Chesapeake Executives
        and CEOs at Similar Companies Further Demonstrates the Excessiveness
        of Defendant McClendon's 2008 Compensation ...............................................32

    H.  Eminent Compensation Expert Declares Defendant McClendon's 2008
        Compensation Unjustifiable...............................................................................36

I. The Board, and Particularly the Members of the Compensation Committee and Audit Committee, Breached Their Duties in Connection with Defendant McClendon's 2008 Compensation.......................................................38

J. The SEC Has Investigated Defendant McClendon's Compensation in Connection with the FWPP.....................................................................................45

K. Chesapeake Shareholders Propose Changes to the Company's Compensation Policies, But (Not Surprisingly) the Board Recommends that Shareholders Vote All of the Proposals Down ...............................................46

VI. INSIDER SELLING .........................................................................................47

VII. THE IRS INVESTIGATES THE FWPP .........................................................49

VIII. DEFENDANTS CONCEAL MASSIVE FINANCING TRANSACTIONS BY DEFENDANT MCCLENDON IN VIOLATION OF THE FWPP'S STATED PURPOSE AND CONTRARY TO THE COMPANY'S BEST INTERESTS ................50

A. Defendant McClendon Borrows over $1 Billion from Chesapeake's Lenders Using His FWPP Interests as Collateral to Continue Participating in the FWPP .........................................................................................................50

B. Defendant McClendon's VPP Contracts Threaten Chesapeake's Ability to Raise Much Needed Cash .......................................................................................62

C. Defendants' Struggle with the SEC to Keep Information Regarding Defendant McClendon's Participation in the FWPP Concealed...........................63

D. The Board Rushes to Defendant McClendon's Defense Before Any Investigation.............................................................................................................65

E. Defendant McClendon and the Board Scramble to Control the Continuing Fallout .....................................................................................................................69

F. S&P Downgrades Chesapeake, Citing Corporate Governance Shortcomings Relating to the FWPP .....................................................................78

IX. UNCHECKED HEDGING ACTIVITIES BY DEFENDANT MCCLENDON CONFIRM UTTER FAILURE BY INDIVIDUAL DEFENDANTS TO ADDRESS AND DISCLOSE MATERIAL CONFLICTS OF INTEREST ....................82

A. Defendant McClendon Distracts Himself with Hedging Activities in Breach of His Employment Agreement and Fiduciary Duties .............................82

B. Disastrous Hedging Positions Likely Contributed to Defendant McClendon's Need for a Bailout in 2008.................................................................86

C.      The Individual Defendants Disregard Serious Conflicts of Interest and
        Other Risks Arising from Defendant McClendon's Hedging Activities ...............88

D.      Defendants Conceal Defendant McClendon's Hedging Activities ........................93

X.      THE INDIVIDUAL DEFENDANTS MAKE IMPROPER STATEMENTS IN
        THE PROXY STATEMENTS RELATING TO THE FWPP ..........................................94

XI.     THE INDIVIDUAL DEFENDANTS MAKE ADDITIONAL IMPROPER
        STATEMENTS REGARDING DEFENDANT MCCLENDON'S FINANCING
        AND RELATED RISKS ..................................................................................................97

XII.    DESPITE TOUGH TIMES, THE BOARD CONTINUES TO PROVIDE
        DEFENDANT MCCLENDON WITH LAVISH COMPENSATION ...........................110

XII.    DAMAGES TO CHESAPEAKE ..................................................................................114

XIV.    GENERAL DERIVATIVE ALLEGATIONS .................................................................116

XV.     DERIVATIVE ALLEGATIONS: DEMAND IS EXCUSED ........................................116

A.      Demand Is Excused Because the 2012 Director Defendants' Conduct Is
        Not a Valid Exercise of Business Judgment .......................................................117

B.      Demand Is Excused Because at least a Majority of the Current Board
        Faces a Substantial Likelihood of Liability for Their Misconduct .....................120

COUNT I

        Breach of Fiduciary Duties Against the 2008 Compensation Committee
        Defendants for Their Roles in Defendant McClendon's Excessive
        Compensation ......................................................................................................128

COUNT II

        Breach of Fiduciary Duties Against the 2008 Audit Committee Defendants for
        Their Roles in Defendant McClendon's Excessive Compensation .....................130

COUNT III

        Breach of Fiduciary Duties Against the 2008 Director Defendants for Their Roles
        in Defendant McClendon's Excessive Compensation .........................................131

COUNT IV

        Breach of Fiduciary Duties Against Defendant McClendon for His Role in
        Ensuring Excessive Compensation to Himself ...................................................132

COUNT V

Breach of Fiduciary Duties Against the Individual Defendants for Their Roles in Connection with McClendon's Financing and Hedging Transactions ................ 133

COUNT VI

Against the 2008 Director Defendants for Waste of Corporate Assets in Connection with Defendant McClendon's 2008 Compensation Package ................................................... 140

COUNT VII

Against the Insider Selling Defendants for Breach of Fiduciary Duties for Insider Selling and Misappropriation of Information ...................................................... 141

COUNT VIII

Against Defendant McClendon for Unjust Enrichment .................................................. 142

COUNT IX

Against Defendants Whittemore, Nickles, and Maxwell for Unjust Enrichment ........... 143

COUNT X

Derivatively on Behalf of Chesapeake Against the Individual Defendants for Violations of Section 14(a) of the Exchange Act ................................................ 144

COUNT XI

Derivatively on Behalf of Chesapeake Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act ................................................ 147

PRAYER FOR RELIEF ................................................................................................ 148

JURY DEMAND .......................................................................................................... 150

Plaintiff Greg Erickson ("Erickson") ("Plaintiff"), by and through his undersigned attorneys, hereby submits this Shareholder Derivative Complaint (the "Complaint") on behalf of nominal defendant Chesapeake Energy Corporation ("Chesapeake" or the "Company") against certain current and former members of its Board of Directors (the "Board") and executive officers seeking to remedy the defendants' misconduct from January 1, 2008 to the present (the "Relevant Period"). Plaintiff makes the following allegations based upon individual and personal knowledge as to his own acts, and the investigation undertaken by his undersigned counsel as to other matters, which investigation included, inter alia, an analysis of U.S. Securities and Exchange Commission ("SEC") filings by Chesapeake, as well as securities analysts' reports and advisories about the Company, press releases, and other public statements issued by the Company, and media reports about the Company. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.      NATURE OF THE ACTION

1.      Chesapeake's business is the exploration for and production of natural gas. The Company is North America's second-largest producer of natural gas. It owns interests in nearly 40,000 natural gas and oil-producing wells that are currently producing more than 2 billion cubic feet equivalent per day. Chesapeake's strategy is to discover, acquire, and develop conventional and unconventional natural gas reserves.

2.      Defendant Aubrey K. McClendon ("McClendon") co-founded the Company in 1989. He has served as Chesapeake's Chief Executive Officer ("CEO") and

Chairman of the Board.  McClendon has routinely taken advantage of his imperial status at the Company to offload his personal financial risk to Chesapeake and its minority shareholders – all under the guise of purportedly aligning his interests with theirs.  This twisted logic is increasingly being exposed for what it is, as investors continue to learn the truth that, between his weight at the Company and his leveraging of other people's money, McClendon can only win while everyone else will lose.

3.     Since the Company's initial public offering ("IPO") in 1993, defendant McClendon has participated in a "well participation program" available only to the Company's founders known as the Founder Well Participation Program ("FWPP").  This program has allowed McClendon to personally participate in the Company's exploratory efforts and to seek personal benefits from that participation in addition to the benefits he has obtained by serving as Chesapeake's lead executive.  McClendon has participated in almost every single one of the Company's wells since the IPO, thereby obtaining purported ownership interests in gas producing reserves valued at more than $852 million.

4.     Defendants' stated purpose of the FWPP, when it was presented to shareholders for approval in 2005, is to retain and motivate defendant McClendon and his co-founder and align their interests with the Company's interests.  This has proven – through McClendon and the Board's manipulations – not to be true, as defendants have repeatedly disregarded these justifications of the FWPP and have instead allowed it to simply serve as a vehicle for McClendon to once again leverage himself to the potential peril of the Company.

5.     In order to participate in the FWPP during any given "participation period," defendant McClendon was required first to state his intention to do so and to declare "the percentage working interest" that he proposes to participate with during that participation period, not to exceed 2.5% of the total.  Thereafter, the Company is supposed to invoice McClendon on a monthly basis for a pro rata portion of certain costs associated with drilling the applicable well.  McClendon, however, encountered personal liquidity troubles in 2008 relating to, among other things, his stock ownership in the Company and his personally operated wedge fund, and struggled to fulfill his financial obligations under the FWPP in 2008.  More recently, McClendon has been taking out substantial loans totaling approximately $1 billion to buy into the FWPP, while at the same time using his other FWPP interests as collateral.

6.     Going into 2008, defendant McClendon was the largest individual shareholder of Chesapeake.  McClendon historically touted the fact that he had never sold any of his Chesapeake shares, which led the public to believe that McClendon felt confident about the Company's future prospects.  At the same time, as of 2008, McClendon's employment agreement with the Company required that he hold shares of Chesapeake common stock equal in value to 500% of his annual salary and annual cash bonuses.  The purpose of that requirement is to help align McClendon's interests with those of the Company.  Despite his public boasts and his contract with the Company, by 2008, McClendon had put almost all of his Chesapeake shares up as collateral for various credit arrangements.

7.     In 2008, Chesapeake performed abysmally.   It was named the worst-performing oil and gas producer in the Standard & Poor's ("S&P") 500 for 2008. Chesapeake's value dropped so far that, on October 8, 9, and 10, 2008, defendant McClendon received margin calls requiring him to liquidate 94% of his Chesapeake stock (which also jeopardized his ability to participate in the FWPP).   In the few days prior to Chesapeake's October 10, 2008 announcement of the margin calls, three Chesapeake directors sold their personally held shares of Company stock for more than $5.2 million in proceeds.

8.     As a result of the forced sales arising from defendant McClendon's reckless risk taking, he no longer possessed 500% of his annual salary and cash bonuses in Company stock that his employment contract required.   But McClendon did not receive so much as a slap on the wrist for this breach.   Rather, McClendon leveraged his positions as co-founder, Chairman, and CEO to demand that the Company's Board bail him out with a new employment agreement and a massive annual compensation increase (despite the Company's terrible performance in 2008).

9.     The Board caved to defendant McClendon's demands, approving an amended employment agreement that paid McClendon a total of $124 million in 2008. This compensation package included a $77 million bonus, $75 million of which was a "well cost incentive award" structured as a net credit to be used against past and future billings from the Company for costs owed by McClendon under the Company's FWPP. The compensation also included a payment from Chesapeake to McClendon in the amount of $12.1 million for the purchase of McClendon's personal collection of "antique

maps."  And showing little concern for McClendon's breach of his previous employment agreement, the Board gave the financially-troubled executive a year to buy back the stock he needed in order to reach the 500% mark.

10.    The compensation paid to defendant McClendon in 2008 was not based on his performance or the performance of the Company under his watch.  Rather, the $124 million compensation package represents an effort by the Board to bail McClendon out of the financially precarious situation in which he placed himself.  There was no provision in the FWPP for fronting McClendon's costs, but the Board nonetheless did just that by approving the $75 million "incentive award" to ensure that McClendon could continue to participate in the program and save him from the mess he had created.  Neither was the $12.1 million for McClendon's personal maps based on McClendon's performance or for the Company's benefit – the map collection had already been on display at the Company's headquarters for years and would have remained there.  Chesapeake received no benefit from the Board showering McClendon with millions more in compensation.

11.    The excessiveness of defendant McClendon's compensation becomes even clearer when compared to his own compensation in prior years, the compensation of fellow Chesapeake executives in 2008, and the compensation of other CEOs of similar companies in 2008.  Indeed, McClendon's total 2008 compensation package made him the highest paid CEO of all S&P 500 companies, when he had never previously made more than $20 million in a single year.

12.    The members of the Board, and the members of the Board's Compensation Committee and Audit Committee in particular, breached their fiduciary duties in

connection with the approval of defendant McClendon's 2008 compensation package. The Compensation Committee spent only a single day, and did not consult any independent consultants, in considering and deciding to approve the new employment agreement despite the fact that it paid McClendon more than $124 million in a year in which Chesapeake and McClendon himself were ranked at the bottom of their respective lists performance-wise.  The Audit Committee members breached their fiduciary duties as well by relying solely on McClendon's own art agent to value his personal collection of maps and not seeking any independent appraisal.  The Compensation Committee did not even discuss the Audit Committee's recommendation.

13.     McClendon's transactions, amounting to approximately $1 billion, were first revealed by *Reuters* on April 18, 2012, in an in-depth investigative report. Amazingly, as part of these transactions, McClendon has assigned the rights to a vast portion of any profits he could hope to make from his FWPP interests, meaning he not only has minimal down side exposure, but also minimal interest in the upside.  *Reuters* cites numerous experts, analysts, and investors who expressed surprise and concern regarding the nature and extent of these loans, as well as the threat they pose to the Company.

14.     These new loans present a serious conflict of interest between defendant McClendon and the Company, whose interests McClendon is duty bound to put before his own.  Some of McClendon's lenders are providing financing to the Company, but at rates that are lucrative to the lenders, while unfair to the Company.  For example, while McClendon bought back his map collection at only 2.28% interest (the Company's

purported average borrowing cost), one of McClendon's lenders bought preferred stock from the Company that pays an annual dividend of 7%, plus royalty interest from Chesapeake's oil and gas wells.  McClendon's massive leveraging of his FWPP interests also runs the serious risk that an imminent default by the CEO could, among other things, ensnare Chesapeake in litigation with McClendon's lenders.

15.     Defendant McClendon's use of his FWPP interests presents an additional conflict of interest as he competes with the Company to sell gas.  According to *Forbes*, McClendon has personally collected more than $130 million from Volumetric Production Payment ("VPP") contracts, by which he has promised to deliver certain pre-arranged amounts of gas for a certain period of time, in exchange for an upfront payment.  Chesapeake, however, is in no position to be competing with McClendon in the sale of gas.  The Company has a debt load of $10 billion and has been scraping for money and liquidating assets to maintain cash flows.

16.     The revelations of defendant McClendon's loans and VPP contracts has exposed the FWPP as simply a conduit for McClendon to enrich himself despite the consequences to the Company.  He shares very little risk because he is using other people's money to buy into the FWPP, while at the same time he has a low chance of seeing any profits because his lenders will take practically any profits the wells are likely to generate.  Defendants' repeated statements to shareholders, year after year, that the FWPP aligns McClendon's interests with those of the Company's, were clearly meant to distract shareholders from discovering the entire slate of McClendon's financial transactions.

17.     Indeed, defendants do not hide the fact that the Board was aware of defendant McClendon's financing transactions, and they were quick to partially disclose the deals in the Company's latest Proxy Statement – that is, once the media already broke the news of what had been going on behind the scenes.   Defendants' improper and incomplete disclosures are also wrongful because many of them were made in connection with annual Proxy Statements soliciting shareholder votes *for* various compensation proposals that benefitted McClendon and ***against*** other shareholder-sponsored proposals that sought to limit the extent of McClendon's ability to personally profit at the expense of the best interests of Chesapeake.

18.     On top of a reopened investigation by the SEC, the Internal Revenue Service ("IRS") is also investigating potential wrongdoing in connection with the FWPP. A U.S. Senator is also calling for an investigation by the U.S. Department of Justice. These investigations mean the Company may face substantial costs in connection with investigating and defending itself – and potentially pay steep penalties or fines – as a result of defendants' wrongdoing.

19.     Furthermore, *Reuters* has revealed that between approximately 2004 and 2008, while defendant McClendon was also supposed to be the full time CEO of Chesapeake, he operated a $200 million hedge fund.   Bad bets made through the hedge fund may have contributed to McClendon's desperate financial condition in 2008, which necessitated his bailout by the Board.   If the distraction from his duties at Chesapeake (if not potential violation of his employment agreement) was not problematic enough, the CEO's hedging activities involved bets on commodities that Chesapeake produces.

Despite the serious conflicts of interest presented by McClendon's hedging activities, the Board amended his employment agreement to make it easier for him to engage in these activities.  At the same time, the Board utterly failed to disclose any material facts relating to the hedge fund to shareholders.

20.     In light of these facts and the facts alleged below, Plaintiff, on behalf of Chesapeake, respectfully requests that the Court: (i) order rescission of defendant McClendon's amended employment agreement (including the $77 million bonus and the $12.1 million purchase of maps from McClendon); (ii) order disgorgement of the insider trading profits alleged herein; (iii) order that the FWPP is invalid and that McClendon is prohibited from further participating in the program; (iv) order that defendants pay damages they proximately caused to the Company through their breaches of fiduciary duty and waste; and (v) grant the other relief requested in this Complaint.

## II.     JURISDICTION AND VENUE

21.     This Court has jurisdiction in this case arising under Article III of the United States Constitution and 28 U.S.C. §1331 because of claims arising under sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act").  This Court also has supplemental jurisdiction pursuant to 28 U.S.C. §1367(a) over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.  This Court also has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1332 because Plaintiff and defendants are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.

This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

22.    Venue is proper in this District pursuant to 28 U.S.C. §1391(a).  The acts and transactions that gave rise to the violations of law asserted in this complaint occurred in this District.  The misconduct complained of herein occurred in substantial part in this District, including the preparation and dissemination of materially false and misleading statements and the omission of material information complained of herein.

## III.    THE PARTIES

### A.    Shareholder Plaintiff

23.    Plaintiff Greg Erickson is a current shareholder of Chesapeake and has continuously held Chesapeake stock since at least October 2005.  Plaintiff Erickson is a citizen of Wisconsin.

### B.    Nominal Defendant

24.    Nominal defendant Chesapeake is an Oklahoma corporation headquartered in Oklahoma City, Oklahoma.  The Company's principal executive offices are located at 6100 North Western Avenue, Oklahoma City, Oklahoma. Chesapeake's shares trade on the New York Stock Exchange.

### C.    Director Defendants

25.    Defendant McClendon has served as Chairman of the Board and CEO of the Company since 1989, when he co-founded the Company.  Defendant McClendon is a citizen of Oklahoma.

26.     Defendant Richard K. Davidson has served as a director of the Company since 2006.  In addition, Davidson has served as a member of the Board's Audit Committee since March 2006.  Davidson is a citizen of Florida.

27.     Defendant V. Burns Hargis has served as a director of the Company since September 2008.  In addition, Hargis has served as Chairman of the Audit Committee since at least April 2010 and a member of that committee since September 2008.  Hargis is a citizen of Oklahoma.

28.     Defendant Frank Keating has served as a director of the Company since 2003.  In addition, Keating has served as Chairman of the Compensation Committee since at least April 2011 and a member of that committee since March 2005.  Keating was also a member of the Audit Committee from at least April 2004 to March 2005.  Keating is a citizen of Virginia.

29.     Defendant Breene M. Kerr ("Kerr") served as a director of the Company from 1993 until June 12, 2009.  In addition, Kerr served as Chairman of the Audit Committee from at least April 2004 to June 2009.  Kerr is a citizen of Maine.

30.     Defendant Charles T. Maxwell has served as a director of the Company since 2002.  In addition, Maxwell has served as a member of the Compensation Committee since March 2007 and from at least April 2004 to March 2005.  Maxwell also served as a member of the Audit Committee from at least April 2004 to March 2007.  On October 9, 2008, Maxwell sold 2,000 shares of Chesapeake stock for proceeds of $34,455.50.  Maxwell is a citizen of New York.

31.    Defendant Don Nickles has served as a director of the Company since 2005.  In addition, Nickles served as a member of the Audit Committee from March 2005 to December 2008.  Between October 8 and 9, 2008, Nickles sold 9,375 shares of Chesapeake stock for proceeds of $211,948.75.  Nickles is a citizen of Virginia.

32.    Defendant Frederick B. Whittemore ("Whittemore") has served as a director of the Company from 1993 until June 2011.  In addition, Whittemore served as Chairman of the Compensation Committee from at least April 2004 to at least April 2010 and a member of that committee from at least April 2004 to at least April 2011.  On October 6, 2008, Whittemore sold 200,000 shares of Chesapeake stock for proceeds of $5,017,660.  Whittemore is a citizen of New York.

33.    Defendant Merrill A. Miller, Jr. has served as Lead Independent Director of the Company since March 2010 and a director since 2007.  In addition, Miller has served as a member of the Audit Committee since March 2007.  Miller is a citizen of Texas.

34.    Defendant Kathleen M. Eisbrenner ("Eisbrenner") has served as a director of the Company since December 2010.  In addition, Eisbrenner has served as a member of the Compensation Committee since at least April 2011.  Eisbrenner is a citizen of Texas.

35.    Defendant Louis A. Simpson ("Simpson") has served as a director of the Company since June 2011.  Simpson is a citizen of Florida.

36.    Collectively, defendants McClendon, Davidson, Hargis, Keating, Kerr, Maxwell, Nickles, Whittemore, and Miller are referred to herein as the "2008 Individual Defendants."

37.     Collectively, defendants McClendon, Davidson, Hargis, Keating, Kerr, Maxwell, Nickles, Whittemore, and Miller are referred to herein as the "2008 Director Defendants."

38.     Collectively, defendants Maxwell, Keating, and Whittemore are referred to herein as the "2008 Compensation Committee Defendants."

39.     Collectively, defendants Davidson, Hargis, Kerr, and Miller are referred to herein as the "2008 Audit Committee Defendants."

40.     Collectively, defendants Whittemore, Nickles, and Maxwell are referred to herein as the "Insider Selling Defendants."

41.     Collectively, defendants McClendon, Davidson, Hargis, Keating, Maxwell, Nickles, Miller, Eisbrenner, and Simpson are referred to herein as the "2012 Director Defendants."

42.     Collectively, defendants Maxwell, Keating, and Eisbrenner are referred to herein as the "2012 Compensation Committee Defendants."

43.     Collectively, defendants Davidson, Hargis, and Miller are referred to herein as the "2012 Audit Committee Defendants."

44.     Collectively, defendants McClendon, Davidson, Hargis, Keating, Kerr, Maxwell, Nickles, Whittemore, Miller, Eisbrenner, and Simpson are referred to herein as the "Individual Defendants."

## IV.     THE INDIVIDUAL DEFENDANTS' DUTIES

45.     By reason of their positions as officers, directors, and fiduciaries of Chesapeake and because of their ability to control the business and corporate affairs of

Chesapeake, the Individual Defendants owed and owe Chesapeake fiduciary obligations of good faith, loyalty, and candor, and were and are required to use their utmost ability to control and manage Chesapeake in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Chesapeake and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

46.    Each director and officer of the Company owes to Chesapeake and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.  In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's operations, performance, management, projections, and forecasts so that the market price of the Company's stock would be based on truthful and accurate information.  The Individual Defendants are also required to disclose fully and fairly all material information within their control when they seek shareholder action.

47.    The directors also have a duty to inform themselves of all material information reasonably available to them prior to making a business decision.  Upon receipt of a litigation demand, the directors must investigate and evaluate the charges in order to discharge their duty to the shareholders and the Company.  The directors must review all information necessary to objectively and meaningfully evaluate the demand.

48.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Chesapeake, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein. Because of their advisory, executive, managerial, and directorial positions with Chesapeake, each of the Individual Defendants had knowledge of material, non-public information regarding the Company.

49.     To discharge their duties, the officers and directors of Chesapeake were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the Company.   By virtue of such duties, the officers and directors of Chesapeake were required to, among other things: (i) exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner and provide the highest quality of performance; (ii) exercise good faith to ensure that the Company was operated in a diligent, honest, and prudent manner and complied with all applicable federal and state laws, rules, and regulations, and all contractual obligations, including acting only within the scope of its legal authority; (iii) ensure that the Company is operated in a diligent, honest, and prudent manner in compliance with all applicable laws, rules, and regulations; (iv) ensure that the purposes and goals of the Company's FWPP are served at all times and are not compromised in order to serve the interests of any of Chesapeake's executive officers; (v) ensure that compensation is paid to the Company's executives and other employees in accordance with the Company's Compensation Committee Charter, or other relevant corporate guidelines; (vi) ensure that the Company not waste its corporate assets by conferring personal benefits on its

executives or other employees, with no corresponding benefit to the Company; (vii) ensure that the Board and any of its committees, including the Compensation Committee and Audit Committee, fulfill their respective duties, including by ensuring that the Board and its committees become reasonably informed before making any decisions on the Company's behalf; (viii) ensure that no Chesapeake director, officer, or other employee sells shares of Chesapeake stock with knowledge of and on the basis of non-public information; (ix) ensure that the Company's public disclosures do not contain false or misleading statements or omissions of material facts; and (x) identify and mitigate conflicts of interest and other risks to the Company.

50.     Furthermore, Chesapeake's current Code of Business Conduct and Ethics (the "Code") provides that "[a]ll directors, officers and employees of the Company must avoid situations that create a conflict of interest or the appearance or potential for a conflict of interest."  The Code defines a conflict of interest as occurring when personal interests are either in conflict with the Company's interest or interfere with one's ability to perform his or her duties to the Company or responsibilities at work.  The Individual Defendants are also expected to recognize situations where a conflict of interest has occurred, or has the potential to occur, and take the necessary actions to eliminate or mitigate such conflict, including, if necessary, enlisting the assistance of management. Upon information and belief, the forgoing or its substantial equivalent was required by the Code throughout the Relevant Period.

51.     The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of

Chesapeake, the absence of good faith on their part, and a disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The Individual Defendants breached their duties of loyalty, care, and good faith by allowing defendants to cause, or by themselves causing, the wrongdoing alleged herein.

## V.   DEFENDANT MCCLENDON'S EGREGIOUS 2008 COMPENSATION PACKAGE

### A.   Defendant McClendon's History as Chesapeake's Chairman and CEO

52.   Defendant McClendon is Chesapeake's Chairman and CEO, and has been since he co-founded the Company in 1989.

53.   Per his employment agreements with Chesapeake, defendant McClendon had the duty to, inter alia, use his best efforts and due diligence to assist the Company in the objective of achieving the most profitable operation of the Company consistent with developing and maintaining a quality business operation.

54.   Between 2002 and 2007, defendant McClendon made the following compensation:

| Fiscal Year | Salary | Bonus | Restricted Stock Awards | Option Awards | Securities Under-lying Options (#) | All Other Comp | Total Comp |
|---|---|---|---|---|---|---|---|
| 2007 | $975,000 | $1,826,000 | $14,398,233 | $294,020 | - | $1,271,231 | $18,764,484 |
| 2006 | $975,000 | $1,581,000 | $9,288,550 | $1,412,612 | - | $1,819,698 | $15,076,860 |
| 2005 | $925,000 | $1,326,000 | $14,364,800 | - | - | $1,339,300 | $17,955,100 |
| 2004 | $840,000 | $1,127,500 | $8,045,000 | - | - | $921,649 | $10,934,149 |
| 2003 | $737,500 | $877,500 | - | - | 1,375,000 | $452,594 | $2,067,594 |
| 2002 | $650,000 | $686,000 | - | - | 860,000 | $245,659 | $1,581,659 |

55.   As a co-founder of Chesapeake, defendant McClendon is also permitted to participate in the Company's FWPP. McClendon has elected to invest in every

Chesapeake well since the Company's IPO in February 1993 (with the exception of the five-quarter period between January 1, 1999 to March 31, 2000). As Mitchell Schnurman of the Star-Telegram stated in an article titled "Chesapeake CEO is a Winner Either Way" (April 25, 2009), "[g]iving McClendon a share of gas revenue is akin to giving Steve Jobs a share of iPod sales or giving Michael Dell a percentage of computer shipments." According to Chesapeake's April 20, 2009 Proxy Statement, McClendon owned producing gas reserves with an estimated net present value of approximately $191 million as of December 31, 2008.

B. **Shareholders Adopt the FWPP under the Pretext It Would Align Defendant McClendon's Interests with Those of the Company**

56. While the FWPP was not approved by shareholders until June 10, 2005, the FWPP was a continuation of a well participation program that was initiated with Chesapeake's IPO in 1993 for its two founders, including defendant McClendon. The FWPP permits McClendon to participate in all of the wells drilled by or on behalf of Chesapeake during each fiscal year.

57. The FWPP operates on an all-or-nothing basis, meaning that if defendant McClendon elects to participate, he must participate in every well drilled by Chesapeake during that participation period. However, McClendon's participation percentage may not exceed a 2.5% working interest in a well and is not effective for any well where the Company's working interest (after elections by the founders to participate) would be reduced to below 12.5%. For each well in which defendant McClendon participates, the

Company will bill him, on a monthly basis, an amount equal to his participation percentage multiplied by the costs incurred in drilling the well.[1]

58.    When shareholders were asked to approve the FWPP in 2005, they were told in Chesapeake's April 29, 2005 Proxy Statement ("2005 Proxy") that the purpose of the FWPP was to align the interests of defendant McClendon and his co-founder with those of the Company.  Per the 2005 Proxy and the terms of the FWPP itself, the purpose of the FWPP is to foster and promote the development and execution of the Company's business by: (i) retaining and motivating the principal executive officers who founded the Company; (ii) aligning the financial rewards and risks of the founders with the Company more effectively than overriding royalty, carried interest or other performance incentive programs maintained by many of the Company's peers; and (iii) imposing on the founders the same risk incurred by the Company in its core operations.

59.    To encourage shareholders to vote to approve the FWPP, the Company presented the program's benefits as follows:

- Since the long-term success of the Company is dependent on its ability to conduct oil and gas exploration and production profitability, the participation program instills discipline in the Company's long-term strategy by imposing risks on the Founders which are identical to the risks incurred by the Company.

- The Company's stock price fluctuates based on many industry-related factors that are not within the control of our management, including volatility of oil and gas prices and global supply/demand trends for natural resources.  The participation program provides an additional mechanism for providing direct incentives to the Founders

---

[1]  The terms of the FWPP are essentially the same as the prior well participation program.

to create long-term value through the efficient development of the Company's resource base.

- Our founders are personally and professionally incentivized to maintain their focus on the growth, success, and profitability of the Company's operations since such operations have a direct impact on the Founders.

60.    The terms of the FWPP provide that a founder (including defendant McClendon) who participates in the program for a particular participation period agrees to pay all joint billings "immediately on receipt of the Company's invoice" and agrees to prepay to the Company amounts attributable to the founder's interest to the extent a Company entity is required to prepay costs in connection with a well spudded during that participation period. The 2005 Proxy reinforced these terms in greater detail:

> For each well in which a Founder participates, ***the Company will bill the Founder, on a monthly basis***, an amount equal to the Founder's participation percentage multiplied by the drilling and operating costs incurred in drilling the well. Leasehold costs associated with each new well will be billed in the first invoice for the well based on an amount determined by the Company to approximate the Company's average cost in the Company's pool of acreage. ***Payment is due for all such costs promptly upon receipt of an invoice***.

61.    The FWPP, as presented to and approved by shareholders in 2005, further provides that: "Notwithstanding anything herein to the contrary, in each case the Founder's participation in a Program Well will be on no better terms than the terms agreed to by unaffiliated third party participants in connection with the participation in such Program Well or similar wells operated by the Company Entities."

62.    In February 2006, within a year of the FWPP's approval by Chesapeake shareholders, defendant McClendon's co-founder left the Company.  As a result, since February 2006, the FWPP has only been available and applicable to McClendon.

C.     **Defendant McClendon's Employment Agreement and Stock Ownership History**

63.     In addition to serving as Chesapeake's Chairman and CEO, defendant McClendon was Chesapeake's largest individual shareholder at times during the Relevant Period.  Per a July 15, 2008 Form 4, McClendon owned 33,469,359 shares of Chesapeake stock on July 15, 2008.  McClendon's significant stock interest in the Company was in part due to a requirement of his employment with the Company that took effect in January 1, 2008 and was supposed to remain in effect until December 31, 2012 (the "2008 Employment Agreement").

64.     The 2008 Employment Agreement contained a stock investment requirement intended to help align defendant McClendon's interests with those of the Company.  Specifically, the 2008 Employment Agreement required McClendon to hold shares of Chesapeake common stock worth more than 500% of McClendon's annual base salary and bonus compensation.

65.     Prior to and throughout the early part of the Relevant Period, defendant McClendon also publicly touted that he had never sold any of his Chesapeake common stock.  This, of course, signaled to the public that McClendon was confident in the future success of the Company.

66.     Contrary to the terms of defendant McClendon's 2008 Employment Agreement and his public boasts, McClendon's stake and confidence in Chesapeake's business prospects were not as substantial as advertised: nearly all of his Chesapeake holdings were collateralized.  McClendon put up his Chesapeake common stock as

collateral for his credit arrangements with RBC Dain Rauscher, Inc., Lehman Brothers, Wachovia Securities, Morgan Stanley & Co., and Goldman, Sachs & Co.  According to the Company's 2008 Proxy Statement, as of April 14, 2008, McClendon had pledged 29,332,493 of his 29,529,975, or 99%, of his shares of Chesapeake common stock.

67.    Defendant McClendon's clandestine leveraging of nearly all his Chesapeake stock was a reckless, if not conscious, disregard of both his employment agreement and the best interests of the Company.  McClendon's risk-taking led to the predictable loss of nearly all his Chesapeake holdings in a sudden selloff.  The following chart shows the history of McClendon's Chesapeake stock ownership, including the sudden selloff that resulted in McClendon breaching his employment contract:



D.     **Defendant McClendon and Chesapeake's Dreadful 2008 Performance Leads to Margin Calls for McClendon and the Forced Sale of 94% of His Chesapeake Stock**

68.     The year 2008 was rough for Chesapeake by any measure.  Earnings per share ("EPS") in 2008 fell to $1.16 compared to $2.69 in 2007, and the Company's EPS growth rate for year-end 2008 (-56.4%) was significantly worse than the preceding two years:  2007 (-39.85%) and 2006 (73.55%).  The Company's net income for 2008 was only $723 million, compared to $1.45 billion recorded in 2007, and $2 billion in 2006.  Bloomberg.com dubbed Chesapeake the worst-performing oil and gas producer in the S&P 500 for the year 2008.  The Company lost $860 million in the 4Q:08, compared with a $303 million profit for the same period in 2007.   The Company's stock fell from $74 per share in July 2008 to less than $10 per share in December 2008.  By way of comparison, Chesapeake performed worse in 2008 than other large independent energy companies, including Devon Energy Corporation ("Devon"), Anadarko Petroleum Corporation ("Anadarko") and XTO Energy Inc.

69.     The Company's poor financial performance put enormous strain on its cash flow.  To raise cash, the Company issued twenty-three million shares and sold more than $1 billion in senior notes in the spring of 2008, put forth a stock offering of 28.75 million shares on July 15, 2008, and later, in the fall of 2008, announced a plan to sell fifty million additional shares, which caused Chesapeake's stock price to immediately drop by 40% on concerns that the Company's stock was being severely diluted.  The Company later canceled most of the latter offering due to the market's strong negative reaction.  CEO defendant McClendon personally apologized to analysts and investors during a

conference call in November 2008, for inadvertently causing the Company's stock price to drop because of dilution concerns.  The lack of operating cash led the Company to sell off many of its key assets.  In 2008, the Company sold off more than $11 billion worth of assets, which represented approximately one-third of the total assets owned by the Company.  Some of these sales were completed at prices that were disadvantageous to Chesapeake and reflected the Company's need for immediate infusions of cash.  For example, McClendon stated that one transaction with Statoil occurred at prices that were very favorable to the foreign energy conglomerate.

70.     Chesapeake struggled for cash when the price of natural gas reached unprecedented highs in the summer of 2008.  The Company routinely withdrew all of its $3.5 billion revolving credit facility.  The proceeds from the stock offering were intended to be used to temporarily pay down the revolving credit facility.

71.     Chesapeake's ongoing cash flow concerns caught the attention of the SEC. In a letter dated May 30, 2008, the SEC requested additional disclosures regarding the Company's negative cash flow and liquidity problems.  The Company responded by stating, in effect, that it planned to sell significant assets to raise new working capital and to temporarily resolve their cash problems.

72.     Defendant McClendon stated in a conference call in the last quarter of 2008 that concerns over whether the Company had sufficient operating capital caused the Company's stock to trade at a significantly reduced level.  Several analysts who track Chesapeake have confirmed his statement.  An analyst report published by J.P. Morgan Securities Inc. ("J.P. Morgan") on November 28, 2008, stated that Chesapeake is the

"riskiest of the large cap group because of the corporate strategy and operating and financial leverage."   Others indicated that Chesapeake traded at reduced multiples because of its liquidity concerns.

73.    The selling of senior notes continued at a rapid pace in 2009, raising nearly $1.5 billion to repay "outstanding indebtedness."  But the Company is still not out of the clear.  More recently, in January 2012, the Company's capital needs forced it to enter into a joint venture with Total S.A., a French energy company, for access to Chesapeake's 619,000 acres in Ohio, including a 25% ownership interest, in exchange for $610 million in cash up front and $1.42 billion by the end of 2014.

74.    As Chesapeake's stock value plummeted, defendant McClendon faced margin calls requiring him to unload nearly all of his Chesapeake stock.  Specifically, on October 8, 9, and 10, 2008, McClendon received three consecutive margin loan calls, forcing him to sell 94% of his Chesapeake stock for proceeds of over $569 million. Chesapeake announced this on October 10, 2008, informing the public that McClendon had "involuntarily sold substantially all of his shares of Chesapeake common stock over the past three days in order to meet margin loan calls."  Specifically, over those three days, McClendon sold 31,522,923 shares of Chesapeake's common stock, and was left with 1,947,959 shares on October 10, 2008.

75.    Just days prior to the October disclosure, defendants Whittemore, Nickles, and Maxwell sold over $5.2 million worth of Chesapeake stock with knowledge of McClendon's impending margin calls.

76.     In a Form 8-K filed with the SEC on January 7, 2009, the 2008 Individual

Defendants in essence admitted that defendant McClendon breached the 500% stock

investment requirement in his 2008 Employment Agreement, stating: "As a result of the

forced liquidation of a substantial portion of Mr. McClendon's stock holdings in the

Company during October 2008, Mr. McClendon's stock ownership fell below the

required amount."

E.      **Notwithstanding Defendant McClendon's Breach of Contract and Chesapeake's 2008 Performance, the Board Rewarded McClendon with a $124 Million Compensation Package**

77.     Despite defendant McClendon's breach of his 2008 Employment

Agreement and the Company's putrid performance in 2008, defendants Davidson, Hargis,

Keating, Kerr, Maxwell, Nickles, Whittemore, and Miller rewarded McClendon with a

lavish compensation package, granting him a new five-year employment contract that

made him one of the highest, if not, the highest paid CEOs in the country.

78.     As a preliminary matter, this was an odd time to enter into a new

employment agreement with defendant McClendon.  Just one year earlier, in December

2007, Chesapeake had entered into the 2008 Employment Agreement with McClendon to

last for the next five years until December 31, 2012.  The 2008 Employment Agreement

provided for, among other things: (i) an annual base salary of at least $975,000; (ii)

bonuses at the discretion of the Compensation Committee; (iii) eligibility for equity

awards under the Company's stock compensation plans; and (iv) unlimited use of the

Company aircraft.

79.     On January 7, 2009, Chesapeake announced a new employment agreement with defendant McClendon to last until December 31, 2013 ("2009 Employment Agreement").  This new agreement maintained McClendon's $975,000 in salary, but also provided for total 2008 "bonus" compensation of $76,950,000.  This nearly $77 million bonus consisted of a semi-annual cash bonus of $1.95 million and a one-time $75 million "well cost incentive award."  The $75 million award was structured as a net credit against past and future billings from the Company for well costs owed by McClendon under the FWPP.  The incentive award was set forth as an after-tax credit of $43.5 million toward McClendon's costs in the FWPP (which may be paid in cash to McClendon at year-end 2014 if not fully utilized).

80.     Further, the 2009 Employment Agreement provided for the payment of $12.1 million from Chesapeake to defendant McClendon based on the sale of McClendon's personal "extensive collection of historical maps of the American Southwest" to Chesapeake in December 2008 (which was approved by the Board).

81.     Rather than penalize defendant McClendon for breaching his employment contract, the 2008 Individual Defendants temporarily neutered the 500% stock investment requirement.  The 2009 Employment Agreement provided that for calendar year 2009, McClendon only needed to maintain ownership of Chesapeake common stock worth 200% of his base salary and bonus compensation, though not inclusive of the $75 million "2008 incentive award."  In the Form 8-K filed with the SEC on January 9, 2009, the 2008 Individual Defendants explained that they reduced the required ownership percentage that year to provide McClendon with time to acquire additional shares of

Chesapeake common stock.  In other words, McClendon was given a one-year grace period to return to compliance with the stock investment requirement he agreed to in the 2008 Employment Agreement.

82.     In sum, in a year in which defendant McClendon breached his employment agreement and Chesapeake struggled mightily, the Board awarded McClendon a compensation package totaling $124.6 million.  Per the Company's Proxy Statement filed in April 2009, McClendon's 2008 compensation was as follows: (i) $975,000 in salary; (ii) $76,950,000 in bonus, $75 million of which was in the form of a "well incentive award"; (iii) $32,737,700 in stock awards[2]; (iv) $12,395,316 in stock option grants that had not yet vested; (v) $12.1 million from the sale of McClendon's personal maps to Chesapeake in December 2008, which was approved by the Board; and (vi) $1,800,817 in other compensation.  Moreover, the Board significantly relaxed the stock ownership requirement that was designed to help align McClendon's interests with that of the Company.

83.     For the reasons discussed below, the Board's approval of this excessive compensation package to defendant McClendon represents a breach of fiduciary duties and an utter waste of Chesapeake's corporate assets.

---

[2] This value of the stock awards is based on the fair market value of the Company's stock price on the date of the grant, and the $32 million in stock awards is reported in the "Grants of Plan-Based Awards Table" in Chesapeake's 2009 Proxy Statement.  However, the Company only reported $20,342,384 of this as compensation for defendant McClendon in 2008.

**F.     Defendant McClendon's $124 Million Compensation Package Was Designed to Bail McClendon Out and Bore No Relation to Chesapeake's 2008 Performance**

84.    The Board's (including defendants Davidson, Hargis, Keating, Kerr, Maxwell, Nickles, Whittemore, and Miller) hasty approval of a $124 million compensation package, which included a $75 million bonus incentive award, was wholly unwarranted in light of the Company's abysmal 2008 performance.  The Board's actions do not reflect any sort of evaluation of the job defendant McClendon did in 2008, but rather represent an attempt to bail McClendon out from his self-inflicted troubles.

85.    As detailed above, Chesapeake performed much worse in 2008 than in either of the prior two years.  The Company was labeled the worst-performing oil and gas producer in the S&P 500 in 2008, and defendant McClendon played no small part in the Company attaining that infamous distinction.   Indeed, the *Financial Times*, in a November 29, 2009 article entitled "Oil and Gas Chiefs Win Bonuses Despite Missing Targets," noted that McClendon received the lowest ranking among CEOs of energy companies in terms of the value provided to shareholders in 2008.  The ranking examined return on equity, shareholder returns, and compensation.

86.    Yet, despite all of this, defendant McClendon's compensation in 2008 increased exponentially.   McClendon made approximately $19 million in total compensation in 2007, and $15 million in 2006.  He made a total of $124 million in 2008—***more than six times his 2007 compensation***.  McClendon's $77 million bonus in 2008 also dwarfs the less than $2 million bonuses he received in 2007 and 2006 — years

in which Chesapeake was much more successful.    The following chart shows McClendon's compensation in the years 2006-2008:

| Year | Salary | Bonus | Stock Awards | Option Awards | All Other Compensation | Total Compensation |
|------|--------|-------|--------------|---------------|------------------------|--------------------|
| 2008 | $975,000 | $76,951,000 | $20,342,384 | — | $1,800,817 | $100,069,201 |
| 2007 | $975,000 | $1,826,000 | $14,398,233 | $294,020 | $1,271,231 | $18,764,484 |
| 2006 | $975,000 | $1,581,000 | $9,288,550 | $1,412,612 | $1,819,698 | $15,076,860 |

87.    Neither the FWPP nor any employment agreement contained any provisions stating that Chesapeake would or could front well costs to defendant McClendon.    Yet, the Board approved a $75 million "well incentive award" after McClendon breached his 2008 Employment Agreement due to the forced sale of 94% of his Chesapeake stock and while McClendon apparently faced serious personal liquidity problems.  The incentive award helped to secure McClendon's participation in the FWPP and his ability to receive future returns from the program at no cost or personal risk to himself.  The Board effectively granted McClendon an outlandish bonus to bail him out of the mess in which he had placed himself and Chesapeake through his failures as the Company's CEO.

88.    As noted above, the goals of the FWPP, as pitched to shareholders in seeking their approval of the program, included motivating defendant McClendon to serve the best interests of Chesapeake and aligning his interests with those of the Company.  Providing McClendon a $75 million bonus in a year in which he led the Company to new lows furthers neither of those objectives.

89.    The use of the FWPP as the structure for defendant McClendon's compensation would be especially troubling if it turns out that McClendon breached the

shareholder-approved terms of the FWPP. As discussed above, the Company invoices McClendon on a monthly basis any costs associated with his participation in the FWPP, and these bills must be paid "immediately" upon receipt. It is possible that McClendon may not have paid these bills in a timely fashion, instead being potentially behind by as much as $44 million (the after-tax amount of the $75 million incentive award). As noted above, McClendon owned producing gas reserves with an estimated net present value of approximately $191 million. Yet, while the $75 million incentive award was to be applied to McClendon's well costs associated with the FWPP, those funds were quickly exhausted: as of March 31, 2009, the $75 million bonus was ***fully applied*** against McClendon's outstanding obligations under the FWPP. Indeed, McClendon's 2009 Employment Agreement was carefully crafted to provide that he could apply his so-called "incentive" award to "all or part of any unpaid joint interest billing issued by the Company." A failure by McClendon to abide by the unequivocal payment terms of the FWPP would have been especially egregious in light of the Company's dire liquidity problems during 2008.

90.    As additional evidence that the Board's compensation plan for defendant McClendon has little to do with performance, the 2009 Employment Agreement has capped McClendon's salary and bonus at 2008 levels – $975,000 and $1.95 million respectively – until year-end 2013, regardless of how well the Company does.

91.    Finally, in addition to the $75 million bonus relating to the FWPP, the $12.1 million Chesapeake paid defendant McClendon for his collection of maps was not based on McClendon or Chesapeake's performance, but rather was designed to save

McClendon from his precarious financial position and represents an utter waste of corporate assets.  As discussed below, the Board, and in particular the Audit Committee, utterly failed to ensure that the Company's interests in paying a fair price were protected, instead seeking to serve the personal interests of McClendon.  Indeed, the Audit Committee (then comprised of defendants Hargis, Kerr, Nickles, and Miller) relied solely on McClendon's personal art agent to value the maps, and did not even seek an independent appraisal.  Furthermore, at the time of the purchase, the map collection had been on display at the Company's headquarters for several years.  Given that the collection will likely remain on display after the purchase, the Company is receiving no new benefit from purchasing the collection.

### G.   An Examination of the Compensation of Fellow Chesapeake Executives and CEOs at Similar Companies Further Demonstrates the Excessiveness of Defendant McClendon's 2008 Compensation

92.   The fact that defendant McClendon's 2008 compensation was excessive becomes even more undeniable when examined in light of the compensation paid to McClendon's fellow Chesapeake executives and CEOs at competing companies.  For instance, in 2008, the next closest Chesapeake executive officer in total compensation made roughly $12 million, while the next closest bonus was only $1.3 million.  These numbers pale in comparison to the money paid to McClendon.  The following chart shows the compensation paid to Chesapeake's executive officers, including McClendon, from 2006-2008:

|  | Year | Salary | Bonus | Stock Awards | Option Awards | All Other Comp | Total Comp |
|---|---|---|---|---|---|---|---|
| McClendon; Chairman and CEO | 2008 | $975,000 | $76,951,000 | $20,342,384 | — | $1,800,817 | $100,069,201 |
|  | 2007 | $975,000 | $1,826,000 | $14,398,233 | $294,020 | $1,271,231 | $18,764,484 |
|  | 2006 | $975,000 | $1,581,000 | $9,288,550 | $1,412,612 | $1,819,698 | $15,076,860 |
| Rowland; EVP - Finance and CFO | 2008 | $844,769 | $1,331,000 | $5,976,985 | — | $1,164,406 | $9,317,160 |
|  | 2007 | $787,500 | $1,201,000 | $9,371,017 | $35,200 | $941,855 | $12,336,572 |
|  | 2006 | $675,000 | $1,051,000 | $2,016,652 | $164,794 | $679,841 | $4,587,287 |
| Dixon; EVP Operations and COO | 2008 | $844,769 | $1,331,000 | $4,209,405 | — | $664,571 | $7,049,745 |
|  | 2007 | $787,500 | $1,201,000 | $2,442,059 | $21,104 | $579,431 | $5,031,094 |
|  | 2006 | $671,875 | $1,053,986 | $966,919 | $98,130 | $384,512 | $3,175,422 |
| Jacobson; EVP - Acquisitions and Divestitures | 2008 | $787,308 | $1,151,000 | $9,668,499 | — | $482,920 | $12,089,727 |
|  | 2007 | $737,500 | $1,001,000 | $3,789,447 | $18,686 | $449,998 | $5,996,631 |
|  | 2006 | $637,500 | $851,000 | $974,154 | $81,340 | $302,032 | $2,846,026 |
| Lester; EVP - Exploration | 2008 | $762,365 | $1,066,250 | $5,403,174 | — | $540,954 | $7,772,743 |
|  | 2007 | $732,500 | $966,000 | $7,203,335 | $21,104 | $475,952 | $9,398,891 |
|  | 2006 | $637,500 | $851,000 | $1,322,385 | $98,130 | $376,156 | $3,285,171 |

93.     Similarly, the top executive officers at similar companies did not receive anywhere near the compensation that defendant McClendon received, regardless of whether those companies actually performed better than Chesapeake in 2008.   For example, Devon and Anadarko both outperformed Chesapeake in 2008.  Yet, their CEOs received $38 million and $21 million, respectively.   In contrast, Chesapeake paid McClendon $124 million — $77 million in bonus alone — at the same time the Company's value was plummeting.   Further illustrating the excessive nature of McClendon's compensation is the example of EOG Resources ("EOG").   EOG's profitability doubled in 2008, yet its CEO's bonus remained unchanged when compared to his 2007 bonus.  The following chart shows the compensation paid to CEOs of similar companies from 2006-2008, as well as the percentage by which McClendon's compensation exceeds the average compensation of the other CEOs in each of those years:

|  | 2008 Total Compensation | 2007 Total Compensation | 2006 Total Compensation |
|---|---|---|---|
| Mark G. Papa; EOG Resources | $23,439,356 | $13,036,039 | $7,966,606 |
| James T. Hackett; Anadarko Petroleum | $21,336,877 | $14,997,941 | $13,434,466 |
| Larry Nichols; Devon Energy Corp. | $38,511,112 | $12,601,153 | $12,912,845 |
| Harold M. Korell; Southwestern Energy Co. | $6,802,229 | $5,398,684 | $4,717,909 |
| Peer Average Total Compensation | $22,522,394 | $11,508,454 | $9,757,957 |
| Aubrey K. McClendon; Chesapeake Energy | $100,069,201 | $18,764,484 | $15,076,860 |
| Δ% Average CEO vs. McClendon | 344.31% | 63.05% | 54.51% |

|  | Fiscal Year | Salary | Stock Awards | Stock Option/SAR Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|---|---|---|---|---|---|---|---|
| Mark G. Papa; EOG Resources Chairman and CEO | 2008 | $940,000 | $18,371,356 | $2,732,158 | $1,000,000 | $395,842 | $23,439,356 |
|  | 2007 | $940,000 | $6,209,693 | $3,970,420 | $1,500,000 | $415,926 | $13,036,039 |
|  | 2006 | $940,000 | $2,180,922 | $3,173,607 | $1,140,000 | $532,077 | $7,966,606 |

|  | Fiscal Year | Salary | Bonus | Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | Change in Pension Value and Non-qualified Deferred Compensation Earnings | All Other Compensation | Total |
|---|---|---|---|---|---|---|---|---|---|
| James T. Hackett; Anadarko Petroleum Chairman, President and CEO | 2008 | $1,510,385 | $0 | $10,430,684 | $3,764,163 | $3,416,491 | $1,643,878 | $571,276 | $21,336,877 |
|  | 2007 | $1,415,385 | $0 | $6,198,884 | $3,155,045 | $2,962,400 | $693,859 | $572,368 | $14,997,941 |
|  | 2006 | $1,316,667 | $160,860 | $5,252,940 | $1,592,237 | $1,882,834 | $2,633,633 | $595,295 | $13,434,466 |

| | Fiscal Year | Salary | Bonus | Stock Awards | Option Awards | Change in Pension Value and Non-qualified Deferred Compensation Earnings | All Other Compensation | Total |
|---|---|---|---|---|---|---|---|---|
| Larry Nichols; Devon Energy Corp. Chairman and CEO | 2008 | $1,400,000 | $3,000,600 | $15,432,018 | $15,119,891 | $3,219,047 | $339,556 | $38,511,112 |
| | 2007 | $1,200,000 | $2,600,600 | $2,898,547 | $3,229,752 | $2,425,191 | $247,063 | $12,601,153 |
| | 2006 | $1,200,000 | $2,600,600 | $2,108,855 | $2,357,432 | $4,402,009 | $243,949 | $12,912,845 |

| | Fiscal Year | Salary | Bonus | Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | Change in Pension Value and Non-qualified Deferred Compensation Earnings | All Other Compensation | Total |
|---|---|---|---|---|---|---|---|---|---|
| Harold M. Korell; Southwestern Energy Co. Chairman and CEO | 2008 | $675,000 | $454,750 | $839,368 | $1,093,839 | $3,024,000 | $131,567 | $583,705 | $6,802,229 |
| | 2007 | $550,000 | $400,230 | $645,702 | $887,980 | $2,383,770 | $107,981 | $423,021 | $5,398,684 |
| | 2006 | $500,000 | $772,375 | $531,091 | $783,937 | $1,553,625 | $93,039 | $483,842 | $4,717,909 |

94.     Defendant McClendon's $124.6 million compensation in 2008 made him the country's highest-paid executive, according to CNN Money.  Similarly, according to The Associated Press, McClendon's total compensation package for 2008 made him the highest paid CEO among S&P 500 companies.  *Forbes* and *Bloomberg* also placed McClendon in the top six highest-paid CEOs of 2008.  While McClendon received more than $124 million in compensation in 2008, the next nine highest-paid CEOs of S&P 500 companies received an average of $47 million.  The CEO of Exxon Mobil, a much larger energy company, made $24 million in 2008.

**H.      Eminent Compensation Expert Declares Defendant McClendon's 2008 Compensation Unjustifiable**

95.      Renowned compensation expert Graef Crystal ("Crystal") analyzed McClendon's 2008 compensation package in a May 4, 2009 article titled "A $75 Million Consolation Prize?"  Crystal begins his article noting that the timing of the "special bonus of $75 million" within two and a half months of McClendon's forced stock sales "has a certain oder to it."  He continues, "with the exception of Goldman Sachs Group in its best year, I cannot ever recall a CEO receiving a bonus this large."

96.      Crystal ruled out performance as a rational for the $75 million special bonus.  At first blush, Crystal observed a "decidedly mixed picture" for Chesapeake in 2008.  Among other things, he noted that, in 2008, Chesapeake's net income declined 50%, diluted EPS declined 57%, and total return was negative 59% while the S&P 500 was negative only 37% that year.  However, even when comparing Chesapeake's long-term total returns to those of the thirty-nine companies comprising the S&P 500 Energy Index, Chesapeake was performing well below the norm – and has been continually doing so since 2002.  Chesapeake performed quite terribly compared to its peers in 2008:

> Buttressing this finding are the 2008 returns of the four companies in the oil and gas industry the current market caps of which are closest to Chesapeake's market cap. Recall here that Chesapeake's total return for 2008 was negative 58 percent. XTO Energy Inc. had a negative return of 30.7 percent in 2008. The returns in 2008 for EOG Resources Inc., Southwestern Energy Co. and Noble Energy Inc. were, respectively, negative 25 percent, positive 4 percent and negative 37.5 percent.

97.      Based on Chesapeake's performance, Crystal concluded that "the case for having given McClendon an extraordinary reward based on his performance was exceedingly weak."

98.     Crystal poked holes in defendants' rationale for awarding McClendon a bonus via the FWPP:

> If Mr. McClendon is going to invest in every new well, why not simply have given him $75 million of restricted shares? Of course, doing so could have called attention to the fact that he apparently gambled and lost, big time. And what he lost was company shares.

99.     Crystal also identified a laundry list of generous benefits McClendon received in 2008, many of which seemed like conflicts of interest and/or departures from the Company's line of business.  As taken from his article:

(a)     [I]n the same year as his $75 million special bonus, he was awarded another $33 million of stock. (This $33 million was artfully presented in the proxy statement. Normally, the grant date fair value of an equity award occupies the far-right column in the Grants of Plan-Based Awards Table. But in Chesapeake's case, the $33 million figure shows up in the next to the far-right column. The far-right column contains a value of $13 million, which if you take the time to read the footnotes, is the greatly-reduced value of the award as of April 15, 2009, the so-called "record date" for the proxy statement.)

(b)     He also racked up $648,000 of personal air travel in 2008.

(c)     His "accounting costs", which the company pays, weighed in at $527,000 in 2008. Investing in all those wells must produce some accounting headaches.

(d)     In Dec. 2008, the very month in which the company gave Mr. McClendon a $75 million bonus, it also purchased from him "an extensive collection of historical maps of the American Southwest, together with certain books, watercolors and photographs … for $12.1 million, which represented his cost". I thought the company was in the natural gas business.

(e)     In 2008, Chesapeake became a founding sponsor of the Oklahoma City Thunder, a National Basketball Association franchise, in which Mr. McClendon has a 19.2 percent

interest. I thought the company was in the natural gas business.

(f)     In 2008, the company paid approximately $177,150 for food and beverage catering services to a restaurant in which McClendon had a 49.7 percent interest. I thought the company was in the natural gas business.

100.    According to Crystal, "As I see it, *it's virtually impossible to justify a $75 million bonus to anyone in any company*.  And, in my view, that especially covers Mr. McClendon, who, it seems to me, did nothing to justify such a lavish reward."

101.    Crystal also noted that defendant Keating, a member of the Compensation Committee, "has a daughter-in-law and a son working for Chesapeake, one of whom had total cash compensation of $139,327 in 2008 and the other of whom had total cash compensation of $135,242."

102.    Crystal has over fifty years' experience in the executive compensation field. He has been a director of compensation for General Dynamics and Pfizer, worked as a consultant for Booz, Allen & Hamilton, served as worldwide practice director at Towers Perrin for eighteen years, was a professor at the University of California at Berkeley's Haas School of Business for ten years, and a syndicated columnist for *Bloomberg News* for almost nine years.  Crystal has written at least six books and more than 1,600 articles on executive pay as of May 2009.

I.     **The Board, and Particularly the Members of the Compensation Committee and Audit Committee, Breached Their Duties in Connection with Defendant McClendon's 2008 Compensation**

103.    Defendant McClendon's excessive compensation is not surprising when one considers that he determines his own compensation, subject only to "approval" by the

Compensation Committee.  According to the Company's Proxy Statements, McClendon (along with the Chief Financial Officer ("CFO") and Chief Operating Officer ("COO")) was and is responsible for "analyzing, developing and recommending base salary adjustments, cash bonuses and restricted stock awards with respect to the executive officers, including [himself], for review, discussion and approval by the Compensation Committee at its regularly scheduled meetings in June and December of each year."

104.    Pursuant to the Compensation Committee's Charter in place during the Relevant Period, its members are assigned the following responsibilities (among others):

(a)     Review and approve corporate goals and objectives relevant to CEO compensation, evaluate the CEO's performance in light of those goals and objectives, and set the CEO's compensation level based on this evaluation;

(b)     Review, evaluate, and approve all compensation of directors and executive officers, including salary adjustments, bonuses, stock awards, stock option grants, perquisites, and other benefits;

(c)     Review and make recommendations to the Board with respect to the adoption, amendment and termination of the Company's compensation plans, oversee their administration, and discharge any duties imposed on the Compensation Committee by any such plans;

(d)     Establish and monitor compliance with stock ownership guidelines for directors and executive officers;

(e)     Review, evaluate, and make recommendations to the Board with respect to the approval of the employment agreements of executive officers;

(f)     Prepare the report required by the rules of the SEC to be included in the Company's annual Proxy Statement; and

(g)     Review compliance with and make recommendations to the Board regarding the participation of the CEO in accordance with the FWPP.

105.   Here, the 2008 Compensation Committee Defendants (defendants Maxwell, Keating, and Whittemore) completely abdicated their duties in connection with approving defendant McClendon's compensation.  The Compensation Committee took only one day to consider and approve the new employment agreement paying McClendon more than $124 million (which McClendon himself proposed).  After a single day of consideration of the enormous bonus — a bonus that was totally out of line with prior bonuses paid to McClendon and was being granted in a year in which the Company's value had dropped dramatically — the Compensation Committee recommended the new employment agreement to the Board, which ultimately approved it.  The 2008 Compensation Committee Defendants cannot be said to have acted in good faith by considering an employment agreement amendment of this magnitude for just one day.

106.   Additionally, the 2008 Compensation Committee Defendants did not consult with any independent consultant, as it is entitled to do pursuant to its Charter. According to Chesapeake's 2008 and 2009 Proxy Statements, the Company "has not utilized any specific tools or contracted for services to benchmark its total compensation, or any material element of compensation, to peer companies or other benchmarks." Again, in the context of a jump in compensation from less than $20 million (in 2006 and 2007) to more than $124 million (2008), in a horrible year for Chesapeake no less, it was

incumbent upon the Compensation Committee to obtain an independent analysis as to whether the proposed compensation was in the best interests of the Company. This the 2008 Compensation Committee Defendants did not do. Only years later, in response to obvious shareholder outrage following the 2011 proxy season, the Compensation Committee determined it should redesign the Company's executive compensation program and retain a compensation expert.

107. The 2008 Compensation Committee Defendants, if not the whole Board at the time, further violated the responsibilities assigned to it under the terms of the FWPP. The FWPP provides that the Compensation Committee administers the program. However, the Board, in its sole discretion, may take any action with respect to the FWPP that would otherwise be the responsibility of or delegated to the Compensation Committee. The committee has the power to: (i) employ attorneys, consultants, accountants, and other advisors as deemed necessary or appropriate by the committee; (ii) to establish, adopt, or revise such rules and regulations and to make all such determinations relating to the FWPP as the Compensation Committee deems necessary or advisable for the administration of the FWPP; and (iii) take any and all action the Compensation Committee deems necessary or advisable for the proper operation or administration of the FWPP. In furtherance of these powers and responsibilities, the FWPP requires the Company to provide a semi-annual report regarding the FWPP to the Compensation Committee. On April 18, 2012, defendants posted on the Company's website their response to media inquiries in which they state that "[t]he Board of

Director's oversees the administration of the program through a reporting process developed over two decades…."

108.  Contrary to the shareholder-approved terms of the FWPP and the Compensation Committee's responsibility to administer the plan, the committee (with the support of the entire Board at the time): (i) fronted defendant McClendon $75 million, potentially to improperly cure or prevent a failure by McClendon to comply with the requirement that he "immediately" pay bills upon receipt from the Company; and (ii) further disregarded the risk-sharing tenants of the FWPP by in essence rewriting the terms of the program to allow McClendon to participate in the FWPP without his own contribution.  The Compensation Committee rushed to approve the so-called "incentive" award without properly considering the failure of the FWPP to align McClendon's interests with the Company's.  McClendon, for example, has long engaged in financing transactions involving his FWPP interests that, at the very least, present conflicts between his interests and the Company's.  Yet the Board (at least to the extent of the 2012 Director Defendants) admittedly failed to inform itself of the terms of McClendon's financing transactions despite being "generally aware" he was engaged in such transactions.  These departures from the terms of FWPP are so material and egregious that they fall outside any discretion afforded to the Compensation Committee under the FWPP.

109.  The 2008 Audit Committee Defendants (defendants Hargis, Kerr, Nickles, and Miller) also breached their fiduciary duties to Chesapeake in recommending that the Company purchase antique maps from defendant McClendon for over $12 million. Pursuant to the Audit Committee's Charter in place during the Relevant Period, its

members are responsible for, among other things, "review[ing] insider or affiliated party transactions or courses of dealing."  The Individual Defendants admit in Chesapeake's public filings (including Proxy Statements) that McClendon's participation in the FWPP is a related party transaction, and as such, McClendon's participation therein must be reviewed and pre-approved by the Audit Committee.  Pursuant to its Charter, the Audit Committee also oversees the Company's financial reporting, internal controls, and the Company's risk assessment and risk management.

110.   Here, the 2008 Audit Committee Defendants relied only on defendant McClendon's own art agent to value the "over 500 museum quality pieces."  They did not seek any independent appraisal of the value of the maps, and there has been no explanation for the utter failure to fulfill their duties.  Defendant Kerr, the Chairman of the Audit Committee, is McClendon's cousin.

111.   The 2008 Audit Committee Defendants also wrongfully approved or permitted the $75 million "incentive award" and approved defendant McClendon's participation in the FWPP under the terms of the 2009 Employment Agreement.  The Audit Committee approved or permitted the so-called "incentive" award without properly considering the failure of the FWPP to align McClendon's interests, and without properly considering the risks arising from the conflicts of interest arising from McClendon's improper financing relating to the FWPP.  The Audit Committee (at least to the extent of defendants Davidson and Hargis) admittedly failed to inform itself of the terms of McClendon's financing transactions despite being "generally aware" he was engaged in such transactions.

112.     Continuing the trend by the Board of simply "rubber stamping" the compensation proposed by defendant McClendon to himself, the Compensation Committee did not even discuss the Audit Committee's recommendation that the Company pay $12 million for McClendon's maps.

113.     Finally, on March 1, 2009, Chesapeake amended defendant McClendon's 2009 Employment Agreement again, this time granting McClendon a license to use the Company's properties, plant, and equipment, office facilities, handheld electronic devices, phone systems, computer systems, computer servers, and e-mail systems for his own and his family members' own personal affairs, legal advice, accounting, taxes, investments, and personal business activities outside of the Company.  The amended agreement states that information relating to McClendon's use of such Company property is the exclusive property of McClendon and that the Company waives any ownership of such information.  It is not clear what personal interest of McClendon's necessitates this amendment or how the amendment benefits Chesapeake in any way, though this would be consistent with McClendon's overall financial state of being short on cash and in desperate of resources to manage his empire built on leveraging other people's money. Moreover, the 2009 Employment Agreement is subject to the possible interpretation that the agreement gave McClendon the rights to the Company's proprietary information, which McClendon may have pledged as collateral to obtain financing.[3]    Nonetheless,

---

[3] Defendant McClendon's 2009 Employment Agreement provides, for example, that "all records, communications, documents and other information" relating to his personal business activities outside of the Company are "the executive property" of McClendon and that the Company

what is clear is that this further illustrates the Board's acquiescence to McClendon's whims regardless of whether his whims are in the best interests of Chesapeake.

### J.    The SEC Has Investigated Defendant McClendon's Compensation in Connection with the FWPP

114.    Even before the margin calls and $75 million incentive award, the SEC had expressed concern about defendant McClendon's benefits in connection with the FWPP, and the 2008 Individual Defendants' disclosures related thereto, at least as early as August 2007.  In a letter dated August 21, 2007, the SEC recommended, among other things, that Chesapeake disclose whether the founders' total compensation was significantly higher or lower than income they earned from their participatory working interests granted under the FWPP.

115.    One year later, on August 19, 2008, the SEC sent Chesapeake a letter inquiring as to, among other things, whether the revenues defendant McClendon receives from the FWPP constitute "compensation" for purposes of Item 402 of Regulation S-K. The 2008 Individual Defendants responded on September 5, 2008, and agreed to disclose in future annual meeting Proxy Statements the amounts of oil and natural gas production revenues distributed to McClendon in connection with his FWPP interests.  The SEC responded again on October 1, 2008, stating that it was still unclear whether McClendon's revenues from the FWPP should be treated as compensation.  In letters dated November 7

---

"waives any ownership of such information."  Meanwhile, according *Reuters*, to obtain financing to participate in the FWPP, McClendon "pledged as collateral almost every asset associated with his share of Chesapeake wells. Oil, gas and land interests, platforms, wells and pipelines, hedging contracts, *geological and business data, and intellectual property* are among scores of well-related assets that can be seized should McClendon default."

and December 2, 2008, the 2008 Individual Defendants informed the SEC that the Company would disclose the present value of future net revenue of the estimated proved developed producing oil and natural gas reserves associated with the FWPP interests owned by McClendon.

116.    Then, after the 2008 Individual Defendants caused Chesapeake to file its Form 8-K on January 7, 2009, announcing defendant McClendon's new five-year employment agreement, the SEC sent the Company another letter on January 30, 2009, expressing concerns about the $75 million "incentive award" granted to McClendon. Specifically, the SEC requested that Chesapeake, among other things, explain why the Board determined to enter into a new five-year employment agreement with McClendon with the $75 million bonus at that time and address whether the forced liquidation of his holdings was a factor.   The Company's response included the same purported justifications cited above, and they fail for the same reasons.

### K.    Chesapeake Shareholders Propose Changes to the Company's Compensation Policies, But (Not Surprisingly) the Board Recommends that Shareholders Vote All of the Proposals Down

117.    In the wake of the outrageous and undeserved compensation showered on defendant McClendon in 2008, Chesapeake shareholders took action, proposing numerous changes to the Company's compensation policies during the 2010 proxy season.

118.    The Nathan Cummings Foundation, for example, urged Chesapeake's Board to adopt a policy under which shareholders could vote at each annual meeting on an advisory resolution, to be proposed by Chesapeake's management, to ratify the

compensation of the named executive officers set forth in the Proxy Statement's Summary Compensation Table and the accompanying narrative disclosure of material factors provided to understand the Summary Compensation Table ("NCF Proposal"). The proposal submitted to shareholders made clear that the vote was non-binding and would not affect any compensation paid or awarded to any named executive officer.

119.    Gerald R. Armstrong, an individual Chesapeake shareholder, similarly proposed that the Board adopt a policy that provided shareholders the opportunity, at each annual meeting, to vote on an advisory resolution, prepared by management, to ratify the compensation of named executive officers listed in the Proxy Statement's Summary Compensation Table and compensation awarded to members of the Board as disclosed in the Proxy Statement ("Armstrong Proposal").

120.    Not surprisingly in light of its track record, the Board recommended a vote "against" all of these proposals.  But rebuking the Board's lavish treatment of defendant McClendon, shareholders voiced approval for both the NCF Proposal and the Armstrong Proposal.  Chesapeake shareholders ratified the NCF Proposal, voting 207,881,004 shares in the proposal's favor compared to 163,352,123 shares against it.  Shareholders similarly supported the Armstrong Proposal, casting 204,597,656 votes "for" it compared to 163,359,167 actual votes "against" it; but the proposal narrowly failed to pass due to the Company's treatment of abstentions as de facto votes "against."

## VI.    INSIDER SELLING

121.    Defendants knew that defendant McClendon was facing margin calls and was going to be forced to sell nearly all of his substantial shares of Chesapeake stock, and

they knew the impact that would have on the Company's stock value. With this knowledge, certain of the defendants sold their personally held shares of Chesapeake stock at artificially inflated prices just days before Chesapeake announced McClendon's sale of 94% of his Chesapeake shares:

| Insider Last Name | Transaction Date | Shares | Price | Proceeds |
|---|---|---|---|---|
| MAXWELL | 10/9/2008 | 450 | $17.23 | $7,753.46 |
| | 10/9/2008 | 1,100 | $17.23 | $18,953.00 |
| | 10/9/2008 | 450 | $17.22 | $7,749.05 |
| | | 2,000 | | $34,455.50 |
| | | | | |
| NICKLES | 10/8/2008 | 5,300 | $22.53 | $119,430.20 |
| | 10/8/2008 | 900 | $22.52 | $20,268.00 |
| | 10/8/2008 | 50 | $22.53 | $1,126.70 |
| | 10/9/2008 | 1,625 | $22.61 | $36,743.85 |
| | 10/9/2008 | 1,500 | $22.92 | $34,380.00 |
| | | 9,375 | | $211,948.75 |
| | | | | |
| WHITTEMORE | 10/6/2008 | 200,000 | $25.09 | $5,017,660.00 |
| | | 200,000 | | $5,017,660.00 |
| | | | | |
| TOTAL: | | 211,375 | | $5,264,064.25 |

122. As detailed in the chart above, defendant Whittemore, the Chairman of the Compensation Committee, dumped 200,000 shares of his personally held Chesapeake common stock, or 25% of his position, for total proceeds of $5,017,660. This sale was suspicious in timing and amount. Whittemore sold 200,000 shares of his Chesapeake common stock on October 6, 2008 — four days before the Company announced that defendant McClendon had sold 94% of his Chesapeake stock.

123. In addition to defendant Whittemore, the stock sales by defendants Nickles and Maxwell were also unusual, as they represented the first ever stock sales for both of those defendants as Chesapeake directors.

## VII.    THE IRS INVESTIGATES THE FWPP

124.    Adding to the Company's growing list of woes, thanks to the Individual Defendants' disloyalty and mismanagement, the IRS is now investigating perks that defendant McClendon received in connection with the FWPP.  According to a April 30, 2012 *Reuters* article:

> Chesapeake Energy Corp … said on [April 30, 2012] the Internal Revenue Service was reviewing issues related to the company's perk that grants its chief executive officer a stake in thousands of wells the company drills, according to a regulatory filing.

> In a filing with the U.S. Securities and Exchange Commission, Chesapeake disclosed 'the IRS is reviewing certain issues' related to its Founders Well Participation Program (FWPP) granting CEO Aubrey McClendon the right to take a 2.5 percent interest in every well the company drills.

> *        *        *

> Chesapeake, based in Oklahoma City, Oklahoma, said the IRS review relates to its 2008 and 2009 tax returns and the company believes 'that resolution of these issues will not have a material impact on the company,' the filing said.

> A spokesman for the company said Chesapeake's talks with the IRS are ongoing.

125.    It remains to be seen whether this latest government inquiry will result in substantial costs to the Company in connection with investigating and defending itself, if not pay fines and penalties.  If the Company has in fact improperly paid taxes in connection with the FWPP, it would signify further breaches of fiduciary duty and mismanagement by the Individual Defendants.

## VIII.   DEFENDANTS CONCEAL MASSIVE FINANCING TRANSACTIONS BY DEFENDANT MCCLENDON IN VIOLATION OF THE FWPP'S STATED PURPOSE AND CONTRARY TO THE COMPANY'S BEST INTERESTS

### A.   Defendant McClendon Borrows over $1 Billion from Chesapeake's Lenders Using His FWPP Interests as Collateral to Continue Participating in the FWPP

126.   Contrary to the stated purposes for which shareholders approved the FWPP, from 2009 to 2012, defendant McClendon has borrowed approximately $1.1 billion (and potentially more) to fund his participation in the FWPP, while at the same time using his personal stake in Chesapeake's wells to secure the loans.[4]  Most of what is so far publicly known about these loans was revealed by *Reuters* on April 18, 2012, in a special report titled: "The Energy Billionaire's Shrouded Loans."

127.   As discussed above, the FWPP is premised on the idea that defendant McClendon's interests will be aligned with Chesapeake's because he will bear his proportionate share of costs (and risks) from drilling new wells in addition to any profits from their success.  However, from at least 2009 to 2012, McClendon did not contribute his own cash or assets to pay for his share of the Company's wells.  Instead, he used loans secured by his 2.5% interest in others wells that he acquired through the FWPP. McClendon pledged almost his entire interest in these wells as collateral that would be seized if he defaults on the loans.

128.   Defendant McClendon obtained approximately $1.1 billion in loans through three companies that he controls: Chesapeake Investments LP, Larchmont

---

[4] Interestingly, *Forbes* estimated defendant McClendon's net to be $1.1 billion as of March, 2012.

Resources LLC, and Jamestown Resources LLC. Each of these companies lists Chesapeake's headquarters as their address.

129. The more than $1 billion in loans consists of three separate loans secured by defendant McClendon's 2.5% interest in Chesapeake's wells. In June 2009, McClendon borrowed $225 million from Union Bank.5 In December 2010, he borrowed $375 million from TCW Asset Management. Finally, in January 2012, he borrowed at least $500 million from a $1 billion line of credit with EIG Global Energy Partners ("EIG").

130. This ever-growing scale of defendant McClendon's borrowing is troubling, especially when taken in context of smaller borrowing in the past. From 1989 to the present, McClendon has frequently borrowed on a much smaller scale. For example, Oklahoma records indicate that Chesapeake Investments took out a $2.9 million loan in 1992. As *Reuters* observes, Chesapeake released a statement indicating that "McClendon's securing of such loans has been 'commonplace' during the past 20 years." With the most recent loan up to or exceeding $500 million, McClendon's increases in borrowing appear dangerously unsustainable. Reflecting this unsustainability, McClendon has even shown willingness on his part to terminate the FWPP before it is set to expire on December 31, 2015.

---

5 Based on an investigation by Plaintiff's counsel, this $225 million loan referenced by *Reuters* appears to have been amended at some point to allow defendant McClendon to draw up to $250 million.

131.     An examination of cash flows from defendant McClendon's FWPP participation confirms that McClendon may not only be cash-poor, but that he is on course to default on his monstrous loans.   Since at least 2009, McClendon's FWPP interests have required him to find millions (if not hundreds of millions) of dollars of cash to cover his allotment of expenditures.   Meanwhile, McClendon's FWPP interests have generated only nominal revenues.   This pattern is illustrated in the following table that the Company published in the Proxy Statement filed with the SEC on April 20, 2012:

| | First Quarter 2012 | 2011 | 2010 | 2009 |
|---|---|---|---|---|
| Natural gas and oil revenues | $    53,103,173 | $   184,270,948 | $   127,064,861 | $    87,856,431 |
| Lease operating expenditures | (13,203,805) | (42,457,253) | (26,102,787) | (19,481,167) |
| Net cash flow | 39,899,368 | 141,813,695 | 100,962,074 | 68,375,264 |
| Capital expenditures | (127,982,572) | (457,151,007) | (242,839,086) | (184,468,839) |
| Net after capital expenditures | $    (88,083,204) | $ (315,337,312) | $ (141,877,012) | $ (116,093,575) |

132.     There is also a grave risk that defendant McClendon's overleveraging of his well interests (like his overleveraging of Company stock in 2008) will negatively impact Chesapeake.   According to *Reuters*, these loans required McClendon to "'take all commercially reasonable action' to ensure that other owners and operators of the wells – including Chesapeake – 'comply with ... covenants and agreements' of the loans."   Thomas O. Gorman, a partner at Dorsey & Whitney in Washington, D.C., commented that, because of this clause, these private loans had the potential to impact Chesapeake. The 2012 Director Defendants rushed to essentially argue that the Company is immune to any claims by McClendon's lenders in connection with his personal loans.   Defendants

have since admitted that they were not aware of the terms of McClendon's financing transactions. Moreover, their wishful thinking will not prevent the Company from being ensnared in litigation with the lenders who will undoubtedly resort to aggressive tactics to reclaim the vast amounts of money they have lent to McClendon. After all, McClendon's lenders have the capability to bring incredible pressure to bear upon the cash-strapped Company, because these same lenders provide much needed financing to Chesapeake as well. This presents a serious conflict between McClendon and the Company.

133. Defendant McClendon's out-of-control borrowing has also created another serious conflict of interest that has harmed and will continue to harm the Company. McClendon's largest financer, EIG, has provided financing for Chesapeake at a steep price for the Company. Presumably speaking on McClendon's borrowing from EIG, *The Wall Street Journal* reported that McClendon "borrow[ed] up to $1.4 billion from a private-equity firm that has done hundreds of millions of dollars with [Chesapeake] in the past year." In November 2011, EIG was part of a group of investors that bought $1.25 billion worth of "perpetual preferred shares" in Chesapeake Utica LLC, a newly formed entity. Notably, the investment rewarded EIG investors with ***an annual dividend of 7% in addition to royalties from oil and gas wells***. On April 9, 2012, the Company announced plans to raise another $1.25 billion from investors including EIG, through CHK Cleaveland Tonkawa, another new subsidiary.

134. EIG has been closely tied to defendant McClendon and Chesapeake for years. In February 2011, EIG met with the New Mexico State Investment Council ("NMSIC"), the state's public investment fund. The fund asked EIG's COO, Randall

Wade ("Wade"), about the company's prior investments in McClendon's well interests. Wade told NMSIC that "EIG had known Chesapeake for more than 25 years and 'provided pre-IPO financing for them in the late 1980's.'"  He also told the NMSIC that this ongoing relationship provided opportunities to EIG that were not available to other investors.   For example, in 2008 when McClendon did not have the resources to participate in the FWPP, EIG stepped in to provide financing.[6]  After negotiations with McClendon, EIG formed a special purpose vehicle, Larchmont Resources, LLC, through which EIG acquired McClendon's well rights for 2009 and 2010.   EIG later formed a second special purpose vehicle, Jamestown Resources LLC, which it used to control McClendon's well rights in 2011, with rights to control his interests in 2012 as well.

135.   EIG's investments in defendant McClendon and in Chesapeake have been very lucrative.   The *7% **annual dividends*** that are paid by Chesapeake represent very favorable terms to EIG because the dividends on preferred shares get paid first, before the dividends on regular shares.[7]   In stark contrast, as part of the proposed settlement, McClendon agreed to buy back his map collection from the Company and pay interest at

---

[6] The fact that defendant McClendon sought financing from EIG in 2008 does not preclude the possibility that McClendon used his $75 million "incentive" award to pay past due expenses.  McClendon's net expenditures in 2008 with regard to the FWPP were approximately $64 million.   The after-tax amount of McClendon's $75 million "incentive" award was approximately $44 million.   Thus, this means that, assuming all the credits from the incentive award were applied to cover the $64 million in net expenditures, McClendon would still have needed to raise approximately another $20 million.

[7] On top of dividends, EIG and the other private placement investors received a 3% "overriding royalty interest" in up to 1,500 wells to be drilled.

the paltry rate of 2.28%, which (according to the terms of the proposed settlement) equals Chesapeake's average borrowing rate from approximately January 2009 to July 2011. *Reuters* quoted Mark Hanson, an analyst with Morningstar in Chicago, speaking on preferred shares: "'Basically it's a form of more expensive debt.'" He adds: "'It makes it appear that it's not debt, but it sits on top of obligations to the common shareholder.'"

136.   At the same time, EIG's arrangements with defendant McClendon himself are similarly very profitable for EIG and deprive McClendon of substantially all of his future interest in profits from his FWPP participation.  Under the deal with McClendon, EIG receives the entirety of the cash flow from the wells McClendon is participating in until EIG recoups its investment, plus a 13% realized return.  On top of all that, EIG is entitled to a perpetual 42% share of McClendon's profits from the FWPP.  This means that not only is McClendon not exposed to the down-side risks of investing in the FWPP, but he also stands to receive only a small portion of the upside, if any.  Without directly sharing the costs and potentially the revenues from his FWPP interests, it is difficult to say that McClendon has much of any remaining interest in the wells.  Thus, the FWPP, rather than aligning McClendon's interests with the Company, has provided McClendon with a means to gamble with other peoples' money, a situation strikingly similar to when McClendon gambled (and lost) with bets he made using his shares of Company stock.

137.   Chesapeake's Board (including defendants McClendon, Davidson, Hargis, Keating, Maxwell, Nickles, Miller, Eisbrenner, and Simpson) has been aware that McClendon has been financing his participation in the FWPP.  According to *Reuters*, citing as its source Henry Hood ("Hood"), the Company's general counsel: "Chesapeake's

board of directors is aware that McClendon has borrowed against his share of company wells."  In response to the *Reuters* article, the 2012 Director Defendants caused the Company to issue a press release on April 18, 2012 ("April 18 Response"), that quoted Hood making a similar admission that "'[t]he Board of Directors is fully aware of the existence of Mr. McClendon's financing transactions.'"  Mr. Hood's comments were immediately met with disbelief.  In fact, one analyst said Hood's position is "not only disingenuous it's borderline delusional."  Realizing the seriousness of this admission, the 2012 Director Defendants have backtracked on their earlier statement.  They caused the Company to issue a press release on April 26, 2012, to "clarify" their April 18 Response, stating:

> "The Board of Directors is fully aware of the existence of Mr. McClendon's financing transactions" was intended to convey the fact that the Board of Directors is generally aware that Mr. McClendon used interests acquired through his participation in the FWPP as security in personal financing transactions. The Board of Directors did not review, approve or have knowledge of the specific transactions engaged in by Mr. McClendon or the terms of those transactions.

138.   The Board further backtracked from its earlier statements when, on or around April 26, 2012, the Board removed a disingenuous question and answers exchange between *Reuters* and defendants (the "Q&A"), described further below, from the Company's website that had originally been posted as the Company's response to the *Reuters* investigative report.

139.   Unlike the Individual Defendants, the public was not aware of the existence of defendant McClendon's loan transactions, let alone the nature and extent of these transactions.  To the extent the Individual Defendants may have mentioned the loans at

all in their public statements, they did so by issuing, at best, passing references that failed to provide shareholders with adequate information regarding the nature and extent of these transactions and/or their connection to McClendon.  In fact, *Reuters* disclosed that even some industry analysts who were experienced with the Company were not aware of the existence of McClendon's loans until they were contacted for the article.

140.   Defendants have failed and continue to fail to disclose key aspects of defendant McClendon's loans, which remain hidden from shareholders even despite diligent efforts.  A preliminary investigation by Plaintiff's counsel confirms descriptions by *Reuters* concerning the difficulty involved in following the chain of transactions and business entities, as is required to determine that McClendon has borrowed approximately $1.1 billion to buy into the FWPP using his other FWPP interests as collateral.  Even an exhaustive, time-consuming investigation following the trail of various liens, deeds, and other public records can only go so far.  Because the loans consist of private promissory notes, the interest rate, the exact amount borrowed, and other details of the transaction remain private.  It thus appears difficult, if not virtually impossible, for individuals outside of Chesapeake or McClendon's financiers to determine the exact terms and size of McClendon's loans.

141.   Despite the impracticality (if not impossibility) for shareholders to connect the dots on their own, the Individual Defendants refuse to provide adequate disclosure in the Company's Proxy Statements, including disclosures concerning the number, amounts, or terms of defendant McClendon's loans.  Granted, to quell growing shareholder furor at the lack of adequate disclosures, on April 26, 2012, McClendon belatedly released

aggregated information regarding the amounts of his outstanding debt and the value of his interests in Company wells. But this partial disclosure still falls well short of the material information shareholders require for their investment decisions, including to properly assess material conflicts of interest presented by the loans or the risks associated with a default by McClendon.

142. The Individual Defendants have failed to provide adequate disclosures to shareholders. The consensus among the academics, attorneys, and analysts *Reuters* worked with, who personally reviewed the loan transactions, was that Chesapeake should fully disclose the details of defendant McClendon's loan transactions. David F. Larcker, a professor of accounting at Stanford University's Graduate School of Business, said that given the size, scope, and complicated terms of the loans, the details of these transactions are key information for shareholders to have in evaluating the Company and, thus, they should be fully disclosed. Mike Bread, an oil and gas research analyst at Hodges Capital Management in Dallas, a company that owns Chesapeake shares, agreed that the loans should be disclosed, citing the facts that they are large and related to the oil and gas business. Other analysts seeking disclosure cited the potential conflict created by the fact that McClendon's largest source of loans, EIG, is also an investor in Chesapeake. Joseph Allman, an oil and gas industry analyst at J.P. Morgan in New York, reviewed the loan agreements and concluded that the Company should disclose the details of the loan transactions because of the potential for a conflict with EIG.

143. Notwithstanding the above, the 2012 Director Defendants (including defendants Davidson, Hargis, Keating, Maxwell, Nickles, Miller, Eisbrenner, and

Simpson) have rushed to defend their concealment of defendant McClendon's leveraged participation in the FWPP.  For example, in the April 18 Response, they claim, among other things, that: (i) they have disclosed the fact that McClendon's financing transactions occurred; (ii) the terms and procedures for the FWPP "are clear and detailed in every proxy for all shareholders to see"; (iii) McClendon's interests and Chesapeake's are "completely aligned"; and (iv) the "suggestion of any conflict of interest is unfounded." These statements confirm that the 2012 Director Defendants, constituting the current Board, have prejudged the appropriateness of McClendon's financing and determined to take no action.

144.    In preparation for its article, *Reuters* spoke with over a dozen academics, analysts, and attorneys who were given defendant McClendon's loan agreements to review.  Many of these professionals disagreed with McClendon and the Board's view that the loans do not create any possibility of a conflict of interest and need not be disclosed.  Joshua Fershee, an associate professor of energy and corporate law at the University of North Dakaota, told *Reuters* that McClendon's $1.1 billion in loans through his own companies, which operate in the same industry as Chesapeake, could lead to a high risk for conflicts of interest.   Similarly, McClendon's supposed "alignment" of interests was challenged by Mark Hanson, an analyst with Morningstar in Chicago. Hanson noted that because McClendon has financed his participation in the FWPP without putting up any of his own money, the intended alignment of interests is lacking. Chesapeake's general counsel Hood, speaking on behalf of defendants, has even

acknowledged that McClendon's loans with EIG could result in "some theoretical possibility of a conflict of interest," given that the Company is also borrowing from EIG.

145.   Also contradicting defendants' assertion that they have properly disclosed defendant McClendon's financing, *Reuters* reported that that its April 18, 2012 report "drew swift reaction from investors, who pushed the stock down 5 percent the day it was published."   Confirming the seriousness of the Individual Defendant's misconduct, U.S. Senator Bill Nelson ("Nelson") plans to formally request the U.S. Department of Justice (the "DOJ") to investigate potential fraud and price manipulation at Chesapeake.

146.   Further demonstrating the inadequacy of the Individual Defendants' earlier public statements, on April 20, 2012, the 2012 Director Defendants issued a preliminary Proxy Statement that added the following new language regarding defendant McClendon's FWPP financing that was not present in earlier Proxy Statements:

> Additionally, over the life of the FWPP, Mr. McClendon has typically mortgaged his interests acquired under the FWPP with one or more lenders, some of which also have lending, investment or advisory relationships with the Company.  Mr. McClendon's mortgages with these lenders secure loans used in whole or in part to fund Mr. McClendon's well costs.   The Company does not extend loans to Mr. McClendon for participation in the FWPP or any other purposes.  The Company does not review or approve financings of Mr. McClendon's personal assets, including his FWPP interests.   In addition, the Company has no obligation to repay any loans Mr. McClendon may obtain nor are any of the Company's interests in any assets exposed to such loans or the mortgages securing them.

147.   The Board (comprised of the 2012 director defendants) initially took the position that it was not required to look into the loans.  Chesapeake's general counsel, Hood, admitted that "the board did not review or approve the transactions."  Further, the Board has failed to engage in any analysis of the potential conflicts of interest caused by

defendant McClendon's financing.   The Board attempted to justify this inaction by claiming that McClendon's financing of his well interests is a personal matter.  Instead, the Board took a "wait and see" approach.   Hood claimed that "[i]f there were any conflicts of interest ... they would have surfaced by now."   However, the Board's (especially that of the 2012 Compensation Committee Defendants) decision to bury its head in the sand is contrary to the terms of the FWPP, which requires the Compensation Committee (if not the whole Board) to administer the program.  (As discussed below, the Board has recognized their position to be erroneous, and claims it has begun to investigate McClendon's financing transactions.)   This conscious disregard of or, at a minimum, participation in false statements relating to the FWPP and McClendon's participation therewith, further constitutes a breach of the 2012 Director Defendants' fiduciary duties.

148.   Contrary to their assertion that they are properly disclosing information regarding the FWPP, the Individual Defendants have historically resisted attempts to get more information regarding defendant McClendon's participation in the FWPP.   For example, in 2008 when the SEC requested information regarding McClendon's interests in the FWPP, the request was initially rebuked.  As detailed below, after numerous letters between the SEC and Chesapeake and negotiations on the subject, the Company agreed to provide shareholders with a chart showing the costs and revenues for the wells in the program.

**B.    Defendant McClendon's VPP Contracts Threaten Chesapeake's Ability to Raise Much Needed Cash**

149.    Following the *Reuters* article, on April 19, 2012, *Forbes* published an article entitled "Why Chesapeake Shareholders Should Worry About McClendon's Big Borrowing," which revealed more details regarding his clandestine financing.  *Forbes* revealed that, in addition to the $1.1 billion in loans that defendant McClendon has taken out, he has also entered into several other private contracts with lenders.  These contracts involve volumetric production payments, by which McClendon has promised to deliver certain pre-arranged amounts of gas for a certain period of time, in exchange for an upfront payment.  He has collected more than $130 million so far from these transactions. Chesapeake, however, routinely relies on VPPs to generate cash, pitting McClendon in direct competition against the Company.

150.    *Forbes* also details in its article why defendant McClendon's financing efforts are particularly significant given the financial state of Chesapeake.  Due in large part to very low gas prices, Chesapeake has struggled in recent years and has taken on a lot of debt.   The Company has sold substantial stakes in Chesapeake and borrowed massively in recent years to alleviate the financial stress on the Company.  Chesapeake currently has a debt load of $10 billion.  McClendon's own efforts to obtain financing, including from lenders to Chesapeake, creates – at the very least  – the potential for a conflict of interest as McClendon may be competing against the Company for financing (including for VPPs from the same purchasers).  If nothing else, this conflict of interest needs to be fully disclosed to shareholders. The lack of disclosure is particularly

problematic because the message defendants have repeatedly communicated to shareholders is that the FWPP aligns McClendon's interests with the Company's, whereas in reality, it appears that the FWPP creates the potential for a serious conflict of interest when McClendon and the Company compete to sell gas and obtain financing.

151. Confirming the materiality of defendant McClendon's VPP transactions, after *Forbes* revealed these transactions, the Company mentioned the transactions in the Company's April 20, 2012 Proxy Statement. This disclosure is quite late in coming, however, because defendants never announced the deals when they were entered. The disclosures in the Proxy Statement are also woefully inadequate, as the dollar values involved are not disclosed, nor do defendants address whether McClendon has competed with the Company for VPP contracts.

### C. Defendants' Struggle with the SEC to Keep Information Regarding Defendant McClendon's Participation in the FWPP Concealed

152. Defendants' efforts to suppress information regarding defendant McClendon's participation in the FWPP are reflected in exchanges they have had with the SEC. For example, on August 21, 2007, the SEC wrote to Chesapeake seeking additional information in relation to its Proxy Statement on Form DEF 14A that the Company filed on April 30, 2007. The SEC requested additional information, including information relating to whether McClendon's total compensation was significantly higher or lower than income earned prior to the implementation of the FWPP. The SEC noted that, due to the "material manner in which [the founding executives] have benefited from working interests in properties drilled by the company," the Company should "consider revising

[its] disclosure to provide greater balance and context."  Chesapeake's response to this request on August 31, 2007, declared that it would be "inappropriate" to compare McClendon's compensation to the income he received from his FWPP interest, and that "[a]nother reason we have not disclosed Mr. McClendon's annual FWPP revenue is that it flows from property that belongs to him, not the company."

153.   On May 30, 2008, the SEC wrote to Chesapeake regarding its Form 10-K for fiscal year ending December 31, 2007, again requesting additional information.  For example, the SEC once again requested more detail regarding defendant McClendon's benefits from the FWPP.  On June 13, 2008, the Company reiterated that "it was inappropriate to disclose revenues received by Mr. McClendon from his participation in the FWPP."

154.   From July 16, 2008 to October 1, 2008, the SEC sent Chesapeake three more letters requesting additional information, including information related to defendant McClendon's participation in the FWPP.  In fact, the SEC's letter from October 1, 2008, consisted solely of a request for more information regarding McClendon's revenues from the FWPP.  The SEC declared that "[i]t is still unclear whether the revenues that Mr. Aubrey McClendon receives from his FWPP participation constitute compensation for Item 402 of Regulation S-K purposes."  It was only after these repeated attempts at obtaining additional disclosures that the SEC was successful in getting Chesapeake to agree to provide some additional information.  In the Company's response from November 7, 2008, the Company proposed that it would provide shareholders with a table of "annual revenues, lease operating expenses, the resulting net cash flow before

capital expenditures and then capital expenditures." A sample of this table from the Company's April 20, 2012 Proxy Statement is reproduced above in ¶153.

155.   In the aftermath of the April 18, 2012 *Reuters* article and other revelations, the SEC has reopened its investigation into the FWPP.  *Reuters* reported on April 26, 2012, the following:

> The U.S. Securities and Exchange Commission has opened an informal inquiry into Chesapeake Energy Corp's well participation program with Chief Executive Officer Aubrey McClendon, a source familiar with the matter said on Thursday.
>
> The SEC inquiry is being led by its Fort Worth, Texas, regional office, the source said. The inquiry comes after *Reuters* exclusively reported about loans McClendon had obtained to participate in a co-investment deal with Chesapeake.

**D.     The Board Rushes to Defendant McClendon's Defense Before Any Investigation**

156.   Immediately following the release of the *Reuters* article, Chesapeake received so much attention from shareholders, investors, analysts, and industry commentators that the 2012 Director Defendants decided to respond to the article and post on the Company's website a "Q&A" exchange between *Reuters* and defendants'. The Company's response, however, provides only piecemeal information and generally fails to address the lack of transparency to Chesapeake's shareholders and the investing public as a whole.  The Q&A was, in fact, so misleading that the 2012 Director Defendants were ultimately forced to remove it from the Company's website.

157.   The 2012 Director Defendants' asserted in their Q&A that "the FWPP still effectively aligns Mr. McClendon's interests with the interests of Chesapeake's

shareholders during any period that Mr. McClendon participates in the FWPP." Rather than acknowledge the concerns presented by the article, the Board further maintained that its disclosures related to the FWPP were "extensive." Further, despite apparently not engaging in a formal review of potential conflicts, the 2012 Director Defendants insisted "[w]e do not believe any conflicts of interest exist."

158. The 2012 Director Defendants attempted to explain in their Q&A with *Reuters* that they (as the Board) have already determined, without analysis or investigation, that there is no conflict of interest because of defendant McClendon's loans. As explained herein, this rush to judgment and utter failure to implement relevant internal controls flies in the face of the many duties and responsibilities imposed on the Board and its constituent committees under state law. The Q&A stated, in part:

> Q: "Has Mr. McClendon obtained any other loans in the last three years for which he pledged his share of company wells as collateral?
>
> [A:] Whether Mr. McClendon has obtained other loans concerns his personal finances unrelated to the company. ***It is not a matter*** for review or monitoring by the company or ***for public comment.***
> * * *
> Q: What are the other terms of Mr. McClendon's loans - such as interest rate and fee structure – contained in the underlying promissory notes referred to in the loan agreements? Please provide the underlying promissory notes.
>
> [A:] Again, ***any loans are Mr. McClendon's personal business and not appropriate*** for review or monitoring by the company or ***for public comment***.

Furthermore, the Company's Code discourages even the appearance of potential conflicts of interest and requires the Board (as well as officers and employees) to take the necessary actions to eliminate or mitigate a conflict of interest.

159.    The 2012 Director Defendants also contended that "the lending market is transparent, with both lenders and borrowers possessing detailed knowledge of available and actual terms."  This response, however, generally failed to address the lack of transparency to Chesapeake's shareholders and the investing public as a whole.  At best, the 2012 Director Defendants claimed (without citing any examples) that they have "disclosed that Mr. McClendon pledged his oil and gas interests as collateral in financial transactions," which they believed was sufficient.  Even assuming defendants made such disclosures, they would hardly be sufficient, for reasons stated above and below.

160.    The current Board further attempted to justify defendant McClendon's FWPP-backed loans by claiming that such loans are industry standard, and that "it is not surprising that financial institutions have relationship with both Mr. McClendon and Chesapeake," as there is a "finite group" of financial institutions making oil and gas loans and "virtually all (if not all) have a lending or other economic relationship with Chesapeake."  First, even if it may be industry standard for energy companies to take out loans collateralized by well interests, that is different than saying that CEOs of other energy companies participate in their company's wells as McClendon can.  In fact, the very terms of the FWPP tout the uniqueness of the program, stating that it helps "align[] the financial rewards and risks of the Founders with the Company more effectively than overriding royalty, carried interest or other performance incentive programs maintained

by many of the Company's peers."  Second, the fact there is a small universe of lenders cannot serve as an excuse for McClendon to obtain financing from the same sources as the Company.  Rather, the 2012 Director Defendants' statement that there are only a few possible lenders confirms that McClendon's financing transactions present a real conflict of interest and a serious threat to the Company.  The risk is very high that McClendon has already arranged financing on terms beneficial to himself in return for assurances that he would cause Chesapeake to borrow on terms more favorable for the lenders.  Indeed, because the FWPP does not appear to generate significant profits for McClendon, it is difficult to understand why lenders would loan vast amounts of money to him with only his FWPP interests as collateral unless McClendon is offering them something else in return – such as lucrative financing terms for the lenders at Chesapeake's expense.  Alternatively, should McClendon default on his massive loans, as is likely, these lenders could bring significant pressure on the Company to get their money back because Chesapeake might cave to their demands to secure much needed financing, if only to avoid a costly litigation battle over interests in the wells.

161.   Not surprisingly, public outrage continues to mount.  In its April 20, 2012 article, *Reuters* reported that Phil Weiss, an oil analyst at Argus Research, told its clients: "'When we consider the full financial picture at Chesapeake, including its high debt levels, its use of financial engineering, the relatively low quality of its financial data, the questionable nature of some of the CEO's transactions with the company … we believe the best thing for investors would be to replace the board and/or the CEO.'"   Similarly,

David Dreman, chairman of Dreman Value Management LLP, said Chesapeake's management '"has to be cleaned up.'"

### E. Defendant McClendon and the Board Scramble to Control the Continuing Fallout

162.   The knee-jerk reaction by the Board to defend defendant McClendon's' financing efforts failed horribly and exposed the Individual Defendants' tortious oversight failures.   Faced with an unrelenting barrage of reporters, analysts, and shareholders poking holes in the Board's response to *Reuters* April 18 report, the 2012 Director Defendants have begun backtracking from their prior positions.

163.   For example, recognizing the numerous fallacies – if not outright misstatements – contained in the Q&A, the 2012 Director Defendants caused Chesapeake to remove the disingenuous Q&A from its website on or around April 26, 2012.

164.   That same day, the 2012 Director Defendants caused the Company to issue a carefully crafted press release that, at first blush, might seem to announce concessions by the Board and defendant McClendon.   The 2012 Director Defendants announced that the "Board of Directors has determined that it does not ***intend*** to extend" the FWWP beyond its current term ending December 31, 2015.   Similarly, the 2012 Director Defendants added that, "[t]he Board of Directors and Mr. McClendon have ***committed to negotiate*** the early termination of the FWPP and the amendment to Mr. McClendon's employment agreement necessary to effectuate the early termination."   It is quite evident that the rushed, yet word-smithed, April 26, 2012 press release was designed to curry favor with shareholders ahead of the Company's upcoming annual meeting for 2012.

165.    The 2012 Director Defendants also used the April 26, 2012 press release to "clarify" their previous statements regarding being "fully aware" of the existence of defendant McClendon's financing transactions.  However, in making their clarification that the Board was instead "generally aware" of the transactions, the 2012 Director Defendants revealed that the Individual Defendants had previously chosen to bury their head in the sand regarding the terms of McClendon's financing.  The 2012 Director Defendants stated in the April 26, 2012 press release:

> Chesapeake also wishes to clarify a statement appearing in its April 18, 2012 press release captioned "'Chesapeake Energy Corporation General Counsel Henry J. Hood Issues Statement.'" The statement that "'the Board of Directors is fully aware of the existence of Mr. McClendon's financing transactions'" was intended to convey the fact that the Board of Directors is generally aware that Mr. McClendon used interests acquired through his participation in the FWPP as security in personal financing transactions. The Board of Directors did not review, approve or have knowledge of the specific transactions engaged in by Mr. McClendon or the terms of those transactions.

166.    Recognizing that defendant McClendon's financing transactions pose serious conflicts of interest that cannot be disregarded, the 2012 Director Defendants also announced in the April 26, 2012 press release that they are investigating McClendon's financing arrangements.  Specifically, they announced that "the Board of Directors is reviewing the financing arrangements between Mr. McClendon (and the entities through which he participates in the FWPP) and any third party that has had or may have a relationship with the company in any capacity."  This purported investigation, however, comes years too late.  Given the fact that the Board has been "generally aware" of the existence of these transactions, and in light of the various duties of the Board and its

standing committees, the Individual Defendants knew or should have known to that McClendon's financing activities present actual and potential conflicts of interest that have harmed or could harm the Company. For similar reasons, they also knew or should also have known that the FWPP was not aligning McClendon's interests with the Company's, but rather creating conflicts of interest. The Individual Defendants' prior failures to investigate, disclose, and remedy with internal controls these conflicts of interest is inexcusable.

167.    In a supplemental disclosure filed on April 26, 2012, defendant McClendon belatedly disclosed in general terms the total extent of his current outstanding debt and the estimated value of his collateral as of December 31, 2012. He disclosed that, as of December 31, 2012, he still owed a total of $846 million in loans relating to his FWPP interests. Meanwhile, his FWPP interests themselves, in terms of estimated proved reserves, may be valued at approximately $862 million. Because these figures are only dated as of December 31, 2012, it does not appear that they reflect McClendon's $500 million or so of borrowing in January 2012. At the same time, McClendon does not identify any of the specific loans or amounts of those loans he has taken out, the lenders involved, nor the material terms of the loans. Thus, the April 26, 2012 supplemental disclosure is woefully incomplete with partial disclosures that fall well short of meeting McClendon's (if not the 2012 Director Defendants') obligation to adequately inform shareholders of material facts ahead of the upcoming annual meeting. McClendon stated the following in his April 26, 2012 supplemental disclosure:

**SUPPLEMENTAL DISCLOSURE REGARDING AUBREY K. MCCLENDON'S INTERESTS IN CHESAPEAKE ENERGY CORPORATION'S FOUNDER WELL PARTICIPATION PROGRAM**

**OKLAHOMA CITY, OKLAHOMA, APRIL 26, 2012** – After consultation between the Board of Directors of Chesapeake Energy Corporation (NYSE:CHK) and Aubrey K. McClendon, Chairman and Chief Executive Officer of Chesapeake, Mr. McClendon's companies, Arcadia Resources, L.P., Larchmont Resources, L.L.C. and Jamestown Resources, L.L.C. are providing supplemental information regarding the interests in oil and gas acquired under Chesapeake's shareholder-approved Founder Well Participation Program (FWPP). Since 1993, Mr. McClendon has possessed the contractual right under the FWPP or his employment agreement to participate with up to a 2.5% working interest in the oil and gas wells assigned under the FWPP (FWPP Wells). Arcadia, Larchmont and Jamestown are each approved as "Founder Affiliates" under the FWPP and in the aggregate hold all of Mr. McClendon's interests in the FWPP Wells. In order to address questions generated by various media reports in the past week, the Founder Affiliates are providing the following information:

**Outstanding Founder Affiliate Loans**: On December 31, 2011, the aggregate principal amount owed under loans secured by the FWPP Wells was $846 million allocated among the Founder Affiliates as indicated in the summary table below. All of the loans were from third parties and none of them were from Chesapeake or its affiliates.

**Estimated Founder Affiliate Proved Reserve Volumes**: As of December 31, 2011, the total proved reserves associated with the FWPP Wells were estimated to be approximately 810 billion cubic feet of natural gas equivalent (bcfe), of which approximately 45% were proved developed reserves (37% proved developed producing), approximately 55% were proved undeveloped reserves and approximately 87% were natural gas. These calculations do not include interests in FWPP Wells that are categorized as unproved reserves (i.e., probable and possible) and wells in process for which costs have been expended and monies borrowed, but for which no proved reserves have yet been booked. The estimated proved reserves are allocated among the Founder Affiliates as indicated in the summary table below.

**Estimated Daily Production Rates**: As of December 31, 2011, the estimated average daily production from the FWPP Wells in the aggregate was 147 million cubic feet of natural gas equivalent (mmcfe) allocated among the Founder Affiliates as indicated in the summary table below.

**Estimated PV9 of Founder Affiliate Proved Reserves**: As of December 31, 2011, the estimated present value of the future net revenue (pre-tax) of the estimated proved reserves attributable to the FWPP Wells discounted at 9% per year and based on NYMEX strip prices at that time (PV9) was approximately $852 million in the aggregate allocated among the Founder Affiliates as indicated in the summary table below. This does not include any value for unproved reserves (i.e., probable and possible) or lease hold. A subset of the proved reserves attributable to the FWPP Wells, proved developed producing reserves (PDP), has been reported in Chesapeake proxy statements based on an annual discount rate of 10% and the unweighted arithmetic average of prices on the first day of each month within the 12 months of the reporting period (SEC PV10). On this basis, the aggregate PDP reserve value for the FWPP Wells was $409.6 million. At PV9, these same PDP reserves would be valued at $447 million. These PDP reserve valuations do not include any value for (a) unproved reserves (i.e., probable and possible); (b) leasehold or (c) proved developed non-producing or proved undeveloped reserves. Proved reserves at PV9 values are used frequently by lenders in the oil and gas industry.

Summary Table

| Founder Affiliate | Loan Inception | Principal Amount | Proved Reserves | Average Daily Production | PV9 Proved | SEC PV10 PDP |
|---|---|---|---|---|---|---|
| Arcadia | Aug. 1993 | $181 mm | 239 bcfe | 35 mmcfe | $234 mm | $117 mm |
| Larchmont | Dec. 2008 | $375 mm | 433 bcfe | 87 mmcfe | $422 mm | $217 mm |
| Jamestown | Jun-10 | $291 mm | 138 bcfe | 25 mmcfe | $196 mm | $ 76 mm |
| Totals | | $846 mm[1] | 810 bcfe[2] | 147 mmcfe | $852 mm[3] | $410 mm[4] |

(1) Includes amounts borrowed to pay well costs incurred on wells or leasehold for which no proved reserves have been booked.

(2) This does not include unproved reserves (i.e., probable and possible).

(3) This does not include any value for unproved reserves (i.e., probable and possible) or leasehold.

(4) Based on reporting rules of the Securities and Exchange Commission, calculated using an annual discount rate of 10% and the unweighted arithmetic average of prices on the first day of each month in 2011. At PV9, the value would be $447 mm. This does not include any value for (a) unproved reserves (i.e., probable and possible); (b) proved undeveloped reserves or (c) leasehold.

**2011 Asset Sales**: During 2011, the Founder Affiliates sold interests in the FWPP wells for approximately $108.6 million in the aggregate resulting in an aggregate net gain of approximately $61 million (pre tax).

168.   The 2012 Director Defendants caused the Company to issue a press release at 4:00 a.m. on May 1, 2012, announcing that the Board and defendant McClendon renegotiated the terms of the FWPP to cause the program to expire eighteen months early on June 30, 2014, instead of December 31, 2015.   This decision by the 2012 Director Defendants and McClendon to terminate the FWPP only a year-and-a-half early is intended only to avoid a shareholder revolt at the upcoming annual meeting and has nothing to do with the impropriety of the FWPP.   Indeed, the Board is still purportedly investigating McClendon's financing transactions with regard to the FWPP, meaning that the Board could not have assessed the many conflicts of interest and other risks presented by the FWPP before agreeing to shorten the life of the FWPP by little.[8]   If McClendon and the rest of the Board truly had the Company's best interests in mind (as opposed to their own), they would have agreed to immediately terminate the FWPP.

169.   The early – yet still delayed – termination of the FWPP will likely only accomplish the inevitable, and thus, does not constitute any concession by defendant McClendon.   In light of McClendon's enormous indebtedness and the negative publicity from his financing efforts, McClendon likely will not be able to secure the necessary financing to enable him to continue participating in the program until 2015.   However, because the 2012 Director Defendants refuse to immediately terminate the FWPP,

---

[8] In the May 1, 2012 press release, the 2012 Director Defendants confirm that they have not yet concluded their purported investigation, reiterating that they are still "reviewing the financing arrangements between Mr. McClendon (and the entities through which he participates in the FWPP) and any third party that has had or may have a relationship with the company in any capacity."

McClendon can continue to push himself to the brink of insolvency by drawing on whatever lines of credit he has remaining.

170. Also in the May 1, 2012 press release, the 2012 Director Defendants caused the Company to announce that the Board will name a new Chairman to replace defendant McClendon "in the near future." McClendon will, however, continue as CEO and apparently remain as a director on the Board. The still forthcoming removal of McClendon as Chairman is yet another move by the 2012 Director Defendants that comes years too late and is only happening now that the 2012 Director Defendants face a shareholder insurrection that threatens the Board's control over the Company.

171. Defendant Miller essentially concedes that the early termination of the FWPP was to appease angry shareholders and help improve the Company's languishing corporate governance. The May 1, 2012 press release quotes Miller as saying in part: "'We believe separation of the Chairman and CEO roles will improve Chesapeake's corporate governance and the early termination of the FWPP will eliminate a source of controversy, both of which should send a positive signal to the market and improve shareholder value.'"

172. Reflecting the materiality of defendant McClendon's financing related to the FWPP and the need for governance changes, the price of Chesapeake's shares soared more than *9%* in premarket trading after the 2012 Director Defendants caused the Company to issue the May 1, 2012 press release. The Company's stock retained most of that boost throughout the day, closing at 6% higher than the day before.

173.   Unfortunately for the investors who fell for the Board's bait by rushing to buy Chesapeake stock after the May 1, 2012 press release, it was a well-timed ploy to bury abysmal financial news with defendants' self-serving good news.   At 11:07 a.m. on May 1, 2012, after the markets and media had seven hours to digest the May 1, 2012 press release, Chesapeake posted on its website a press release announcing shocking financial results for first quarter 2012, which highlight the Company's ill-fated trajectory. In an article published that day titled "Chesapeake Profits Slump Amid Top Level Upheaval, *The Financial Times* discussed the dismal news that the Company is reporting an 82% drop in adjusted post-tax profits (calculated to be $94 million after excluding certain items that otherwise drove these meager earnings to a net loss) compared to adjusted post-tax profits of $518 million in first quarter of 2012.   Including write downs and other extraordinary items, Chesapeake reported a net loss of $71 million for the first quarter of the year.   According to *The Financial Times*, analysts were anticipating bad results but were caught off guard.   The stock market similarly reflected surprise, as the Company's stock price fell after the good news from earlier in the day. *The Financial Times* also noted that analysts predict the Company faces a struggle to make ends meet in light of falling natural gas prices.   *The Financial Times'* May 1, 2012 article states in part:

> ***Chesapeake Energy, the US gas producer that has been dragged into controversy over its chief executive's personal finances, has reported an 82 per cent drop in underlying post-tax profits, with revenues and earnings below analysts' expectations.***
>
> ***The slump in first-quarter profits was reported on the same day that the company said it would appoint a new independent chairman in a bid to boost investor confidence.***

Chesapeake is also ending its unusual chief executive pay plan which gives Aubrey McClendon, its co-founder, the right to take a personal 2.5 per cent stake in all of the company's wells.

Mr McClendon is to give up the title of chairman, but will remain as chief executive. He has also agreed to end the widely criticised "founder well participation programme" 18 months early in June 2014, without any compensation.

* * *

**The news of the changes was welcomed by the market, and Chesapeake's shares closed up 6 per cent to $19.60.**

**However, they lost almost all of that gain in after-hours trading following the earnings release.**

**Post-tax net income, excluding the effect of one-off items such as mark-to-market charges for movements in the value of hedging contracts, fell to $94m, from $518m in the equivalent period of 2011, Chesapeake said.**

Revenues rose 50 per cent to $2.42bn, with a rise in Chesapeake's oil production offsetting the slump in natural gas prices, but that was less than the average of analysts' expectations.

The price Chesapeake earns for its gas has plunged as the market hit a 10-year low: it was paid an average of $2.35 per 1,000 cubic feet, including the effect of realised gains on derivatives contracts, down from $5.31 per 1,000 cu ft in the equivalent period of 2011.

In February, Chesapeake predicted that cash from operations would be $4.5bn-$5.2bn this year. In its results release, it cut that projection to $2.7bn-$3bn.

* * *

**Analysts have warned that weak natural gas prices are leaving Chesapeake with a large funding gap that it will need to fill this year** if it is to fulfil its plans for drilling and developing new wells to build up its more lucrative oil businesses.

174. The Individual Defendants' desperate actions to appease shareholders ultimately seem designed to provide distractions rather than solve problems. Notably,

U.S. Senator Nelson plans to formally request the DOJ to investigate potential fraud and price manipulation at Chesapeake.   The circumstances surrounding defendant McClendon's loans – including, but not limited to, their size, their sources, their purpose, and their seemingly unsustainable velocity – highlight the need for prompt disclosure and implementation of internal controls.   Indeed, the underlying and systemic problems of inadequate disclosures and internal controls remain largely unabated.   Shareholders need to know the full extent of McClendon's financing to the extent it detracts from assurances made concerning the FWPP and the Company's compensation policies.   Shareholders also need to know about McClendon's financing to the extent there are material conflicts of interest that could harm the Company.   Relatedly, shareholders need to be supplied with adequate information concerning the risk of a default by McClendon on one or more loans collateralized with his interests in Company wells.   At the same time, the Board needs to take immediate action to implement internal controls to address these conflicts of interest and other risks presented by McClendon's out-of-control financing – as well as terminate the FWPP (the catalyst for these conflicts of interest and risks) without any further delay.

### F.    S&P Downgrades Chesapeake, Citing Corporate Governance Shortcomings Relating to the FWPP

175.    On April 26, 2012, ratings agency S&P downgraded Chesapeake's debt to "BB" from "BB+."   S&P implicated the Individual Defendants' wrongdoing (including defendant McClendon's financing transactions and the Individual Defendants' mismanagement of the FWPP) as the reason for the downgrade.   S&P also placed

Chesapeake on "CreditWatch with negative implications," hinting that further downgrades are possible.  Importantly, S&P suggested that recent developments arising from defendants' wrongdoing "could hamper Chesapeake's ability to meet the massive external funding requirements."  S&P additionally concluded that the Board's failure to keep tabs on McClendon's financing represented a "significant governance deficiency." The agency further expressed concerns of the heighted potential for "unmanaged and unmonitored conflicts of interest" posed by McClendon's FWPP-related financing transactions.  S&P announced and explained its April 26, 2012 downgrade as follows:

Overview

     -- U.S. natural gas producer Chesapeake Energy Corp. has announced that it is negotiating an early termination of the Founder Well Participation Program (FWPP) after revelations about the CEO's personal transactions revealed shortcomings in the company's existing corporate governance practices.  The board is currently reviewing financing agreements between the CEO and third parties.

     *-- **Turmoil resulting from these developments could hamper Chesapeake's ability to meet the massive external funding requirements stemming from its currently weak operating cash flow and continuing aggressive capital spending.***

     *-- **We are lowering our corporate credit and senior unsecured debt issue ratings on Chesapeake to 'BB' from 'BB+'**, and lowering the ratings on two affiliates--Chesapeake Oilfield Operating LLC and Chesapeake Midstream Partners L.P.*

     *-- **We are placing all these ratings on CreditWatch with negative implications.***

Rating Action

On April 26, 2012, Standard & Poor's Ratings Services lowered its ratings on Oklahoma City-based Chesapeake Energy Corp., including the corporate credit rating to 'BB' from 'BB+', and lowered ratings on two related entities--Chesapeake Oilfield Operating LLC and Chesapeake Midstream Partners

L.P. At the same time, we placed all these ratings on CreditWatch with negative implications.

Rationale

***The downgrade and CreditWatch placement reflect our view that recent revelations about personal transactions undertaken by Chesapeake's CEO relating to the company's unusual FWPP underscore shortcomings in Chesapeake Energy Corp.'s corporate governance practices***. Under the FWPP, Chesapeake's CEO, Aubrey McClendon can, before the beginning of each year, elect to take a small (up to 2.5%, subject to certain restrictions) working interest in all of the wells Chesapeake drills during that year. Recent press reports have revealed that Mr. McClendon has obtained loans to fund his investments under the FWPP from third parties (such as EIG Global Energy Partners LLC) who, at the same time, were also significant participants in financing transactions with Chesapeake. Mr. McClendon has also at times sold his interests in certain fields, in conjunction with asset sales by Chesapeake. ***We believe these transactions heighten the potential for unmanaged and unmonitored conflicts of interest, or the perception thereof. Under the terms of the FWPP, there has been no effective mechanism to protect against conflicts of interest, in our view***. Indeed, Chesapeake has previously stated that the company does not review or approve financings of Mr. McClendon's personal assets, including his FWPP interests. It is our understanding that Mr. McClendon has also been under no obligation to disclose his dealings with third parties which also have lending, investment, or advisory relationships with the company. Chesapeake today has announced that its board and Mr. McClendon have committed to negotiate the early termination of the FWPP, which otherwise would have expired at the end of 2015. The company also announced that the Board is reviewing financing arrangements between Mr. McClendon (and the entities through which he participates in the FWPP) and any third party that has had a relationship with the company in any capacity. The board has also confirmed that it did not previously review, approve, or have knowledge of the specific transactions engaged in by Mr. McClendon or the terms of those transactions. ***In our view this represents a significant governance deficiency***.

***Turmoil resulting from these developments--and from potential revelations resulting from the board investigation--could hamper Chesapeake's ability to meet the massive external funding requirements stemming from its currently weak operating cash flow and aggressive capital spending***. Chesapeake's production is heavily skewed toward

natural gas, and natural gas prices are severely depressed at this time. Although hedge-related gains had been an important support to Chesapeake's earnings and cash flow in recent years, the company terminated its natural-gas related hedge positions in late 2011. Chesapeake is in the midst of an extensive repositioning of its business mix, placing more emphasis on production of crude oil and natural gas liquids (collectively, liquids). The company's excellent drilling record and large acreage positions in the most promising North American liquids-rich basins afford confidence about its ability to make this transition.

However, *Chesapeake faces very large external funding requirements to sustain the aggressive planned investment needed to effect its strategic shift*. In its investor presentation dated April 17, 2012, Chesapeake gave guidance of total investment of $10.9 billion to $12.4 billion in 2012, and $10.5 billion to $12.3 billion in 2013. This guidance encompasses well costs on proved and unproved properties, acquisition of unproved properties, and investment in oilfield services and midstream assets. Based on our estimates and price deck assumptions (including natural gas price of $2.00/btu in 2012, $2.75 in 2013, and $3.50 thereafter), we expect Chesapeake's funds from operations to total only $3.4 billion to $3.8 billion in 2012 and $5.4 billion to $5.8 billion in 2013, implying massive internal funding shortfalls.

To help fund its planned investment, Chesapeake has stated that it is targeting sales of proved and unproved properties, and monetization of oilfield services, midstream, and other assets, totaling $10 billion to $12 billion in 2012, and $4.0 billion to $6.5 billion in 2013. *Chesapeake is asset rich, and it has been adept at structuring varied and innovative transactions to generate funds, including outright asset sales, formation of joint ventures (JVs), issuance of securities by a royalty trust and by newly formed subsidiaries, and issuances of volumetric production payment (VPP) obligations.* …

CreditWatch

As part of our CreditWatch review, Standard & Poor's will take account of the conclusions of the board's investigation; the terms under which the FWPP is terminated; Chesapeake's ongoing capital-raising initiatives; and potential changes to its growth strategy, financial policies, and governance structure. *At this time, we cannot rule out further ratings downgrades of more than one notch*; for example, if we believe that asset monetization actions will fall short of plans and that offsetting actions won't be taken to preserve liquidity and limit the increase in financial leverage.

176.    Also on April 26, 2012, Fitch Ratings lowered its outlook on Chesapeake's BB rating to stable from positive.

## IX.    UNCHECKED HEDGING ACTIVITIES BY DEFENDANT MCCLENDON CONFIRM UTTER FAILURE BY INDIVIDUAL DEFENDANTS TO ADDRESS AND DISCLOSE MATERIAL CONFLICTS OF INTEREST

177.    Unbeknownst to shareholders, in addition to his reckless margining of his Company stock and leveraged participation in the FWPP, defendant McClendon also operated a $200 million hedge fund between at least 2004 and 2008 that traded in the same commodities the Company produces.  The facts currently known to the public about this hedge fund were unearthed by *Reuters* in a May 2, 2012, article titled "Special Report: Inside Chesapeake, CEO Ran $200 Million Hedge Fund," which followed in the wake of McClendon's financing scandal.  As is apparent from the *Reuters* report, McClendon's hedge fund management presented a serious distraction, presented further conflicts of interest between McClendon and Chesapeake, and was entirely concealed from shareholders.

### A.    Defendant McClendon Distracts Himself with Hedging Activities in Breach of His Employment Agreement and Fiduciary Duties

178.    Between approximately 2004 and 2008, while defendant McClendon was also supposed to be the full time CEO of Chesapeake, McClendon operated Heritage Management Company LLC ("Heritage").  McClendon started Heritage with Chesapeake co-founder Tom Ward ("Ward").  Heritage was a hedge fund by which McClendon and others bet on energy markets (including the price of natural gas), as well as goods, such as cocoa and coffee.  Heritage also had a cattle trader in Oklahoma.

179.    Defendant McClendon was distracted almost on a daily basis – sometimes for significant amounts of time – with the management of his $200 million hedge fund. According to *Reuters*:

> As chairman and CEO of Chesapeake Energy Corp, Aubrey McClendon has been a powerhouse in the vast U.S. natural gas market, directing the company's multibillion dollar energy-trading operation and setting output targets for America's second-largest producer.
>
> Behind the scenes, a Reuters investigation has found, McClendon also ran a lucrative business on the side: a $200 million hedge fund that traded in the same commodities Chesapeake produces.
>
> *          *          *
>
> **But for at least four years, from 2004 to 2008, McClendon's attention extended well beyond his job at Chesapeake.**
>
> During that time, said a veteran trader who helped run McClendon's private hedge fund, **the Chesapeake executive engaged in "near daily" communications and "exhaustive" calls to help direct the fund's trading.**

180.    From day one, defendant McClendon and Ward were in charge of Heritage. Sometime around 2004, five commodity traders, including Peter Cirino ("Cirino"), approached McClendon and Ward simply for a capital investment to start a hedge fund. But the two energy tycoons insisted on "full ownership and involvement in the fund's trading strategy." *Reuters* presents the following account on the formation of Heritage:

> Heritage was born when commodity trader Cirino and four other traders went searching for capital to start a hedge fund, Cirino said. Through industry contacts, they landed a coveted audience with McClendon and Ward, already famed Oklahoma drillers before becoming pioneers of the shale-gas boom.
>
> The Chesapeake founders, Cirino recalled, agreed to seed the fund with a total of $40 million of their own cash. But **McClendon and Ward insisted on full ownership and involvement in the fund's trading strategy**, Cirino said.

"They took a leap of faith to invest money in us, so we knew we were on the line," said Cirino, Heritage's former head trader and risk officer. *'That they were in charge was made very clear.'*

181.    Based on Cirino's and Ward's accounts in the May 2, 2012 *Reuters* article, it is evident that defendant McClendon (more so than Ward) spent considerable time communicating with investors about Heritage:

> Cirino and Ward's recollections differ on at least one point. Ward said he didn't interact with the fund's outside investors. ***Cirino recalled that "every investor I was involved with either met with McClendon and Ward or at least spoke with them by phone before investing."*** The hedge fund's healthy gains were a lure, but "the cachet of those two individuals certainly also helped," Cirino said.
>
> ***In addition to weekly Monday conference calls and regular emails, the two owners met frequently with traders in New York and occasionally in Oklahoma, Cirino said.***

182.    In 2007, Heritage's traders told defendant McClendon and Ward that they wanted an equity stake in the fund.  As Cirino told *Reuters*, however, "the executives weren't ready to cede control."  So the traders left Heritage to start their own fund.  It is reasonable to infer that McClendon and Ward spent considerable more managing the fund following these departures.

183.    By the time the trades left Heritage, the fund was managing around $200 million in assets.  Cirino told *Reuters* that "[a]s Heritage racked up stellar returns of between 15 to 25 percent a year, McClendon and Ward decided to open the hedge fund to outside investors, including friends and associates."  Like most other hedge funds, defendant McClendon and Ward further bolstered their profits from Heritage by charging

outside investors a 2% of assets management fee and collecting 20% of the fund's profits – also know as "two and twenty."

184.    However, things seemed to go down hill for Heritage once the traders left. By 2008, defendant McClendon and Ward returned all of the funds' money from external investors.  McClendon and Ward continued to operate the fund during that year.  But by 2009, McClendon and Ward apparently stopped trading with Heritage.

185.    Defendant McClendon's frequent and sustained involvement with Heritage is hard to reconcile with the terms of his employment agreement and his duties and obligations to Chesapeake.  McClendon's Third Amended and Restatement Employment Agreement, which took effect in January 2004 ("2004 Employment Agreement") provided that McClendon was "employed on a ***full-time basis***," and that he would use "***best efforts and due diligence*** to assist the Company in achieving the ***most profitable operation*** of the Company and the Company's affiliated entities consistent with developing and maintaining a quality business operation."  This or substantially similar language was contained in each of McClendon's employment agreements effective from 2004 through 2008.

186.    The 2004 Employment Agreement also prohibited defendant McClendon from engaging in business independent of his employment by the Company that requires "***any substantial portion***" of his time, except that he could be involved in "passive investments" as a partner or member of an enterprise if doing so would not violate the terms of employment and "require only a minimal portion" of his time.  McClendon and the Board amended the 2004 Employment Agreement in 2005.  This revised agreement

included similar language, but the prohibition against side activities requiring "any substantial portion" of time was changed to only prohibit McClendon from engaging in activities that "require such substantial services" of McClendon that he would be "unable to perform the duties" assigned to him under the agreement. The 2005 amendment also eliminated the language restricting participation in "passive investments."  Instead, it generally provided that McClendon would not be "restricted from maintaining or making investments, or engaging in other businesses, enterprises or civic functions" if doing so would not violate the other restrictions on McClendon's activities.   Despite these somewhat loser restrictions in his later agreements, it still seems possible that he breached the terms of his employment agreement.

187.   These new revelations that defendant McClendon may have breached – if not pushed the boundaries of – these terms of his employment further demonstrate the impropriety of the 2008 "compensation" package.   Indeed, at a time when Chesapeake was struggling to raise funds during the second half of 2008, it appears that McClendon was quite distracted with bad bets he made through Heritage.

### B.    Disastrous Hedging Positions Likely Contributed to Defendant McClendon's Need for a Bailout in 2008

188.    Although it is not clear what happened to Heritage in 2008, it appears that defendant McClendon made yet bad bets that year in addition to (or as part of) his margin trading using Chesapeake stock.   Specifically, McClendon and Ward appear to have staked the fate of Heritage (and millions of their own dollars) on the price of natural gas increasing.

189.   As seems to be the repeating pattern, defendant McClendon's bets went horribly wrong, likely contributing to his desperate demand that Chesapeake bail him out with the egregious 2008 "compensation" package.   Indeed, *Reuters* noted that McClendon's "personal cash crunch" followed the drop in natural gas prices in 2008:

> At Heritage, all of the money from external investors was returned by 2008, Cirino said. McClendon and Ward continued to operate the fund during that year, Ward said, but by 2009, Heritage traded no more.

> What happened next to McClendon's commodity-trading ventures is unclear.

> By June 2008 - as natural gas and oil prices were peaking, and just before the financial crisis - McClendon and Ward both held huge positions in natural-gas derivatives, according to confidential trading data disclosed last year by U.S. Senator Bernie Sanders, an independent from Vermont.

> The trading information was assembled as part of a CFTC inquiry into derivatives markets and their impact on real-world energy prices. McClendon and Ward were among only a handful of individual investors identified by the CFTC. Most of the other players were big corporations.

> The data indicated McClendon and Ward were betting that the rally of 2008 would continue. By purchasing derivatives, they controlled nearly identical positions in natural gas worth around $2.3 billion apiece, according to Reuters calculations based on closing futures prices as of June 30, 2008. McClendon held oil contracts worth another $240 million, the CFTC data showed.

> ***Of 300 banks, hedge funds, energy companies and other traders identified in the CFTC survey, only four held larger bullish bets in natural gas.***

> ***Oil fell by more than 75 percent between July and December. Natural gas futures dropped almost 60 percent.***

> It isn't clear how McClendon and Ward's investments fared. McClendon would not discuss his trading. Ward said he could not recall the outcome of his own trades in 2008.

> ***McClendon suffered a well-documented personal cash crunch later that year, however.***

In early 2008 McClendon held a big position in Chesapeake stock purchased with borrowed money. Later that year, margin calls from his brokers forced McClendon to unload more than 90 percent of his Chesapeake shares and suffer a $2 billion paper loss. His selling contributed to an 88 percent fall in Chesapeake's share price from its all-time high of $74 that year. Chesapeake has since restricted "leveraged" trading in the company's shares by its executives.

Months later, McClendon became one of the highest paid CEOs in America for the year, receiving a total compensation package worth $112 million. The payout included a one-time cash bonus of $75 million to help him meet requirements for paying the costs of his personal stakes in Chesapeake-owned wells.

### C.     The Individual Defendants Disregard Serious Conflicts of Interest and Other Risks Arising from Defendant McClendon's Hedging Activities

190.   On top of distracting defendant McClendon from his executive responsibilities owed to Chesapeake, McClendon's hedge fund activities also posed serious conflicts of interest because his fund was trading in the same commodities that Chesapeake was producing.  *Reuters* noted that numerous experts were "stunned" to learn about these hedging activities.  These experts observed that hedging activities relating to the Company's line of business, even if legal, would not be tolerated at other energy firms.  Unlike Chesapeake, other firms banned such activities to prevent conflicts of interest and other risks, including: (i) the risk that a corporate insider like McClendon might trade on commodities based on non-public, corporate information; (ii) the conflict of interest that arises when a corporate insider might be faced with an operating decision that could affect the commodities markets in which he or she invests; and (iii) the risk of "front-running," which would occur when an insider buys or sells a commodity in

advance of the company's orders. Indeed, *Reuters* explained these conflicts of interest and similar risks as follows:

> But **experts** on energy trading, corporate governance and commodity-market regulation said they **were stunned by the latest revelation.**
>
> **"An executive's first responsibility is to shareholders and the betterment of their investment,"** said Carl Holland, who ran the trading-compliance department at former U.S. oil major Texaco. **"Personal trading in the commodity around which the CEO's business is based would be a clear no. We would never have tolerated that, ever."**
>
> Thomas Mulholland, a risk-management consultant to oil and gas producers for Golden Energy Services in St Louis, said **such matters are "taken very seriously by energy companies, and there are strict codes against it. Even if there is just a whiff of impropriety,"** he said, **"it can be enough to lead to a termination."**
>
> \*       \*       \*
>
> Nonetheless, personal **dealing in energy markets is typically forbidden by oil and gas companies for a variety of reasons**.
>
> In Chesapeake's case, **McClendon would have been aware of major decisions that could affect natural gas prices before that information became public.** Accounting for 5 percent of U.S. natural gas production, Chesapeake holds tremendous sway over markets. On January 23, the company announced sharp output curbs in response to low prices. In response, U.S. natural gas futures surged by 8 percent the same day.
>
> **"If the company needs to make an operating decision which might move the market against the CEO's positions, there's a risk that will influence the decision-making at the top of the company,"** said Jeff Harris, former chief economist at the market's U.S. regulator, the Commodity Futures Trading Commission, and now professor of finance at Syracuse University.
>
> **Another potential problem is known as "front-running." That's when a trader buys or sells a commodity in advance of a client's or his company's orders. In theory, McClendon's first-hand knowledge of Chesapeake's own plans to trade would enable him to profit by trading ahead of Chesapeake - a move that could raise costs for the company.**

- 89 -

"*Advance knowledge of Chesapeake's activities could be perceived as having insight into the movement of commodities prices, which certainly raises conflict-of-interest issues as well as ethical issues about the ability to enrich himself on non-public information,*" said Tim Rezvan, oil and gas industry analyst at Sterne Agee in New York.

191.    The Board at the time – comprised of the 2008 Director Defendants – was likely aware of defendant McClendon's hedging activities through Heritage.  As noted above, both Chesapeake co-founders formed Heritage.  McClendon and Ward opened Heritage to friends and associates, meaning they likely invited the Board to participate in the hedge fund.  McClendon (and perhaps Ward) also spent considerable amounts of time managing Heritage, including weekly conference calls and frequent meetings in New York that would have required McClendon to be frequently (and noticeably) out of the office.

192.    Furthermore, defendant McClendon ran Heritage from Chesapeake's office using Chesapeake's staff and other resources.  Heritage listed Chesapeake's headquarters in Oklahoma as its mailing address in certain documents discovered by *Reuters*.  A number listed for Heritage in several business directories was answered by a person for Chesapeake.  Heritage also shared at least one employee with the Company: a Chesapeake accountant who also handled the hedge fund's bookkeeping.

193.    Defendant McClendon's use of Chesapeake's resources to run Heritage appears to be consistent with the terms of his employment agreement – further indicating that the Board was well aware of McClendon's hedge fund activities.  Amendments to McClendon's employment agreements between 2004 and 2008, relating to use of Chesapeake staff, highlight other discussions between McClendon and the Board that

foreseeably would have prompted members of the Board to inquire into the nature of McClendon's personal business activities.  Consistent with *Reuter's* finding that Heritage and Chesapeake shared an accountant, McClendon's 2004 Employment Agreement provided that McClendon could, ***free of charge***, "utilize the Company's office space, computer facilities and personnel to provide accounting services, records maintenance and tax advice and tax return preparation for the Executive's … personal business investments and activities."  These terms changed slightly in July 2005, at which point McClendon was required reimburse the Company for one-half of 50% of the salaries and bonuses of employees who were primarily engaged in providing support services, other than secretarial or general administrative services, to McClendon for his personal and business activities.  In January 1, 2007, McClendon's employment agreement was amended to require that he was to reimburse the Company for 100% of salaries and bonuses.  McClendon's 2008 Employment Agreement required McClendon to cover even more direct and indirect costs relating to the employees who provided services to McClendon outside his duties as Chairman and CEO of Chesapeake.

194.   Further accommodations by the Board with regard to defendant McClendon's employment agreements confirm the Board was aware of Heritage.  McClendon's 2004 Employment Agreement provided that McClendon could be involved with "passive investments" as a partner or member of another enterprise to the extent it would not violate the terms of employment or require only a "minimal portion" of his time.  The agreement also provided that McClendon could not engage in activities that required "any substantial portion" of time.  But the year after McClendon and Ward

formed Heritage, McClendon and the Board agree to amend McClendon's employment agreement to eliminate the time restriction on "passive investments" and the general restriction on activities that would require "any substantial portion" of time.  Instead, from July 2005 through at least 2008, McClendon's employment agreements provided that he could not engage in activities that would "require such substantial services" of McClendon that he was "unable to perform the duties" assigned under the agreement.  By eliminating express restrictions on McClendon's ability to engage in time-consuming activities (namely with regard to investments), the Board enabled McClendon to spend more and more time on his hedge fund.  In negotiating these new terms and keeping tabs on McClendon to ensure compliance therewith, the Board inevitably must have known about McClendon's activities with Heritage.

195.    Finally, because defendant McClendon's active involvement with Heritage presented conflicts of interest between McClendon and the Company, the Code at the time likely required McClendon to report the conflicts of interest to the Company, and likely required the Board to eliminate or mitigate such conflicts.

196.    Despite presenting serious conflicts of interest, in addition to distracting defendant McClendon from his duties as CEO (potentially in breach of his employment agreement), the Board (including each of the 2008 Director Defendants) failed to put in place adequate and effective internal controls or limitations to restrict McClendon's involvement with Heritage.  Rather, the Board agreed to amend the terms of McClendon's employment in such a way that it facilitated McClendon's involvement with Heritage.  As

a result, the Board breached their fiduciary duties and likely the terms of the Code at the time.

**D.  Defendants Conceal Defendant McClendon's Hedging Activities**

197.  Not only did defendant McClendon and the 2008 Director Defendants fail to clamp down on McClendon's involvement with Heritage, but they utterly failed to disclose to shareholders any material facts about McClendon's hedge fund.  According to *Reuters*, "A search of Chesapeake's public filings turned up no disclosure of McClendon's hedge fund, Heritage."

198.  *Reuters* cites several experts who agree that information regarding McClendon's hedging activities were material and should have been disclosed to shareholders:

> "If correct," [Tim] Rezvan said [referring to the possibility McClendon traded on advance knowledge], "these disclosures would be even more alarming than the personal loans."

> A securities law professor said the very existence of the hedge fund could prompt a securities investigation.

> "I would argue, and I think the SEC would argue, that the failure to disclose that you are engaging in this kind of conduct can constitute a securities fraud problem," said Elizabeth Nowicki, a professor at Tulane University. She said a failure by McClendon and Ward to disclose their fund to Chesapeake's shareholders may constitute a "material omission" that could draw SEC scrutiny.

> "A reasonable investor would want to know that the CEO could be in a situation where he's betting against the interests of the company personally," Nowicki said. "That, it seems to me, is a slam dunk."

199.  The failure of the 2008 Director Defendants to disclose defendant McClendon's hedging activities to investors constitutes, at a minimum, a violation of

their fiduciary duties of loyalty, good faith, and candor.  The failure further demonstrates that the Board cannot be trusted to monitor and keep tabs on McClendon.

## X.  THE INDIVIDUAL DEFENDANTS MAKE IMPROPER STATEMENTS IN THE PROXY STATEMENTS RELATING TO THE FWPP

200.    The course and pattern of concealment by the Individual Defendants included improper statements in the Company's annual Proxy Statements filed with the SEC on Forms DEF 14A.  These Proxy Statements (dating as far back as 2009) failed to disclose material information concerning defendant McClendon's participation in the FWPP.  Namely, these Proxy Statements contained false or misleading statements or omissions of material facts regarding, among other things: (i) the purpose of the FWPP as it related to aligning McClendon's interests with the Company's; and (ii) the nature and extent of McClendon's financing arrangements made in connection with his participation in the FWPP.

201.    The Individual Defendants were members of the Board during the issuance of one or more of these Proxy Statements, and as such, approved and made said statements, which were provided to shareholders in connection with soliciting their votes. Each Proxy Statement between 2005 and the present was signed "By Order of the Board of Directors."

202.    The Individual Defendants have repeatedly informed shareholders in the Company's Proxy Statements that the FWPP was justified because it aligned the interests of the Company with those of defendant McClendon.  These false statements date as far back as the Company's 2005 Proxy in which the Individual Defendants then at the

Company (defendants McClendon, Keating, Kerr, Maxwell, and Whittemore) asked shareholders to ratify the FWPP. The 2005 Proxy, for example, informed shareholders that: "The Board believed the participation program aligned the interests of the Founders with those of the Company because the Founders were investing, and sharing the risks and rewards of drilling, on the same basis as the Company."

203. The 2005 Proxy also told shareholders that the purpose of the FWPP was to retain the founders, including defendant McClendon, by "aligning the financial rewards and risks of the Founders with the Company more effectively than overriding royalty, carried interest or other performance incentive programs maintained by many of the Company's peers." Shareholders were further told that this was to be achieved through "imposing on the Founders the same risk incurred by the Company in its core operations." These same statements were repeated almost verbatim in every Proxy Statement since then, including Forms DEF-14A filed on April 28, 2006, April 30, 2007; April 29, 2008, April 30, 2009, April 30, 2010, and April 29, 2011, and more recently on Form PRE 14A filed on April 20, 2012.

204. In the Company's May 4, 2009 Proxy Statement, defendants McClendon, Davidson, Hargis, Keating, Kerr, Maxwell, Nickles, Whittemore, and Miller further declared that "[t]he alignment of risk between Aubrey and the Company is unique and exemplary." In describing the Company's incentive award to McClendon for 2008, these defendants also told shareholders that "the Board tailored a specific award that aligned Aubrey's interests with the Company and put him at risk if the Company drilled poor wells."

205.   These and similar statements issued in the Proxy Statements on Forms DEF-14A were materially false or misleading because defendant McClendon is not facing the same risks as the Company, and his interests are not aligned with the Company.   Rather, his participation in the FWPP is being funded by his massive, ever-increasing private loans to the same lenders that provide financing to Chesapeake.   As a result, McClendon is not sharing the same risk as the Company in any real sense, with only nominal down-side exposure.   At the same time, defendant McClendon participates in very little of the upside, because under the terms of his loans, his lenders will collect the vast portion of any profits that would be generated from McClendon's FWPP interests.   In addition to the lack of aligning interests, the Individual Defendants' mismanagement of the FWPP has allowed defendant McClendon to create actual or potential conflicts of interest (such as competition with McClendon's VPP contracts) that could already be seriously damaging Chesapeake at a time when it is desperate to maintain adequate cash flows.   This is a far cry from the alignment of interests and shared risk that the Individual Defendants repeated to Chesapeake's shareholders.

206.   Each of the Proxy Statements from 2009 to 2012 contained a Board-sponsored proposal to increase the amount of shares available to compensate employees through the Company's Long Term Incentive Program ("LTIP").   The Individual Defendants continued their practice of asking for amendments to increase the shares available under this program every year since its inception.   The LTIP amendments passed each year from 2009 to 2011.

**XI.   THE INDIVIDUAL DEFENDANTS MAKE ADDITIONAL IMPROPER STATEMENTS REGARDING DEFENDANT MCCLENDON'S FINANCING AND RELATED RISKS**

207.   During at least March 2010 to March 2012, the Individual Defendants (except for defendant Kerr, who was no longer a member of the Board as of June 2009) directly made, signed, approved, or otherwise caused Chesapeake to issue improper statements to the public that were materially false or misleading.   Specifically, these statements, published in Chesapeake's Annual Reports, Proxy Statements, press releases, and other public documents, were materially false or misleading because they, among other reasons:

(a)   suggest to investors that defendant McClendon had been participating in the FWPP using his own cash and that he retained all rights to his interests in the FWPP, when the truth is that McClendon had been resorting to massive borrowing using all (or nearly all) of his interests in the FWPP as collateral and promising to payoff the loans with future FWPP-generated profits (*See, e.g*., ¶¶230-31, 233-37);

(b)   suggest that, from time to time, defendant McClendon engaged in VPP transactions pursuant to which he owed money to third parties, while the truth is McClendon has raised over $130 million for himself by engaging in multiple VPP contracts (*See, e.g*., ¶¶231, 234);

(c)   utterly fail to apprise shareholders of the full extent to which defendant McClendon was engaging in financing transactions and the material terms of

those transactions that would have alerted shareholders to the nature and extent of McClendon's material conflicts of interest (*See, e.g.*, ¶¶230-31, 233-37) ; and/or

(d)    utterly fail to apprise shareholders of the risks to the Company presented by McClendon's financing transactions and related conflicts of interest (*See, e.g.*, ¶¶230-31, 233-37).

208.    In Chesapeake's Annual Report filed on Form 10-K on March 1, 2010, the Individual Defendants then at the Company caused Chesapeake to issue the following improper statement:

Since Chesapeake was founded in 1989, our CEO, Aubrey K. McClendon, has acquired working interests in virtually all of our natural gas and oil properties by participating in our drilling activities under the terms of the Founder Well Participation Program (FWPP) and predecessor participation arrangements provided for in Mr. McClendon's employment agreements. Under the FWPP, approved by our shareholders in June 2005, Mr. McClendon may elect to participate in all or none of the wells drilled by or on behalf of Chesapeake during a calendar year, but he is not allowed to participate only in selected wells. A participation election is required to be received by the Compensation Committee of Chesapeake's Board of Directors not less than 30 days prior to the start of each calendar year. His participation is permitted only under the terms outlined in the FWPP, which, among other things, limits his individual participation to a maximum working interest of 2.5% in a well and prohibits participation in situations where Chesapeake's working interest would be reduced below 12.5% as a result of his participation. In addition, the company is reimbursed for costs associated with leasehold acquired by Mr. McClendon as a result of his well participation.

* * *

As of December 31, 2009, we had accrued accounts receivable from our CEO, Aubrey K. McClendon, of $14 million representing joint interest billings from December 2009 which were invoiced and timely paid in January 2010. Since Chesapeake was founded in 1989, Mr. McClendon, has acquired working interests in virtually all of our natural gas and oil properties by participating in our drilling activities under the terms of the

Founder Well Participation Program ("FWPP") and predecessor participation arrangements provided for in Mr. McClendon's employment agreements. Under the FWPP, approved by our shareholders in June 2005, Mr. McClendon may elect to participate in all or none of the wells drilled by or on behalf of Chesapeake during a calendar year, but he is not allowed to participate only in selected wells. A participation election is required to be received by the Compensation Committee of Chesapeake's Board of Directors not less than 30 days prior to the start of each calendar year. His participation is permitted only under the terms outlined in the FWPP, which, among other things, limits his individual participation to a maximum working interest of 2.5% in a well and prohibits participation in situations where Chesapeake's working interest would be reduced below 12.5% as a result of his participation. In addition, the company is reimbursed for costs associated with leasehold acquired by Mr. McClendon as a result of his well participation.

209.   In Chesapeake's April 30, 2010 Proxy Statement filed with the SEC on Form DEF 14A, the Individual Defendants then at the Company caused Chesapeake to issue the following improper statement:

Under the FWPP, Mr. McClendon is permitted to participate in all of the wells spudded by or on behalf of the Company during each calendar year. In order to participate, prior to the beginning of each year Mr. McClendon must provide written notice to the members of the Compensation Committee of his election to participate in the FWPP and the percentage working interest which he proposes to participate with during the year. His working interest percentage may not exceed a 2.5% working interest in a well and is not effective for any well where the Company's working interest after Mr. McClendon's participation election would be reduced to below 12.5%.

* * *

The right to participate in the FWPP can only be assigned by Mr. McClendon to an affiliate designated as such in accordance with the FWPP.

Under the FWPP, Mr. McClendon cannot change his working interest percentage during any calendar year without the prior approval of the Compensation Committee, and he agrees to pay all joint interest billings immediately on receipt of the Company's invoice and to prepay amounts owing to a third party operator if the Company is required to prepay any such costs. The amount paid by Mr. McClendon for the acreage assigned in

connection with his participation in the FWPP is equal to the following amount computed on a per acre basis: (a) all direct third party costs paid by the Company net of acreage sale proceeds and capitalized in the appropriate accounting pool in accordance with the Company's accounting procedures (including capitalized interest, leasehold payments, acquisition costs, landman charges and seismic charges); divided by (b) the acreage in the applicable pool. The acreage charge amount is recomputed as of the first day of each calendar year and reviewed for adjustment quarterly by the Company and submitted to the Compensation Committee for approval. All other costs are billed in accordance with the Company's accounting procedures applicable to third party participants pursuant to any applicable joint operating agreement or exploration agreement relating to a particular well, and such amounts paid by Mr. McClendon in connection with his participation in a well are on no better terms than the terms agreed to by unaffiliated third party participants in connection with the participation in such well or similar wells operated by the Company.

The following table sets forth, with respect to Mr. McClendon's FWPP interests (including interests from participation programs that were predecessors to the FWPP), the natural gas and oil revenues he received, lease operating expenses he paid, the resulting net cash flow before capital expenditures, capital expenditures he paid and net cash flow after capital expenditures during the first quarter of 2010 and each of the three years in the period ended December 31, 2009.

| | First Quarter 2010 | 2009 | 2008 | 2007 |
|---|---|---|---|---|
| Natural gas and oil revenues | $ 29,174,340 | $ 87,856,431 | $ 171,513,367 | $ 92,817,072 |
| Lease operating expenditures | (6,408,578) | (19,481,167) | (22,617,688) | (13,676,003) |
| Net cash flow | 22,765,762 | 68,375,264 | 148,895,679 | 79,141,069 |
| Capital expenditures | (40,932,863) | (184,468,839) | (212,634,566) | (170,659,274) |
| Net after capital expenditures | $ (18,167,101) | $ (116,093,575) | $ (63,738,887) | $ (91,518,205) |

The foregoing information has been derived solely from the Company's records. Accordingly, it may not include all revenues and expenses for FWPP interests that are not operated by the Company, and it may include revenues and expenses for previous FWPP interests currently owned by others for which such ownership change has not been communicated to the Company for reflection in the Company's records. *Mr. McClendon's FWPP interests are his personal assets and the Company does not restrict sales, dispositions or financing transactions involving FWPP interests previously assigned by the Company*. Accordingly, *the foregoing amounts*

*include revenue attributable to volumetric production payments owed to third parties under transactions that Mr. McClendon has entered into from time to time. Mr. McClendon pays the Company for lease operating expenses and capital expenditures related to his FWPP interests promptly upon receipt of each invoice. There was no amount owed to the Company by Mr. McClendon for FWPP invoices at any month-end in the first quarter of 2010 or in the three years ended December 31, 2009.*

*While Mr. McClendon's cumulative expenditures under the FWPP and predecessor programs have significantly exceeded cumulative monthly production revenues to date, Mr. McClendon believes the present value of the future net revenue (pre-tax) of the estimated proved developed producing reserves attributable to his FWPP interests in Company wells at December 31, 2009*, discounted at 10% per year and based on prices and costs in effect at such date, was approximately $108 million....

210.   The above statement that the Company "does not restrict sales, dispositions or financing transactions involving FWPP interests" is a prime example of a partial disclosure by the Individual Defendants that – certainly once made – required further disclosure to not be false or misleading.  With regard to the aforementioned statement, for example, defendants were required, at a minimum, to reveal that defendant McClendon was in fact engaging in financing transactions involving the FWPP, as well as the nature and extent of those transactions.  Because the disclosure only stated the Company did not restrict "*previously assigned*" interests, shareholders would have no reason to believe that the Board and its committees had abdicated their responsibilities to review transactions *on an ongoing basis* for conflicts of interest and take appropriate steps to deal with associated risks.  Thus, by failing to reveal anything further, defendants improperly led shareholders to believe that: (i) McClendon was not engaging in financing relating to his FWPP interests; or (ii) any financing transactions were not material and did not create any conflict of interest.

211. In Chesapeake's Annual Report filed on Form 10-K on March 1, 2011, the Individual Defendants then at the Company caused Chesapeake to issue the following improper statement:

> Under the FWPP, Mr. McClendon may participate in all of the wells spudded by or on behalf of the Company during each calendar year. Prior to the beginning of each year Mr. McClendon must provide written notice to the members of the Compensation Committee of his election to participate in the FWPP and the working interest percentage that he proposes to participate during the year. His working interest percentage may not exceed a 2.5% working interest in a well and is not effective for any well where the Company's working interest after Mr. McClendon's participation election would be reduced to below 12.5%. Subject to these working interest limitations, if Mr. McClendon elects to participate in the FWPP, he must participate in all wells spudded by or on behalf of the Company during the given calendar year and cannot elect to participate on a well-by-well basis. In September 2010, Mr. McClendon elected to participate in the FWPP for the 2011 calendar year at the maximum 2.5% working interest permitted.

212. In Chesapeake's April 29, 2011 Proxy Statement filed with the SEC on Form DEF 14A, the Individual Defendants then at the Company caused Chesapeake to issue the following improper statement:

> ***As of December 31, 2010, we had accrued accounts receivable from our Chief Executive Officer, Aubrey K. McClendon, of $30 million representing joint interest billings from December 2010 which were invoiced and timely paid in January 2011.*** Since Chesapeake was founded in 1989, Mr. McClendon has acquired working interests in virtually all of our natural gas and oil properties by participating in our drilling activities under the terms of the Founder Well Participation Program (FWPP) and predecessor participation arrangements provided for in Mr. McClendon's employment agreements. Under the FWPP, approved by our shareholders in June 2005, Mr. McClendon may elect to participate in all or none of the wells drilled by or on behalf of Chesapeake during a calendar year, but he is not allowed to participate only in selected wells. A participation election is required to be received by the Compensation Committee of Chesapeake's Board of Directors not less than 30 days prior to the start of each calendar year. His participation is permitted only under the terms outlined in the FWPP, which, among other things, limits his individual participation to a

maximum working interest of 2.5% in a well and prohibits participation in situations where Chesapeake's working interest would be reduced below 12.5% as a result of his participation. In addition, the company is reimbursed for costs associated with leasehold acquired by Mr. McClendon as a result of his well participation.

\* \* \*

**Mr. McClendon participates in the FWPP through entities in which all equity interests are owned solely by Mr. McClendon and his immediate family members as approved by the Compensation Committee in accordance with the FWPP.**

Under the FWPP, Mr. McClendon cannot change his working interest percentage during any calendar year without the prior approval of the Compensation Committee, and **he agrees to pay all joint interest billings immediately on receipt of the Company's invoice and to prepay amounts owing to a third party operator** if the Company is required to prepay any such costs. Mr. McClendon has never requested, nor has the Committee made, an adjustment to the participation percentage during a participation period. The amount paid by Mr. McClendon for the acreage assigned in connection with his participation in the FWPP is equal to the following amount computed on a per acre basis: (i) all direct third party costs paid by the Company net of acreage sale proceeds and capitalized in the appropriate accounting pool in accordance with the Company's accounting procedures (including capitalized interest, leasehold payments, acquisition costs, landman charges and seismic charges); divided by (ii) the acreage in the applicable pool. The acreage charge amount is recomputed as of the first day of each calendar year and reviewed for adjustment quarterly by the Company and submitted to the Compensation Committee for approval. All other costs are billed in accordance with the Company's accounting procedures applicable to third party participants pursuant to any joint operating agreement or exploration agreement relating to a particular well, and such amounts paid by Mr. McClendon in connection with his participation in a well are on no better terms than the terms agreed to by unaffiliated third party participants in connection with the participation in such well or similar wells operated by the Company.

The following table sets forth the amounts received from or paid to the Company with respect to Mr. McClendon's FWPP interests (including interests acquired in years prior to shareholder approval in 2005) during the first quarter of 2011 and each of the three years in the period ended December 31, 2010.

| | First Quarter 2011 | 2010 | 2009 | 2008 |
|---|---|---|---|---|
| Natural gas and oil revenues | $   40,191,374 | $   127,064,861 | $   87,856,431 | $   171,513,367 |
| Lease operating expenditures | (8,986,880) | (26,102,787) | (19,481,167) | (22,617,688) |
| Net cash flow | 31,204,494 | 100,962,074 | 68,375,264 | 148,895,679 |
| Capital expenditures | (89,345,128) | (242,839,086) | (184,468,839) | (212,634,566) |
| Net after capital expenditures | $   (58,140,634) | $   (141,877,012) | $   (116,093,575) | $   (63,738,887) |

The foregoing information has been derived solely from the Company's records. Accordingly, it may not include all revenues and expenses for FWPP interests that are not operated by the Company, and it may include revenues and expenses for FWPP interests currently owned by others. *For example, the foregoing amounts include revenue attributable to volumetric production payments owed to third parties under transactions that Mr. McClendon has entered into from time to time. Mr. McClendon pays the related lease operating expenses and disburses revenue to the VPP owners. Mr. McClendon pays the Company for lease operating expenses and capital expenditures related to his FWPP interests promptly upon receipt of each invoice. During the first quarter of 2011 and the three years ended December 31, 2010, Mr. McClendon and Mr. McClendon's affiliates paid all monthly invoices on receipt in accordance with the terms of the FWPP*.

While *Mr. McClendon's cumulative expenditures under the FWPP and predecessor programs have significantly exceeded cumulative monthly production revenues to date*, Mr. McClendon believes the present value of the future net revenue (pre-tax) of the estimated proved developed producing reserves attributable to his FWPP interests in Company wells at December 31, 2010, discounted at 10% per year and based on prices and costs under existing conditions at such date, was approximately $308 million.… The Company's reservoir engineering staff provides data and analysis to Mr. McClendon's affiliates with respect to reserves associated with FWPP interests using the engineering prepared for the Company's interest in the same wells.…

Mr. McClendon's interests are his personal assets and the FWPP does not restrict sales, other dispositions or financing transactions involving FWPP interests previously acquired from the Company. From time to time, *Mr. McClendon has sold FWPP interests in conjunction with sales by the Company of its interests in the same properties, and the proceeds related to the properties have been allocated between Mr. McClendon and the Company based on their respective ownership interests*. As a condition to the sale of the Company's Fayetteville Shale assets completed on March 31,

2011, Mr. McClendon's affiliates sold the FWPP interests they held in the Fayetteville Shale on the same terms as those that applied to the Company's developed producing properties included in the sale.…

213.   In a current report filed by Chesapeake with the SEC on Form 8-K on November 4, 2011, certain defendants then at the Company (including defendant McClendon) caused Chesapeake to issue the following improper statement that discusses financing terms between EIG and Chesapeake, but entirely fails disclose the material fact that EIG has also been providing McClendon with significant financing, including a loan that helped McClendon to fund some of FWPP-related expenditures in 2008:

> On November 2, 2011, the Company completed the sale to EIG Global Energy Partners of $500 million of perpetual preferred shares of a newly formed entity, CHK Utica, L.L.C.  CHK Utica is an unrestricted subsidiary of the Company that owns approximately 700,000 net leasehold acres within an area of mutual interest in the Utica Shale play in 13 counties primarily in eastern Ohio.  The Company has retained all the common interests in CHK Utica.

> The CHK Utica preferred shares are entitled to receive an initial annual distribution of 7%, payable quarterly.  The Company retains an option exercisable prior to October 31, 2018 to repurchase the preferred shares for cash in whole or in part at any time at a valuation expected to equal the greater of a 10% internal rate of return or a return on investment of 1.4x and may repurchase the shares thereafter at a higher valuation.  Investors in CHK Utica preferred shares will also receive an overriding royalty interest in the well-bore of the first 1,500 net wells drilled in the area of mutual interest.  If an additional $750 million of CHK Utica preferred shares are purchased in the future, holders of the preferred shares would hold an aggregate 3% overriding royalty interest, which is the equivalent of an approximate 0.45% overriding royalty interest across the Company's projected 10,000 net well inventory.  The Company's average net revenue interest on its Utica Shale leasehold is approximately 83%.  As part of the transaction, the Company has committed to drill a minimum of 50 net wells per year through 2016 in the CHK Utica area of mutual interest, up to a minimum cumulative total of 250 net wells, for the benefit of CHK Utica.

214.    Certain defendants then at the Company (including defendant McClendon) also caused the November 4, 2011 Form 8-K to include a press release dated November 3, 2011 that contained the following improper statement, which similarly failed to disclose EIG's financing transactions with McClendon despite disclosing the terms of the arrangement between EIG and Chesapeake:

OKLAHOMA CITY, OKLAHOMA, NOVEMBER 3, 2011 – Chesapeake Energy Corporation (NYSE:CHK) today announced two transactions to monetize a portion of its 1.5 million net acres of leasehold in the Utica Shale play primarily in eastern Ohio.  Fully implemented, the transactions would result in consideration to Chesapeake of approximately $3.4 billion.

*   *   *

Additionally, as a first step in a financial transaction led by EIG Global Energy Partners ("EIG"), Chesapeake has completed the sale to EIG of $500 million of perpetual preferred shares of a newly formed entity, CHK Utica, L.L.C.  Chesapeake expects to sell up to $750 million of additional CHK Utica preferred shares to other investors, including limited partners of EIG, by November 30, 2011.  CHK Utica is a wholly owned, unrestricted subsidiary of Chesapeake that owns approximately 700,000 net leasehold acres within an area of mutual interest in the Utica Shale play in 13 counties primarily in eastern Ohio (the "CHKU AMI") that encompasses the JV AMI.  Chesapeake has retained all the common interests in CHK Utica.

The CHK Utica preferred shares are entitled to receive an initial annual distribution of 7%, payable quarterly.  Chesapeake retains an option exercisable prior to October 31, 2018 to repurchase the preferred shares for cash in whole or in part at any time at a valuation expected to equal the greater of a 10% internal rate of return or a return on investment of 1.4x.  Assuming a total of $1.25 billion of CHK Utica preferred shares are purchased, investors in CHK Utica preferred shares will also receive a 3% overriding royalty interest in the first 1,500 net wells drilled on CHK Utica's leasehold, which is the equivalent of an approximate 0.45% overriding royalty interest across Chesapeake's projected 10,000 net well inventory.  Chesapeake's average net revenue interest on its Utica Shale leasehold is approximately 83%, which compares favorably to net revenue interests in the Haynesville, Barnett and Eagle Ford shale plays of approximately 75%.

As part of the financial transaction, Chesapeake has committed to drill a minimum of 50 net wells per year through 2016 in the CHKU AMI, up to a minimum cumulative total of 250 net wells, for the benefit of CHK Utica. Chesapeake believes it will have considerable operating and financial flexibility in fulfilling the drilling commitment because the company's planned Utica Shale drilling program for the years ahead involves a significantly higher rig count than the approximate 10-rig drilling program required by the terms of the CHK Utica preferred shares investment.

* * *

Aubrey K. McClendon, Chesapeake's Chief Executive Officer, commented, "We are pleased to announce … the closing of the $500 million initial investment by the EIG-led investor group.  Through the industry JV, we will be able to recover more than our total leasehold investment in the entire Utica Shale play while only selling approximately 142,500 net acres of our 1.5 million net acres of Utica Shale leasehold.  Through the financial transaction led by EIG, our drilling program in CHK Utica is almost entirely funded for the foreseeable future (including cash flow from anticipated production).  We have achieved very strong initial drilling results in the wet natural gas and dry natural gas areas of our Utica Shale play and are beginning to accelerate our evaluation of the oil area of the play, which the EIG transaction will help enable."

215.    In Chesapeake's Annual Report filed on Form 10-K on February 29, 2012,

the Individual Defendants then at the Company caused Chesapeake to issue the following

improper statement:

As of December 31, 2011 and 2010, we had accrued accounts receivable from our Chief Executive Officer, Aubrey K. McClendon, of $45 million and $30 million, respectively, representing joint interest billings from December 2011 and 2010. These amounts were invoiced and timely paid in the following month. Since Chesapeake was founded in 1989, Mr. McClendon has acquired working interests in virtually all of our natural gas and oil properties by participating in our drilling activities under the terms of the Founder Well Participation Program (FWPP) and predecessor participation arrangements provided for in Mr. McClendon's employment agreements. Under the FWPP, approved by our shareholders in June 2005, Mr. McClendon may elect to participate in all or none of the wells drilled by or on behalf of Chesapeake during a calendar year, but he is not allowed to participate only in selected wells. A participation election is required to be received by the Compensation Committee of Chesapeake's Board of

Directors not less than 30 days prior to the start of each calendar year. His participation is permitted only under the terms outlined in the FWPP, which, among other things, limits his individual participation to a maximum working interest of 2.5% in a well and prohibits participation in situations where Chesapeake's working interest would be reduced below 12.5% as a result of his participation. In addition, the Company is reimbursed for costs associated with leasehold acquired by Mr. McClendon as a result of his well participation. From time to time, Mr. McClendon has sold his FWPP interests in conjunction with sales by the Company of its interests in the same properties, and the proceeds related to those sales have been allocated between Mr. McClendon and the Company based on their respective ownership interests and on the same terms as those that applied to the Company's properties included in the sale.

216. These misstatements or omissions were material in light of, among other things: (i) the scale of the loans or VPPs: (ii) the small number of sources for financing; (iii) defendant McClendon's history of engaging in risky leveraged transactions with assets involving Chesapeake; (iii) Chesapeake's difficulty maintaining cash flows; (iv) Chesapeake's large debt load relative to its market cap and its peers; (v) Chesapeake's exposure to the volatility and uncertainty of the price of natural gas; (vi) the stated purposes of the FWPP; and (vii) McClendon's obvious trajectory toward insolvency. Defendants knew or recklessly disregarded this material information in making or approving the improper statements.

217. Indeed, recent disclosures by the 2012 Director Defendants, although still deficient and incomplete, help illustrate the type of material disclosures that defendants have long failed to make. For example, in Chesapeake's April 20, 2012 Proxy Statement, the 2012 Director Defendants for the first time disclosed that: "[O]ver the life of the FWPP, Mr. McClendon has typically mortgaged his interests acquired under the FWPP with one or more lenders, some of which also have lending, investment or advisory

relationships with the Company. Mr. McClendon's mortgages with these lenders secure loans used in whole or in part to fund Mr. McClendon's well costs."  Moreover, on April 27, 2012, McClendon released a supplemental disclosure providing a high-level breakdown of his total outstanding debt from loans he took out in connection with the FWPP and the value of his interests in the FWPP.  However, even that supplemental disclosure fails to mention approximately $500 million in loans that McClendon took out in January 2012.

218.   The following chart shows which defendants participated in the dissemination of the improper statements in Chesapeake's Annual Reports on Forms 10-K.  The chart also notes whether defendants signed the statements or additionally certified pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") that, among other things, the Annual Report "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under such statements were made, not misleading":

| Date | Filing | Person(s) Who Signed and Certified |
|---|---|---|
| 3/1/2010 | 10-K | McClendon, Davidson, Hargis, Keating, Maxwell, Miller, Nickles, Whittemore SOX CERTIFICATION: McClendon |
| 3/1/2011 | 10-K | McClendon, Davidson, Eisbrenner, Hargis, Keating, Maxwell, Miller, Nickles, Whittemore SOX CERTIFICATION: McClendon |
| 2/29/2012 | 10-K | McClendon, Davidson, Eisbrenner, Hargis, Keating, Maxwell, Miller, Nickles, Simpson SOX CERTIFICATION: McClendon, |

## XII. DESPITE TOUGH TIMES, THE BOARD CONTINUES TO PROVIDE DEFENDANT MCCLENDON WITH LAVISH COMPENSATION

219. The 2012 Director Defendants continue to pay defendant McClendon excessive compensation that is out of step with the Company's performance.

220. Chesapeake continues to suffer from crushing expenses and meager revenues. As in 2008, to make ends meets and keep the Company afloat, Chesapeake has been scrambling to secure financing from all sorts of means, including asset sales, joint ventures created by selling stakes in Chesapeake-owned and operated wells, and VPPs. Through these transactions, Chesapeake has raised approximately $30 billion in cash since 2008. The following chart presents information concerning some of these transactions disclosed by Chesapeake:

| Transaction Date | Transaction Type | Acquirer(s) | Property Interests | Value |
|---|---|---|---|---|
| 12/31/2007 | VPP | Affiliates of UBS and Deutsche Bank | Interests in 210 billion cubic feet (BCFE) of proved reserves (Kentucky and West Virginia) | $1.1B |
| | | | Total for 2007 | $1.1B |
| | | | | |
| 5/1/2008 | VPP | Undisclosed | Interests in 94 BCFE of proved reserves (Texas, Oklahoma, Kansas) | $616M |
| 7/1/2008 | Joint Venture | Plains Exploration & Production Company | 20% interest in Chesapeake's Haynesville Shale leasehold (appx. 550,000 acres) | $1.65B |
| 8/8/2008 | Asset Sale | BP America | 90,000 acres of leasehold and producing natural gas properties in the Arkoma Basin Woodford Shale play (Oklahoma) | $1.7B |
| 8/1/2008 | VPP | Undisclosed | Interests in 93 BCFE of proved reserves (Anadarko Basin) | $594M |
| 9/5/2008 | Joint Venture | BP America | 25% interest in Chesapeake's Fayetteville Shale assets (appx. 135,000 acres) | $1.9B |
| 11/25/2008 | Joint Venture | StatoilHydro | 32.5% interest in Chesapeake's Marcellus Shale assets (appx. 600,000 acres) | $3.375 B |

| 12/31/2008 | VPP | Argonaut Private Equity | Interests in 98 billion BCFE of proved reserves (Anadarko and Arkoma Basins) | $412M |
|---|---|---|---|---|
| | | | Total for 2008 | $10.2 B |
| | | | | |
| 8/4/2009 | VPP | Undisclosed | Interests in 68 BCFE of proved reserves (South Texas) | $370M |
| | | | Total for 2009 | $370M |
| | | | | |
| 1/25/2010 | Joint Venture | Total E&P USA | 25% interest in Chesapeake's Upstream Barnett Shale assets (appx. 270,000 acres) | $2.25B |
| February 2010 | VPP | Undisclosed | Interests in 46 BCFE of proved reserves (East Texas and Texas Gulf Coast) | $180M |
| June 2010 | VPP | Undisclosed | Interests in 38 BCFE of proved reserves (Permian Basin) | $335M |
| 9/30/2010 | VPP | An affiliate of Barclays | Interests in 390 BCFE of proved reserves (Barnett Shale) | $1.15B |
| 11/16/2010 | Joint Venture | CNOOC Limited | 33.3% undivided interest in Chesapeake's Eagle Ford Shale assets (appx. 600,000 acres) | $2.20B |
| December 2010 | Asset Sale | Chesapeake Midstream Partners L.P. (an affiliate of Chesapeake) | Springridge natural gas gathering system and related facilities in Haynesville Shale | $500M |
| | | | Total for 2010 | $6.6B |
| | | | | |
| 2/16/2011 | Joint Venture | CNOOC Limited | 33.3% undivided interest in Chesapeake's Denver-Julesburg and Powder River Basins (appx. 800,000 acres) | $1.267 B |
| 3/31/2011 | Asset Sale | BHP Billiton Petroleum | 487,000 acres of leasehold and producing natural gas properties in the Fayetteville Shale play (Central Arkansas); 420 miles of pipeline | $4.65B |
| May 2011 | VPP | An affiliate of Barclays | Interests in 177 BCFE of proved reserves (Mid-Continent) | $853M |
| December 2011 | Asset Sale | Chesapeake Midstream Partners L.P. (an affiliate of Chesapeake) | Appalachia Midstream Services, LLC: substantially all of Chesapeake's Marcellus Shale midstream assets | $879M* |
| 12/30/2011 | Joint Venture | Total S.A. | 25% interest in Chesapeake's Utica Shale play (appx. 650,000 acres) | $2.032 B |
| April 2012 | VPP | An affiliate of Morgan Stanley | Interests in 160 billion BCFE of proved reserves (Anadarko Basin) | $745M |
| April 2012 | Asset Sale | XTO Energy, Inc. | 58,400 acres of leasehold in the Texoma Woodford play (Oklahoma) | $590M |

| | | | | Total for 2011 | $11.0B |
|---|---|---|---|---|---|

*The total consideration was for $879 million: $600 million in cash and $279 million in Chelsea Midstream Partners (CHKM) stock.  The transaction increased Chesapeake's stake in CHKM from 42.3% to 46.1%.

221.   As the above chart shows, Chesapeake's financing efforts have become increasingly more desperate.   In 2011, Chesapeake scrambled to raise approximately twice the cash it had raised in 2010.

222.   In addition to the specific transactions listed above, Chesapeake sold "non-core" assets in in 2008, 2009, and 2010 for proceeds of $400 million, $450 million, and $355 million, respectively.   As part of the joint ventures with CNOOC, Total S.A., StatoilHydro, and Plains Exploration & Production Company, Chesapeake also sold interests in additional leaseholds in 2009, 2010, and 2011 for cash proceeds of $100 million, $440 million, and $511 million, respectively.   Further, the Company has sold preferred shares in various subsidiaries, as Chesapeake did in November 2011 with EIG to raise $500 million.

223.   As discussed above, for first quarter 2012, the Company reported adjusted post-tax profits of $94 million (excluding certain items that otherwise drove these meager earnings to a net loss) compared to adjusted post-tax profits of $518 million in first quarter of 2012 – *an 82% decline*.   In fact, when all write downs and other extraordinary items are included, Chesapeake reported a net loss of $71 million for the quarter.   And as *The Financial Times* reported, analysts predict a difficult year ahead for the Company as it struggles to fill its large funding gap.

224.   Meanwhile, Chesapeake has shown mediocre financial performance compared to its peers.[9]   Chesapeake's EBITDA (earnings before interest, taxes, depreciation and amortization) grew only 3.5% in 2011, compared to an average of 31.23% amongst its peers.   Chesapeake's net income shrank by 1.8% last year, whereas Chesapeake's peers saw their net income grow by an average of 98.23%.   Chesapeake's 2011 debt-to-equity ratio was 60.5%, compared to an average of 39.25% amongst its competitors.   The Company's total-debt-to-EBITDA was almost two and half times the average of its peers.   Chesapeake recently reported a debt load of $10.3 billion, or $0.55 per thousand cubic feet of gas reserves, at the end of 2011.   By comparison, Exxon Mobil has $4.37 billion in debt, which amounted to $0.29 per thousand cubic feet of reserves.

225.   Despite Chesapeake's terrible performance, whether compared to prior years or to its peers, and the fact that the Company appears to be a sinking ship, the 2012 Director Defendants have chosen to still treat defendant McClendon like a king.   For 2011, the 2012 Director Defendants generously paid McClendon total compensation of $18,551,295, just 15% less than 2010.   Even with the reduction, McClendon is being

---

[9] Chesapeake's peers, for purposes of the analysis in this paragraph, refers to: Anadarko, Apache Corp. ("Apache"), Conoco Phillips, Devon, EOG, Hess Corporation, Marathon Oil Corporation, and Occidental Petroleum Corporation ("Occidental").   Many of these are the very same Companies that Chesapeake itself uses in its peer comparison for purposes of assessing executive compensation.   For example, in Chesapeake's April 20, 2012 Proxy Statement, the 2012 Individual Defendants measured McClendon's compensation against that of the CEOs of Occidental, Anadarko, Devon, Apache, and EOG.

overpaid.  McClendon has been paid the following executive compensation during the past three years:

| Year | Salary | Bonus | Stock Award | All Other Compensation | Total |
|------|--------|-------|-------------|------------------------|-------|
| 2011 | $975,000 | $1,951,000 | $13,627,556 | $ 1,314,520 | $17,868,076 |
| 2010 | 975,000 | 1,951,000 | 16,804,500 | 1,314,452 | 21,044,952 |
| 2009 | 975,000 | 1,951,000 | 14,049,200 | 1,576,096 | 18,551,29 |

## XIII.  DAMAGES TO CHESAPEAKE

226.   As a direct and proximate result of the Individual Defendants' improprieties, Chesapeake disseminated improper, public statements concerning, among other things, defendant McClendon's financing in connection with his participation in the FWPP.  These improper statements have devastated Chesapeake's credibility.

227.   Similarly, as a direct and proximate result of the Individual Defendants' wrongdoing, the Company's credit rating has been downgraded, which will cause the Company to experience increased borrowing costs.

228.   Further, as a direct and proximate result of the Individual Defendants' actions, Chesapeake has expended, and will continue to expend, significant sums of money.  Such expenditures include, but are not limited to:

(a)   excessive costs associated with defendant McClendon's 2008 "compensation" package (in reality an unjustifiable bailout) following violations by McClendon of his 2008 Employment Agreement and potentially the FWPP, as well;

(b)   excessive interest costs due to unfair financing terms with defendant McClendon's lenders;

(c)     increased borrowing costs because of competition or lost financing opportunities due to competition with defendant McClendon's VPP transaction;

(d)     costs incurred in investigating and defending Chesapeake in connection with investigations by the SEC, the IRS and potentially the DOJ, plus potential fines or penalties resulting therefrom; and

(e)     costs incurred in investigating and defending Chesapeake and defendant McClendon in the Securities Class Action (and any later-filed class actions), plus potentially millions of dollars in settlement or to satisfy an adverse judgment.

229.   Similarly, the Individual Defendants' wrongdoing has irreparably damaged Chesapeake's corporate image and goodwill.   For at least the foreseeable future, Chesapeake will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in improper behavior and have misled the investing public, such that Chesapeake's ability to raise equity capital or debt on favorable terms in the future is now further impaired at a time when the Company is already struggling to raise cash.   Furthermore, Chesapeake's reputation and/or relationship with its customer base has been harmed and may adversely affect the Company's future revenues and growth prospects.

230.   The Company may also face substantial costs arising from potential litigation or other actions taken by defendant McClendon's lenders following an imminent default by McClendon on his loans that are collateralized with his FWPP interests.

## XIV.  GENERAL DERIVATIVE ALLEGATIONS

231.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

232.   Plaintiff brings this action derivatively in the right and for the benefit of Chesapeake to redress injuries suffered, and to be suffered, by Chesapeake as a direct result of the violations of law, breaches of fiduciary duty, abuse of control, gross mismanagement, waste of corporate assets, and unjust enrichment, as well as the aiding and abetting thereof, by the Individual Defendants.  Chesapeake is named as a nominal defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

233.   Plaintiff will adequately and fairly represent the interests of Chesapeake in enforcing and prosecuting its rights.

234.   Plaintiff Erickson was an owner of Chesapeake common stock throughout the Relevant Period and remains a shareholder of the Company.

## XV.  DERIVATIVE ALLEGATIONS: DEMAND IS EXCUSED

235.   The Board of Chesapeake, as of the date of this complaint, consists of the following nine individuals: defendants McClendon, Hargis, Miller, Davidson, Nickles, Keating, Maxwell, Simpson, and Eisbrenner.  To the extent Plaintiff has not already made demands on the Board, Plaintiff has not made any further demands on the present Board to institute claims asserted in this action because such a demand would be a futile, wasteful, and useless act, as set forth below.

**A.      Demand Is Excused Because the 2012 Director Defendants' Conduct Is Not a Valid Exercise of Business Judgment**

236.    Defendants McClendon, Hargis, Miller, Davidson, Nickles, Keating, Maxwell, Simpson, and Eisbrenner, constituting the Company's entire current Board, directly made and/or caused the Company to disseminate improper, materially false and misleading public statements concerning, among other things, the true nature and extent of McClendon's financing relating to his participation in the FWPP, the lack of alignment of McClendon's interests with those of the Company, as well as the actual and potential conflicts of interest and risks arising from McClendon's financing arrangements. McClendon, Davidson, Hargis, Keating, Maxwell, Nickles, and Miller also concealed from the public, or caused or allowed the Company to fail to disclose to the public, any information concerning McClendon's hedging activities.  For reasons stated herein, each member of the Board knew or should have known that the improper statements did not fairly, accurately, or truthfully convey information regarding McClendon's financing, alignment of interests, or conflicts of interest and risks as required by Generally Accepted Accounting Principles, SEC rules and regulations, or other applicable law.  In addition, when deciding whether to sign or approve statements to be publicly disseminated, each member of the Board was bound by the duty of care to inform himself or herself of all reasonably-available material information.  The 2012 Director Defendants admit that they have been generally aware of McClendon's financing in connection with his FWPP interests, and should have, at the very least, inquired further concerning the details of the financing transactions.  Furthermore, because McClendon is a member of the Board and

conducts his personal business at Chesapeake's headquarters, information regarding his financing transactions and hedging activities were reasonably available to each and every one of the 2012 Director Defendants.  In light of, among other things, the obligations imposed by the Code to address conflicts of interest, the scale of the loans to McClendon, the small number of sources for financing, the Company's cash problems, the stated purposes of the FWPP, McClendon's obvious trajectory toward insolvency, and McClendon's history making bad bets, the details concerning McClendon's financing transactions were material for the 2012 Director Defendants in connection with their fulfillment of their duties on the Board (or committees thereof) and their decisions to disseminate public statements.   Defendants McClendon, Hargis, Miller, Davidson, Nickles, Keating, Maxwell, Simpson, and Eisbrenner's conduct can in no way be considered a valid exercise of business judgment.  Accordingly, demand on the Board is excused.

237.  Defendants McClendon, Hargis, Miller, Davidson, Nickles, Keating, Maxwell, Simpson, and Eisbrenner, constituting the Company's entire current Board, have also acted with at least gross negligence by approving or allowing the Company to enter into tainted transactions on terms disadvantageous to Chesapeake, but lucrative for counterparties affiliated with McClendon.  The terms of this financing are particularly egregious in light of the Company's struggle to maintain solvency. Accordingly, McClendon, Hargis, Miller, Davidson, Nickles, Keating, Maxwell, Simpson, and Eisbrenner have breached their fiduciary duties of loyalty and good faith, subjecting

themselves to a substantial likelihood of liability. Demand on the Board is, therefore, further excused.

238. Defendants McClendon, Hargis, Miller, Davidson, Nickles, Keating, Maxwell, Simpson, and Eisbrenner, constituting the Company's entire current Board, approved and authorized the proposed settlement in State Court for improper reasons unrelated to proper business judgment. They approved the settlement as part of a scheme to conceal the material information regarding the existence of McClendon's financing relating to his participation in the FWPP, the lack of alignment of McClendon's interests with those of the Company, as well as actual and potential conflicts of interest arising from McClendon's financing arrangements. The 2012 Director Defendants also approved settlement to secure the potential release of Chesapeake's valuable claims on terms beneficial to the Individual Defendants, but not for the Company. In furtherance thereof, they intentionally withheld material information from the State Court and Plaintiff's counsel. At the same time, the 2012 Director Defendants approved the settlement without conducting a proper investigation and informing themselves of material information readily available to themselves. This conduct was not taken in the Company's best interests, but rather to benefit the Individual Defendants, many of whom remain on the Board (defendants McClendon, Hargis, Miller, Davidson, Nickles, Keating, and Maxwell). McClendon, Hargis, Miller, Davidson, Nickles, Keating, Maxwell, Simpson, and Eisbrenner's conduct can in no way be considered a valid exercise of business judgment. Accordingly, demand on the Board is excused.

**B.**     **Demand Is Excused Because at least a Majority of the Current Board Faces a Substantial Likelihood of Liability for Their Misconduct**

239.     Defendant McClendon has served as Chesapeake's Chairman and CEO since he co-founded the Company in 1989.  McClendon, by participating in the financing arrangements contested by Plaintiff, has knowingly, recklessly, or at least grossly negligently harmed and will continue to harm the Company.  Moreover, as a member of the Board, McClendon participated in the issuance of the improper statements in the Company's Proxy Statements and other public filings with the SEC since at least 2005.  Because McClendon is an officer of the Company, his breaches of the fiduciary duty of care as an officer cannot be exculpated even if the Company has a charter provision that may provide for such exculpation for the directors of the Company.  For these reasons, McClendon faces a substantial likelihood of liability.  Further, he is indisputably interested in the outcome of this litigation that is centered on him, his compensation, and his financing transactions.  Demand is futile against McClendon.

240.     Defendants Davidson, Hargis, and Miller, as members of the Audit Committee, reviewed and approved the improper statements issued in the Company's filings with the SEC.  The Audit Committee's Charter provides that the committee is responsible for, among other things: (i) overseeing the Company's financial reporting; (ii) discussing with management and the outside auditor any major issues as to the adequacy of the Company's internal controls; (iii) reviewing the Company's quarterly statements on Forms 10-Q; (iv) reviewing disclosures made to the committee by the CEO and CFO during their certification process of filings on Forms 10-K and Forms 10-Q; and (iv)

discussing with management the Company's major financial risk exposures and the steps management has taken to monitor and control those exposures, and the guidelines and policies to govern the process by which risk assessment and risk management is undertaken.  The Audit Committee's Charter further provides that the Audit Committee is responsible for oversight of legal, regulatory, and compliance matters, and in connection with that responsibility, must: (i) receive reports (including from management) regarding compliance with applicable laws and regulations and with the Company's Code; (ii) discuss with the Company's general counsel any legal, compliance, or regulatory issues that could have a material effect on the Company's financial statements or compliance policies, investigate material matters brought to the committee's attention within the scope of its duties; and (iii) review insider or affiliated party transactions or courses of dealing and related disclosures in the Company's annual Proxy Statements.  Moreover, the Charter requires the Audit Committee to prepare the reports required by the SEC to be included in the Company's annual Proxy Statements.  As defendants acknowledge even as recently as their April 29, 2011 Proxy Statement, the Audit Committee reviews and assesses ongoing relationships with related parties, and has reviewed and pre-approved certain transactions, including defendant "McClendon's participation in the FWPP."  Thus, Davidson, Hargis, and Miller are responsible for allowing the improper statements relating to, among other things, the true nature and extent of McClendon's financing relating to his participation in the FWPP, the alignment of (or lack thereof) McClendon's interests with those of the Company's, as well as actual and potential conflicts of interest arising from McClendon's financing arrangements.  These defendants

also caused or allowed the Company to fail to disclose any information concerning McClendon's hedging activities. Defendants Davidson, Hargis, and Miller were generally aware of the existence of McClendon's financing transactions, and aware of McClendon's hedging activities. Despite their knowledge, or with reckless disregard, Davidson, Hargis, and Miller caused these improper statements or omissions. Accordingly, Davidson, Hargis, and Miller breached their fiduciary duties of loyalty, good faith, and candor, as well as their duties assigned to them by the Audit Committee Charter. As a result, Davidson, Hargis, and Miller face a substantial likelihood of liability. Any demand upon them is futile.

241. Defendants Davidson, Hargis, and Miller, as members of the Audit Committee, breached their fiduciary duties of loyalty and good faith and the aforementioned duties assigned to them by the Audit Committee Charter by knowingly or recklessly disregarding material conflicts of interest and other risks arising from defendant McClendon's financing transactions that have harmed and will continue to harm the Company. They also utterly failed to implement internal controls to inform themselves regarding McClendon's financing transactions despite their duties and being generally aware of the existence of the transactions. Nonetheless, they approved or allowed the Company to enter into tainted transactions on terms disadvantageous to Chesapeake, but lucrative for counterparties affiliated with McClendon. Davidson, Hargis, and Miller also consciously disregarded the VPP transactions by McClendon that are competing with efforts by Chesapeake to obtain financing during a time of severe cash flow shortages at the Company. As a result, these transactions threatened and

continue to threaten the Company's very solvency. Thus, defendants Davidson, Hargis, and Miller face a substantial likelihood of liability. Any demand upon them is, therefore, futile.

242. Defendants Keating, Maxwell, and Eisbrenner, as members of the Compensation Committee, reviewed and approved improper statements issued in the Company's filings with the SEC. The Compensation Committee's Charter provides that the committee must establish and monitor the implementation of the Company's compensation system. Among other responsibilities, the Charter requires the Compensation Committee to: (i) review, evaluate, and approve all compensation of directors and executive officers; (ii) prepare the report required by the SEC to be included in the Company's annual Proxy Statements; and (iii) review compliance with and make recommendations to the Board regarding the CEO's participation in the FWPP. As provided in the terms of the FWPP, the Compensation Committee administers the FWPP. As a result of these responsibilities, Keating, Maxwell, and Eisbrenner were required to inform themselves of, among other material facts, the general nature and extent of defendant McClendon's financing in connection with the FWPP, the conflicts of interest and risks McClendon's financing transactions pose to the Company, and harm already caused therefrom. In light of their responsibilities, the 2012 Compensation Committee Defendants also were aware of the need for the Company to fairly and adequately disclose information regarding, among other things, the FWPP, McClendon's related financing transactions, and the conflicts of interest and risks associated therewith. Defendants Maxwell and Keating also caused or allowed the Company to fail to disclose

any information concerning McClendon's hedging activities. Despite their known duties, the 2012 Compensation Committee Defendants knowingly, or with reckless disregard, caused or made improper statements or omissions relating to those material issues. Accordingly, defendants Keating, Maxwell, and Eisbrenner breached their fiduciary duty of loyalty and good faith. Thus, they face a substantial likelihood of liability for their breach of fiduciary duties. Any demand upon them is futile.

243. Defendants Keating, Maxwell, and Eisbrenner, as members of the Compensation Committee, breached their fiduciary duties of loyalty and good faith and the aforementioned duties assigned to them by the Compensation Committee Charter and the FWPP by knowingly or recklessly disregarding material conflicts of interest arising from defendant McClendon's financing transactions that have harmed and will continue to harm the Company. They also utterly failed to implement internal controls to inform themselves regarding McClendon's financing transactions despite their duties and being generally aware of the existence of the transactions. Nonetheless, they approved or allowed the Company to enter into tainted transactions on terms disadvantageous to Chesapeake, but lucrative for counterparties affiliated with McClendon. Keating, Maxwell, and Eisbrenner also consciously disregarded the VPP transactions by McClendon that are competing with efforts by Chesapeake to obtain financing during a time of severe cash flow shortages at the Company. As a result, these transactions threatened and continue to threaten the Company's very solvency. Thus, Keating, Maxwell, and Eisbrenner face a substantial likelihood of liability. Any demand upon them is, therefore, futile.

244. Further, as alleged above, defendants McClendon, Davidson, Hargis, Keating, Maxwell, Nickles, Miller, Eisbrenner, and Simpson (constituting the entire current Board) face a substantial likelihood of liability because they approved, caused to be issued, or otherwise participated in the issuance of improper statements in the Company's Proxy Statements and other public statements. In the Proxy Statements, defendants McClendon, Davidson, Hargis, Keating, Maxwell, Nickles, Miller, Eisbrenner, and Simpson misrepresented certain material facts and failed to apprise shareholders of certain material information, which would have affected their voting decisions regarding the FWPP, the LTIP amendments and the 2010 shareholder proposal regarding annual cash bonuses to the named executives. McClendon, Hargis, Miller, Davidson, Nickles, Keating, Maxwell, Simpson, and Eisbrenner also authorized and/or permitted the issuance of various other improper statements, including in the Company's Annual Reports on Forms 10-K and press releases, regarding or otherwise concealing material information regarding McClendon's financing efforts, conflicts of interest and risks arising therefrom, and the lack of alignment of his interests with the Company's interests. McClendon, Davidson, Hargis, Keating, Maxwell, Nickles, and Miller also caused or allowed the Company to fail in disclosing any information regarding McClendon's hedging activities. Each and every member of the Board knowingly or recklessly made or caused improper statements or omissions in one or more Proxy Statements issued between 2005 and the present, the Company's Annual Reports on Forms 10-K, and press releases, thus breaching their fiduciary duties of loyalty and candor. Additionally, McClendon, Davidson, Hargis, Keating, Maxwell, Nickles, Miller,

Eisbrenner, and Simpson at least grossly negligently made or caused improper statements or omissions in one or more of the Company's 2009, 2010, 2011, and/or 2012 Proxy Statements in connection with soliciting shareholder votes, thereby violating provisions of the Exchange Act.  Their breaches of fiduciary duties and violations of the Exchange Act are independently sufficient to subject McClendon, Davidson, Hargis, Keating, Maxwell, Nickles, Miller, Eisbrenner, and Simpson to a substantial likelihood of liability, rendering a pre-suit demand futile.

245.   Defendants McClendon, Hargis, Miller, Davidson, Nickles, Keating, Maxwell, Simpson, and Eisbrenner (especially Keating, Maxwell, and Eisbrenner, as members of the Compensation Committee; Davidson, Hargis, and Miller, as members of the Audit Committee; and McClendon as the individual involved in the improper financing transactions) failed to implement and maintain adequate internal controls and procedures.   These defendants utterly failed to implement any internal controls or procedures to, among other things: (i) monitor McClendon's financing with regard to the FWPP; (ii) monitor and manage material conflicts of interest and risks arising from the FWPP; and (iii) ensure fairness and accuracy of the Company's public disclosures relating to the FWPP.  McClendon, Hargis, Miller, Davidson, Nickles, Keating, Maxwell, Simpson, and Eisbrenner also failed to implement adequate and effective internal controls to protect against material conflicts of interest, including controls to: (i) prevent transactions beneficial to officers or directors of the Company to the Company's detriment; and (ii) prevent officers or directors from competing with the Company for financing.  McClendon, Davidson, Hargis, Keating, Maxwell, Nickles, and Miller also

failed to implement effective and adequate internal controls and limitations to restrict McClendon's hedging activities.  McClendon, Davidson, Hargis, Keating, Kerr, Maxwell, Nickles, Whittemore, Miller, Eisbrenner, and Simpson systematically failed to implement and maintain such internal controls while knowing about, or in reckless disregard of, their duties to do so and while in possession of material facts concerning, among other things, the existence of McClendon's financing transactions related to the FWPP, the stated purposes of the FWPP, the Company's need for financing in light of its cash flow problems, and the low amount of revenues generated by the Company's wells compared to the mounting costs that would be shared by McClendon as part of the FWPP.  As a result, McClendon, Davidson, Hargis, Keating, Kerr, Maxwell, Nickles, Whittemore, Miller, Eisbrenner, and Simpson breached their fiduciary duties of loyalty and good faith. Thus, they face a substantial likelihood of liability.  Demand is futile.

246.  Defendants McClendon, Hargis, Miller, Davidson, Nickles, Keating, Maxwell, Simpson, and Eisbrenner, constituting the Company's entire current Board, approved and authorized the State Court settlement for improper purposes.  They approved the settlement as part of a scheme to conceal material information regarding the existence of McClendon's financing relating to his participation in the FWPP, the lack of alignment of McClendon's interests with those of the Company, as well as actual and potential conflicts of interest arising from McClendon's financing arrangements.  The 2012 Director Defendants also approved the settlement to secure the potential release of Chesapeake's valuable claims on terms beneficial to the Individual Defendants, but not for the Company.   In furtherance thereof, they intentionally withheld material

information from the State Court and Plaintiff's counsel – if not misrepresented material information. This conduct was not taken in the Company's best interests, but rather to benefit the Individual Defendants, many of whom remain on the Board (McClendon, Hargis, Miller, Davidson, Nickles, Keating, and Maxwell).

## COUNT I

**Breach of Fiduciary Duties Against the 2008 Compensation Committee Defendants for Their Roles in Defendant McClendon's Excessive Compensation**

247. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

248. The 2008 Compensation Committee Defendants owed and owe Chesapeake fiduciary obligations of care, loyalty, and good faith.

249. Pursuant to the Compensation Committee Charter, the 2008 Compensation Committee Defendants had and have the duty to, among other things: (i) review and approve corporate goals and objectives relevant to CEO compensation, evaluate the CEO's performance in light of those goals and objectives, and set the CEO's compensation level based on this evaluation; (ii) review, evaluate, and approve all compensation of directors and executive officers, including salary adjustments, bonuses, stock awards, stock option grants, perquisites, and other benefits; (iii) review and make recommendations to the Board with respect to the adoption, amendment, and termination of the Company's compensation plans, oversee their administration, and discharge any duties imposed on the Compensation Committee by any such plans; (iv) establish and monitor compliance with stock ownership guidelines for directors and executive officers;

(v) review, evaluate, and make recommendations to the Board with respect to the approval of the employment agreements of executive officers; (vi) prepare the reports required by the rules of the SEC to be included in the Company's annual Proxy Statements; and (vii) review compliance with and make recommendations to the Board regarding the participation of the CEO in accordance with the FWPP.

250.    The 2008 Compensation Committee Defendants violated their fiduciary duties of care, loyalty, and good faith by, among other things: (i) approving and recommending to the Board defendant McClendon's $77 million bonus without justification, after only considering it for one day, without retaining a compensation expert, and relying on McClendon's own recommendation; and (ii) failing to even discuss the Audit Committee's recommendation that the Company purchase McClendon's personal "antique maps" collection for more than $12 million, notwithstanding the fact that the Audit Committee's decision was without justification, without sufficient explanation, without the retention of an independent appraisal, and relied only on McClendon's own art agent for valuation.

251.    As a direct and proximate result of the 2008 Compensation Committee Defendants' failure to perform their fiduciary obligations, Chesapeake has sustained significant damages, not only monetarily, but also to its corporate image and goodwill.

252.    As a result of the misconduct alleged herein, the 2008 Compensation Committee Defendants are liable to the Company.

253.    Plaintiff, on behalf of Chesapeake, has no adequate remedy at law.

## COUNT II

### Breach of Fiduciary Duties Against the 2008 Audit Committee Defendants for Their Roles in Defendant McClendon's Excessive Compensation

254.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

255.    The 2008 Audit Committee Defendants owed and owe Chesapeake fiduciary obligations of care, loyalty, and good faith.

256.    Pursuant to the Audit Committee's Charter, the 2008 Audit Committee Defendants are responsible for, among other things, "review[ing] insider or affiliated party transactions or courses of dealing."

257.    The 2008 Audit Committee Defendants violated their fiduciary duties of care, loyalty, and good faith by, among other things, recommending that the Company purchase defendant McClendon's personal "antique maps" collection for over $12 million.  The 2008 Audit Committee Defendants relied only on McClendon's own art agent to value the "over 500 museum quality pieces," did not seek any independent appraisal of the value of the maps, and have never explained this utter failure to fulfill their duties.

258.    As a direct and proximate result of the 2008 Audit Committee Defendants' failure to perform their fiduciary obligations, Chesapeake has sustained significant damages, not only monetarily, but also to its corporate image and goodwill.

259.    As a result of the misconduct alleged herein, the 2008 Audit Committee Defendants are liable to the Company.

260.     Plaintiff, on behalf of Chesapeake, has no adequate remedy at law.

## COUNT III

**Breach of Fiduciary Duties Against the 2008 Director Defendants for Their Roles in Defendant McClendon's Excessive Compensation**

261.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

262.     The 2008 Director Defendants owed and owe Chesapeake fiduciary obligations of care, loyalty, and good faith.

263.     The 2008 Director Defendants violated their fiduciary duties of care, loyalty, and good faith by, among other things: (i) approving defendant McClendon's $77 million bonus despite the fact that Chesapeake performed abysmally in 2008, and that the Compensation Committee had only considered the bonus for one day, did not retain a compensation expert, and relied on McClendon's own recommendation; and (ii) approving the purchase, on behalf of Chesapeake, of McClendon's personal "antique maps" collection for more than $12 million despite the fact that the Audit Committee did not retain an independent appraisal and relied only on McClendon's own art agent for valuation.

264.     As a direct and proximate result of the 2008 Director Defendants' failure to perform their fiduciary obligations, Chesapeake has sustained significant damages, not only monetarily, but also to its corporate image and goodwill.

265.     As a result of the misconduct alleged herein, the 2008 Director Defendants are liable to the Company.

266.   Plaintiff, on behalf of Chesapeake, has no adequate remedy at law.

## COUNT IV

**Breach of Fiduciary Duties Against Defendant McClendon for His Role in Ensuring Excessive Compensation to Himself**

267.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

268.   Defendant McClendon owed and owes Chesapeake fiduciary obligations of care, loyalty, and good faith.

269.   As Chesapeake's CEO and Chairman, defendant McClendon had the duty to, among other things, use his best efforts and due diligence to assist the Company in the objective of achieving the most profitable operation of the Company consistent with developing and maintaining a quality business operation.

270.   Defendant McClendon determines his own compensation, pending only approval by the Compensation Committee.   Specifically, McClendon was and is responsible for "analyzing, developing and recommending base salary adjustments, cash bonuses and restricted stock awards with respect to the executive officers, including [himself], for review, discussion and approval by the Compensation Committee at its regularly scheduled meetings in June and December of each year."

271.   Defendant McClendon violated his fiduciary duties of care, loyalty, and good faith by, among other things: (i) recommending and receiving a $77 million bonus to himself in a year in which he was personally responsible for leading Chesapeake to horrible financial results; and (ii) recommending and executing the sale to Chesapeake of

his personal collection of maps for more than $12 million, notwithstanding the fact that Chesapeake was already in possession of the maps and, thus, the sale effectively provided no benefit to the Company.

272.   As a direct and proximate result of defendant McClendon's failure to perform his fiduciary obligations, Chesapeake has sustained significant damages, not only monetarily, but also to its corporate image and goodwill.

273.   As a result of the misconduct alleged herein, defendant McClendon is liable to the Company.

274.   Plaintiff, on behalf of Chesapeake, has no adequate remedy at law.

## COUNT V

**Breach of Fiduciary Duties Against the Individual Defendants for Their Roles in Connection with McClendon's Financing and Hedging Transactions**

275.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

276.   The Individual Defendants owed and owe Chesapeake fiduciary obligations of care, loyalty, good faith, fair dealing, and candor.  The Individual Defendants, and each of them, violated and breached each of these duties.

277.   More specifically, the Individual Defendants violated their fiduciary duties of care, loyalty, good faith, and fair dealing by knowingly or recklessly: (i) disregarding conflicts of interest arising from defendant McClendon's financing in connection with his participation in the FWPP; (ii) approving or allowing the Company to enter into tainted transactions on terms disadvantageous to Chesapeake, but lucrative for counterparties

affiliated with McClendon; and (iii) disregarding the VPP transactions by McClendon that are competing with efforts by Chesapeake to obtain financing during a time of severe cash flow shortages at the Company.

278.    The Individual Defendants, as directors of the Company, owed Chesapeake the highest duty of loyalty and good faith.  These defendants breached their fiduciary duties of loyalty and good faith by failing to implement and maintain adequate internal controls and procedures to protect against material conflicts of interest, including controls to: (i) prevent transactions beneficial to officers or directors of the Company to the Company's detriment; and (ii) prevent officers or directors from competing with the Company for financing.  These defendants also utterly failed to implement any internal controls or procedures to, among other things: (i) monitor defendant McClendon's financing with regard to the FWPP; (ii) monitor and manage material conflicts of interest and risks arising from the FWPP; and (iii) ensure fairness and accuracy of the Company's public disclosures relating to the FWPP.  Defendants McClendon, Davidson, Hargis, Keating, Kerr, Maxwell, Nickles, Whittemore, Miller, Eisbrenner, and Simpson failed to implement and maintain such internal controls while knowing about, or in reckless disregard of, their duties to do so and while in possession of material facts concerning, among other things, the existence of McClendon's financing transactions related to the FWPP, the stated purposes of the FWPP, the Company's need for financing in light of its cash flow problems, and the low amount of revenues generated by the Company's wells compared to the mounting costs that would be shared by McClendon as part of the FWPP.

279.    Defendants Davidson, Hargis, Kerr, and Miller, as members of the Audit Committee during the Relevant Period, breached their fiduciary duties of loyalty and good faith, as well as their duties assigned to them under the Audit Committee Charter, by making or causing the Company to disseminate improper statements to the public in the Company's filings with the SEC.    Thus, Davidson, Hargis, Kerr, and Miller are responsible for allowing the improper statements relating to, among other things, the true nature and extent of McClendon's financing relating to his participation in the FWPP, the alignment of (or lack thereof) McClendon's interests with those of the Company's, as well as actual and potential conflicts of interest arising from McClendon's financing arrangements.    Despite their knowledge, or with reckless disregard, Davidson, Hargis, Kerr, and Miller caused or made improper public statements relating to those material issues.

280.    Defendants Davidson, Hargis, Kerr, and Miller, as members of the Audit Committee during the Relevant Period, breached their fiduciary duties of loyalty and good faith and the duties assigned to them by the Audit Committee Charter by knowingly or recklessly disregarding material conflicts of interest arising from defendant McClendon's financing transactions that have harmed and will continue to harm the Company.    They also utterly failed to implement internal controls to inform themselves regarding McClendon's financing transactions despite their duties and being generally aware of the existence of the transactions.    Nonetheless, they approved or allowed the Company to enter into tainted transactions on terms disadvantageous to Chesapeake, but lucrative for counterparties affiliated with McClendon.    Davidson, Hargis, Kerr, and

Miller also consciously disregarded the VPP transactions by McClendon that are competing with efforts by Chesapeake to obtain financing during a time of severe cash flow shortages at the Company.  As a result, these transactions threatened and continue to threaten the Company's very solvency.

281.   Defendants Maxwell, Keating, Whittemore, and Eisbrenner, as members of the Compensation Committee during the Relevant Period, breached their fiduciary duties of loyalty and good faith, as well as their duties assigned to them under the Compensation Committee Charter, by making or causing the Company to disseminate improper statements to the public in the Company's filings with the SEC.  As a result their responsibilities, defendants Maxwell, Keating, Whittemore, and Eisbrenner were required to inform themselves of, among other material facts, the general nature and extent of defendant McClendon's financing in connection with the FWPP, the conflicts of interest and risks McClendon's financing transactions pose to the Company, and harm already caused therefrom.  In light of their responsibilities, Maxwell, Keating, Whittemore, and Eisbrenner also were aware of the need for the Company to fairly and adequately disclose information regarding, among other things, the FWPP, McClendon's related financing transactions, and the conflicts of interest and risks associated therewith.  Despite their knowledge, or with reckless disregard, Maxwell, Keating, Whittemore, and Eisbrenner caused or made improper public statements relating to those material issues.

282.   Defendants Maxwell, Keating, Whittemore, and Eisbrenner, as members of the Compensation Committee during the Relevant Period, breached their fiduciary duties of loyalty and good faith and the duties assigned to them by the Compensation

Committee Charter and the FWPP by knowingly or recklessly disregarding material conflicts of interest arising from defendant McClendon's financing transactions that have harmed and will continue to harm the Company. They also utterly failed to implement internal controls to inform themselves regarding McClendon's financing transactions despite their duties and being generally aware of the existence of the transactions. Nonetheless, they approved or allowed the Company to enter into tainted transactions on terms disadvantageous to Chesapeake, but lucrative for counterparties affiliated with defendant McClendon. Maxwell, Keating, Whittemore, and Eisbrenner also consciously disregarded the VPP transactions by McClendon that are competing with efforts by Chesapeake to obtain financing during a time of severe cash flow shortages at the Company. As a result, these transactions threatened and continue to threaten the Company's very solvency.

283. Defendants McClendon, Davidson, Hargis, Keating, Maxwell, Nickles, Miller, Eisbrenner, and Simpson breached their futility duties of loyalty, good faith, and candor by approving and authorizing the State Court settlement for improper purposes. They approved the settlement as part of a scheme to conceal the material information regarding the existence of McClendon's financing relating to his participation in the FWPP, the lack of alignment of McClendon's interests with those of the Company, as well as actual and potential conflicts of interest arising from McClendon's financing arrangements. Defendants McClendon, Davidson, Hargis, Keating, Maxwell, Nickles, Miller, Eisbrenner, and Simpson also approved the settlement to secure the potential release of Chesapeake's valuable claims on terms beneficial to the Individual Defendants,

but not for the Company.   In furtherance thereof, they intentionally withheld material information from the State Court and Plaintiff's counsel.

284.   The Individual Defendants breached their fiduciary duties of care, loyalty, and good faith by knowingly or recklessly disregarding conflicts of interest arising from defendant McClendon's financing in connection with his participation in the FWPP.   At the same time the Individual Defendants approved or allowed the Company to enter into tainted transactions on terms disadvantageous to Chesapeake, but lucrative for counterparties affiliated with McClendon.   The Individual Defendants also consciously disregarded the VPP transactions by McClendon that are competing with efforts by Chesapeake to obtain financing during a time of severe cash flow shortages at the Company.   As a result, these transactions threatened and continue to threaten the Company's very solvency.   The Individual Defendants also utterly failed to implement internal controls to provide for the monitoring and management of McClendon's financing transactions, which the Individual Defendants were generally aware of, and knew or should have known presented material conflicts of interest and other risks. Accordingly, the Individual Defendants have breached their fiduciary duties of loyalty and good faith, subjecting themselves to a substantial likelihood of liability.

285.   The Individual Defendants breached their fiduciary duties of loyalty, good faith, and candor by knowingly or recklessly approving, causing to be issued, or otherwise participating in the issuance of improper statements in one or more of the Company's Proxy Statements issued between 2005 and the present in connection with soliciting shareholder votes.   In the Proxy Statements, the Individual Defendants

misrepresented certain material facts and failed to apprise shareholders of certain material information, which would have affected the shareholders' voting decisions regarding the FWPP, the LTIP amendments, and the 2010 shareholder proposal regarding annual cash bonuses to the named executives.

286.    Defendants McClendon, Davidson, Hargis, Keating, Maxwell, Nickles, and Miller also breached their fiduciary duties of due care, loyalty, good faith, and candor with regard to McClendon's hedging activities.   These defendants failed to implement adequate and effective internal controls to restrict McClendon's hedging activities.  This likely constituted a breach of the Code applicable during this time.  Instead, McClendon, Davidson, Hargis, Keating, Maxwell, Nickles, and Miller agreed to amendments to McClendon's employment agreement that facilitated McClendon's hedging activities. These defendants also concealed or otherwise caused or allowed the Company to fail in disclosing any information to the public regarding these hedging activities.   This information was material to the Board and shareholders and readily available to, if not known by, McClendon, Davidson, Hargis, Keating, Maxwell, Nickles, and Miller.

287.    As a direct and proximate result of the Individual Defendants' failures to perform their fiduciary obligations, Chesapeake has sustained significant damages, not only monetarily, but also to its corporate image and goodwill.

288.    As a result of the misconduct alleged herein, the Compensation Committee Defendants are liable to the Company.

289.    Plaintiff, on behalf of Chesapeake, has no adequate remedy at law.

## COUNT VI

### Against the 2008 Director Defendants for Waste of Corporate Assets in Connection with Defendant McClendon's 2008 Compensation Package

290.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

291.   The 2008 Director Defendants owed and owe Chesapeake fiduciary obligations of care, loyalty, and good faith.

292.   For the reasons discussed above, the 2008 Director Defendants, through their respective actions taken as members of the Board, Compensation Committee, and/or Audit Committee, wasted Chesapeake's corporate assets by, among other things: (i) recommending and/or approving defendant McClendon's $77 million bonus without justification, after only considering it for one day, without retaining a compensation expert, and relying on McClendon's own recommendation; (ii) recommending and/or approving the purchase on behalf of Chesapeake of McClendon's personal "antique maps" collection without justification, without sufficient explanation, and without retaining an independent appraisal and instead relying on McClendon's own art agent; and (iii) allowing McClendon to usurp valuable corporate opportunities by fronting the CEO's well costs with the $77 million bonus and artwork purchase.

293.   Defendant McClendon also wasted Chesapeake's corporate assets as a result of his primary role in ensuring that the Board approved, and he received, the unjust compensation described above, with no corresponding benefit inuring to the Company.

294.    As a direct and proximate result of the 2008 Director Defendants' failure to perform their fiduciary obligations, Chesapeake has sustained significant damages, not only monetarily, but also to its corporate image and goodwill.

295.    As a result of the misconduct alleged herein, the 2008 Director Defendants are liable to the Company.

296.    Plaintiff, on behalf of Chesapeake, has no adequate remedy at law.

## COUNT VII

**Against the Insider Selling Defendants for Breach of Fiduciary Duties for Insider Selling and Misappropriation of Information**

297.    Plaintiff incorporates by references and realleges each and every allegation set forth above, as though fully set forth herein.

298.    The Individual Defendants owed and owe Chesapeake fiduciary obligations of care, loyalty, and good faith.

299.    At the time of the stock sales set forth herein, the Insider Selling Defendants knew the information described above, and sold Chesapeake common stock on the basis of such information.

300.    The information described above was non-public, adverse information concerning defendant McClendon's margin loan calls.  The Insider Selling Defendants used that information for their own benefit when they sold Chesapeake common stock.

301.    The Insider Selling Defendants' sales of Chesapeake common stock while in possession and control of this material adverse, non-public information was a breach of their fiduciary duties of loyalty and good faith.

302. As a direct and proximate result of the Insider Selling Defendants' failure to perform their fiduciary obligations, Chesapeake has sustained significant damages, not only monetarily, but also to its corporate image and goodwill.

303. As a result of the misconduct alleged herein, the Insider Selling Defendants are liable to the Company.

304. The Company is entitled to the imposition of a constructive trust on any profits the Insider Selling Defendants obtained thereby.

305. Plaintiff, on behalf of Chesapeake, has no adequate remedy at law.

## COUNT VIII

### Against Defendant McClendon for Unjust Enrichment

306. Plaintiff incorporates by references and realleges each and every allegation set forth above, as though fully set forth herein.

307. Defendant McClendon owed and owes Chesapeake fiduciary obligations of care, loyalty, and good faith.

308. By his wrongful acts and omissions, defendant McClendon was unjustly enriched at the expense of and to the detriment of Chesapeake.

309. As a direct and proximate result of the wrongful acts alleged herein, defendant McClendon was unjustly enriched via, among other things: (i) 2009 Employment Agreement, including the $77 million bonus, and Chesapeake's "purchase" of his antique map collection; (ii) financing with lenders on terms more favorable for himself in return for unfair terms for the Company; and (iii) engaging in contracts for VPPs at the lost opportunity of the Company.

310.    Plaintiff, as shareholder and representative of Chesapeake, seeks restitution from defendant McClendon and seeks an order of this Court requiring him to disgorge all profits, benefits, and other compensation obtained as a result of his wrongful conduct and fiduciary breaches.

311.    As a direct and proximate result of defendant McClendon's failure to perform his fiduciary obligations, Chesapeake has sustained significant damages, not only monetarily, but also to its corporate image and goodwill.

312.    As a result of the misconduct alleged herein, defendant McClendon is liable to the Company.

313.    Plaintiff, on behalf of Chesapeake, has no adequate remedy at law.

## COUNT IX

### Against Defendants Whittemore, Nickles, and Maxwell for Unjust Enrichment

314.    Plaintiff incorporate by references and realleges each and every allegation set forth above, as though fully set forth herein.

315.    The Individual Defendants owed and owe Chesapeake fiduciary obligations of care, loyalty, and good faith.

316.    By their wrongful acts and omissions, defendants Whittemore, Nickles, and Maxwell were unjustly enriched at the expense of and to the detriment of Chesapeake.

317.    As a direct and proximate result of the insider selling acts alleged herein, defendants Whittemore, Nickels, and Maxwell wrongfully deprived the Company of substantial wealth and were unjustly enriched.

318.    Plaintiff, as shareholder and representative of Chesapeake, seeks restitution from these defendants, and each of them, and seeks an order of this Court requiring these defendants to disgorge all profits, benefits, and other compensation obtained as a result of their wrongful conduct and fiduciary breaches.

319.    As a direct and proximate result of these defendants' failure to perform their fiduciary obligations, Chesapeake has sustained significant damages, not only monetarily, but also to its corporate image and goodwill.

320.    As a result of the misconduct alleged herein, these defendants are liable to the Company.

321.    Plaintiff, on behalf of Chesapeake, has no adequate remedy at law.

## COUNT X

### Derivatively on Behalf of Chesapeake Against the Individual Defendants for Violations of Section 14(a) of the Exchange Act

322.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

323.    The Individual Defendants knowingly, recklessly, or with gross negligence issued, caused to be issued, and participated in the issuance of materially false and misleading statements to shareholders that were contained in the Company's 2010, 2011, and/or 2012 Proxy Statements filed with the SEC.  These statements were in connection with compensation-related proposals that the Chesapeake's shareholders voted on.

324.    Each of the Proxy Statements from 2009 to 2012 contained a Board-sponsored proposal to increase the amount of shares available to compensate employees

through the Company's LTIP.  The Individual Defendants continued their practice of asking for amendments to increase the shares available under this program every year since its inception.  The LTIP amendments passed each year from 2009 to 2011.

325.  In addition to the LTIP proposals, the 2010 Proxy Statement contained another proposal related to compensation: a shareholder proposal related to the annual cash bonuses paid to named executive officers.  The proposal provided for a new cash bonus structure, which would be based on the achievement of objective criteria, rather than the subjective criteria that were used at the time.  The supporting statement indicated that part of the rationale behind this was to prevent situations where executives were being paid bonuses for sub-par performance.  For example, the statement pointed out that "In 2008, the CEO received $76.9 million in bonuses despite the stock price dropping from $40 per share at the start of the year to just over $16 at year end."  The Board, then comprised of defendants McClendon, Davidson, Hargis, Keating, Maxwell, Nickles, Whittemore, and Miller, recommended against voting for this proposal on named executive officer bonuses.  In its response to the shareholder proposal, these defendants said that "the Board believes strongly that an executive compensation system that bases cash bonuses solely on objective performance goals is not appropriate for the Company." McClendon, Davidson, Hargis, Keating, Maxwell, Nickles, Whittemore, and Miller told shareholders that "The Company's compensation program is designed to take into consideration and reward ... Individual Performance ... Company performance ... [and] Intangibles."  The 2010 shareholder proposal regarding annual cash bonuses to the executives did not pass.

326.   In the 2009, 2010, 2011, and 2012 Proxy Statements, the Individual Defendants misrepresented certain material facts and failed to apprise shareholders of certain material information, which would have affected their voting decisions on the LTIP amendments and the 2010 shareholder proposal regarding annual cash bonuses to the named executives.  Shareholders were told that defendant McClendon's participation in the FWPP, part of his compensation package, was premised on the alignment of his interests with the Company's interests, and on his sharing the same risks as the Company. However, given that McClendon had secured massive loans, from the same lenders used by the Company, and these loans were secured by his interest in the FWPP, neither of these supposed justifications were true.  In addition to the lack of aligning interests, the Individual Defendants' mismanagement of the FWPP has allowed McClendon to create actual and potential conflicts of interest (such as competition with McClendon's VPP contracts) that have harmed and will continue to harm Chesapeake at a time when it is desperate to maintain adequate cash flows.

327.   Plaintiff, on behalf of Chesapeake, thereby seeks relief for damages caused by the improper approval of the LTIP bonus increases in 2009, 2010, and 2011, and the improper rejection of the shareholder proposal in 2010 on cash bonuses for the named executives. Plaintiff, on behalf of Chesapeake, also seeks disgorgement of the benefits the Individual Defendants unjustly acquired through the approval of the LTIP increases from 2009-2011, and the failed approval of the shareholder proposal in 2010 on cash bonuses.   Further, Plaintiff seeks an order from the Court directing the Individual Defendants to disclose all material facts relating to McClendon's financing with regard to

his participation in the FWPP, so that shareholders may make an informed vote on the LTIP in pending and future votes.

## COUNT XI

### Derivatively on Behalf of Chesapeake Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act

328.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

329.    The Individual Defendants acted as controlling persons of Chesapeake within the meaning of section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as directors of Chesapeake, and by their participation in and/or awareness of the Company's operations and/or their intimate knowledge of the false statements contained in the 2009, 2010, 2011, and 2012 Proxy Statements filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various false and misleading statements or omissions.

330.    The Individual Defendants were provided with or had unlimited access to copies of the 2009, 2010, 2011, and 2012 Proxy Statements containing the misleading statements or omissions prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause them to be corrected.

331.    In particular, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, are presumed

to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

332.    In addition, as the 2009, 2010, 2011, and 2012 Proxy Statements set forth at length, and as described herein, the Individual Defendants were each involved in approving and/or acquiescing to the improper statements involving the nature and extent of defendant McClendon's participation in the FWPP and his personal loans funding his participation in the program.

333.    By virtue of the foregoing, the Individual Defendants have violated section 20(a) of the Exchange Act.

334.    As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated section 14(a) of the Exchange Act by their acts and omissions as alleged herein.   By virtue of their positions as controlling persons, these defendants are liable pursuant to section 20(a) of the Exchange Act.   As a direct and proximate result of defendants' conduct, Chesapeake will be irreparably harmed.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.    Against all of the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' wrongful conduct described herein;

B.    Awarding to the Company restitution from Individual Defendants and ordering disgorgement of all profits, benefits, and other compensation obtained by

defendants McClendon, Whittemore, Nickles, and Maxwell as a result of the acts and transactions, including, but not limited to, improper insider selling, complained of herein;

C.      Rescinding defendant McClendon's amended employment agreement, including the $77 million bonus, and the "purchase" of McClendon's personal antique map collection, as a result of the acts and transactions complained of herein;

D.      Enjoining defendant McClendon from future participation in the FWPP;

E.      Disgorging Individual Defendants of benefits unjustly acquired through the approval of the LTIP amendments from 2009-2011 and the failed approval of the shareholder proposal in 2010 on cash bonuses;

F.      Directing the 2012 Director Defendants to disclose all material facts relating to defendant McClendon's financing with regard to his participation in the FWPP;

G.      Directing the Individual Defendants to take all necessary actions to reform and improve Chesapeake's corporate governance and internal procedures to comply with applicable laws and to protect Chesapeake and its shareholders from a repeat of the damaging events described herein;

H.      Extraordinary equitable and/or injunctive relief as permitted by law and equity, including attaching, impounding, imposing a constructive trust on or otherwise restricting defendants' assets so as to assure that Plaintiff on behalf of Chesapeake has an effective remedy;

I.      Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

J.      Granting such other and further relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury on all claims so triable.

DATED:  June 5, 2012                 DERRYBERRY & NAIFEH, LLP


                                     /s/ Darren Derryberry
                                     DARREN DERRYBERRY, OBA No. 14542
                                     4800 N. Lincoln Blvd.
                                     Oklahoma City, OK  73105
                                     Telephone: (405) 528-6569
                                     Facsimile: (405) 528-6462


                                     JOHNSON & WEAVER, LLP.
                                     FRANK J. JOHNSON Cal. Bar. No. 174882
                                     BRETT WEAVER Cal. Bar No. 204715
                                     110 West A Street, Suite 750
                                     Telephone: (619) 230-0063
                                     Facsimile: (619) 238-0622

                                     *Co-Lead Counsel for Plaintiff*

724579