## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| 1. GREG ERICKSON, | ) | |
| | ) | Case No. CIV-12-631-W |
| Plaintiff, | ) | |
| v. | ) | Relating to: |
| | ) | ALL ACTIONS |
| 1. AUBREY K. MCCLENDON, | ) | |
| 2. RICHARD K. DAVIDSON, | ) | DEMAND FOR JURY TRIAL |
| 3. V. BURNS HARGIS, | ) | |
| 4. FRANK KEATING, | ) | |
| 5. BREENE M. KERR, | ) | |
| 6. CHARLES T. MAXWELL, | ) | |
| 7. DON NICKELS, | ) | |
| 8. FREDERICK B. WHITTEMORE, | ) | |
| 9. MERRILL A. MILLER, JR., | ) | |
| 10. KATHLEEN M. EISBRENNER, | ) | |
| 11. LOUIS A. SIMPSON, | ) | |
| | ) | |
| Defendants, | ) | |
| | ) | |
| and, | ) | |
| | ) | |
| 12. CHESAPEAKE ENERGY | ) | |
| CORPORATION, | ) | |
| | ) | |
| Nominal Defendant. | ) | |
| | ) | |
| | ) | |

## AMENDED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTIES, WASTE OF CORPORATE ASSETS, UNJUST ENRICHMENT, AND VIOLATIONS OF THE SECURITIES AND EXCHANGE ACT OF 1934

## TABLE OF CONTENTS

Page

I.      NATURE OF THE ACTION ................................................................. 1

II.     JURISDICTION AND VENUE ............................................................ 6

III.    THE PARTIES ...................................................................................... 7

        A.     Shareholder Plaintiff ................................................................. 7

        B.     Nominal Defendant .................................................................... 7

        C.     Director Defendants .................................................................. 7

IV.     THE INDIVIDUAL DEFENDANTS' DUTIES ................................... 10

V.      BACKGROUND OF CHESAPEAKE'S DISASTROUS FWPP ......... 13

        A.     Shareholders Adopt the FWPP under the Pretext It Would Align
               Defendant McClendon's Interests with Those of the Company ................ 13

        B.     Defendant McClendon and Chesapeake's Dreadful 2008
               Performance Leads to Margin Calls for McClendon and the Forced
               Sale of 94% of His Chesapeake Stock ......................................... 16

        C.     The SEC Investigates Defendant McClendon's Compensation in
               Connection with the FWPP ........................................................ 19

        D.     The IRS Investigates the FWPP ................................................. 20

VI.     DEFENDANTS CONCEAL MASSIVE FINANCING TRANSACTIONS
        BY DEFENDANT MCCLENDON IN VIOLATION OF THE FWPP'S
        STATED PURPOSE AND CONTRARY TO THE COMPANY'S BEST
        INTERESTS ......................................................................................... 21

        A.     Defendant McClendon Borrows over $1 Billion from Chesapeake's
               Lenders Using His FWPP Interests as Collateral to Continue
               Participating in the FWPP ......................................................... 21

        B.     Defendant McClendon's VPP Contracts Threaten Chesapeake's
               Ability to Raise Much Needed Cash ............................................. 33

        C.     Defendants' Struggle with the SEC to Keep Information Regarding
               Defendant McClendon's Participation in the FWPP Concealed ............. 35

D.    The Board Rushes to Defendant McClendon's Defense Before Any Investigation ............................................................................ 37

E.    Defendant McClendon and the Board Scramble to Control the Continuing Fallout ............................................................. 40

F.    S&P Downgrades Chesapeake, Citing Corporate Governance Shortcomings Relating to the FWPP ........................................ 50

VII.   UNCHECKED HEDGING ACTIVITIES BY DEFENDANT MCCLENDON CONFIRM UTTER FAILURE BY INDIVIDUAL DEFENDANTS TO ADDRESS AND DISCLOSE MATERIAL CONFLICTS OF INTEREST .................................................................... 53

A.    Defendant McClendon Distracts Himself with Hedging Activities in Breach of His Employment Agreement and Fiduciary Duties ................. 54

B.    McClendon's Risky Hedging Positions Prove Disastrous ...................... 58

C.    The Individual Defendants Disregard Serious Conflicts of Interest and Other Risks Arising from Defendant McClendon's Hedging Activities ......................................................................... 59

D.    Defendants Conceal Defendant McClendon's Hedging Activities ............. 64

VIII.   THE INDIVIDUAL DEFENDANTS MAKE IMPROPER STATEMENTS IN THE PROXY STATEMENTS RELATING TO THE FWPP ...................... 65

IX.    THE INDIVIDUAL DEFENDANTS MAKE ADDITIONAL IMPROPER STATEMENTS REGARDING DEFENDANT MCCLENDON'S FINANCING AND RELATED RISKS .............................................................. 68

X.    DAMAGES TO CHESAPEAKE ......................................................... 81

XI.    GENERAL DERIVATIVE ALLEGATIONS ........................................ 83

XII.   DERIVATIVE ALLEGATIONS: demand Is Excused ............................ 83

A.    Demand Is Excused Because the Director Defendants' Conduct Is Not a Valid Exercise of Business Judgment ................................... 84

B.    Demand Is Excused Because at least a Majority of the Board Faces a Substantial Likelihood of Liability for Their Misconduct ...................... 86

C.    Demand Is Excused a Majority of the Board Has Demonstrated It Cannot Disinterestedly or Independently Consider a Demand ............... 93

COUNT I ............................................................................................................. 94

    Derivatively On Behalf of Chesapeake Against the Individual Defendants
        for Violations of Section 14(a) of the Exchange Act ................................. 94

COUNT II ............................................................................................................ 95

    Derivatively on Behalf of Chesapeake Against the Individual Defendants
        for Violations of Section 20(a) of the Exchange Act ................................. 95

COUNT III ........................................................................................................... 97

    Against the Individual Defendants for Breach of Fiduciary Duty ........................ 97

COUNT IV ........................................................................................................... 99

    Against the Individual Defendants for Unjust Enrichment ................................... 99

PRAYER FOR RELIEF ........................................................................................ 99

JURY DEMAND ................................................................................................. 101

Plaintiff Greg Erickson ("Plaintiff"), by and through his undersigned attorneys, hereby submits this Amended Shareholder Derivative Complaint (the "Complaint") on behalf of nominal defendant Chesapeake Energy Corporation ("Chesapeake" or the "Company") against certain current and former members of its Board of Directors (the "Board") and executive officers seeking to remedy the defendants' misconduct from 2005 to the present (the "Relevant Period"). Plaintiff makes the following allegations based upon individual and personal knowledge as to their own acts, and the investigation undertaken by their undersigned counsel as to other matters, which investigation included, inter alia, an analysis of U.S. Securities and Exchange Commission ("SEC") filings by Chesapeake, as well as securities analysts' reports and advisories about the Company, press releases, and other public statements issued by the Company, and media reports about the Company. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.    NATURE OF THE ACTION

1.     Chesapeake's business is the exploration for and production of natural gas. The Company is North America's second-largest producer of natural gas. It owns interests in nearly 40,000 natural gas and oil-producing wells that are currently producing more than 2 billion cubic feet equivalent per day. Chesapeake's strategy is to discover, acquire, and develop conventional and unconventional natural gas reserves.

2.     Defendant Aubrey K. McClendon ("McClendon") co-founded the Company in 1989. He has served as Chesapeake's Chief Executive Officer ("CEO") and

Chairman of the Board. McClendon has routinely taken advantage of his imperial status at the Company to offload his personal financial risk to Chesapeake and its minority shareholders – all under the guise of purportedly aligning his interests with theirs. This twisted logic is increasingly being exposed for what it is, as investors continue to learn the truth that, between his weight at the Company and his leveraging of other people's money, McClendon can only win while everyone else will lose.

3. Since the Company's initial public offering ("IPO") in 1993, defendant McClendon has participated in a "well participation program" available only to the Company's founders known as the Founder Well Participation Program ("FWPP"). This program has allowed McClendon to personally participate in the Company's exploratory efforts and to seek personal benefits from that participation in addition to the benefits he has obtained by serving as Chesapeake's lead executive. McClendon has participated in almost every single one of the Company's wells since the IPO, thereby obtaining purported ownership interests in gas producing reserves valued at more than $852 million.

4. Defendants' stated purpose of the FWPP, when it was presented to shareholders for approval in 2005, is to retain and motivate defendant McClendon and his co-founder and align their interests with the Company's interests. This has proven – through McClendon and the Board's manipulations – not to be true, as defendants have repeatedly disregarded these justifications of the FWPP and have instead allowed it to simply serve as a vehicle for McClendon to once again leverage himself to the potential peril of the Company.

5.      In order to participate in the FWPP during any given "participation period," defendant McClendon was required first to state his intention to do so and to declare "the percentage working interest" that he proposes to participate with during that participation period, not to exceed 2.5% of the total.  Thereafter, the Company is supposed to invoice McClendon on a monthly basis for a pro rata portion of certain costs associated with drilling the applicable well.  McClendon, however, encountered personal liquidity troubles in 2008 relating to, among other things, his stock ownership in the Company and his personally operated wedge fund, and struggled to fulfill his financial obligations under the FWPP in 2008.  More recently, McClendon has been taking out substantial loans totaling approximately $1 billion to buy into the FWPP, while at the same time using his other FWPP interests as collateral.

6.      McClendon's transactions, amounting to approximately $1 billion, were first revealed by *Reuters* on April 18, 2012, in an in-depth investigative report.  Amazingly, as part of these transactions, McClendon has assigned the rights to a vast portion of any profits he could hope to make from his FWPP interests, meaning he not only has minimal down side exposure, but also minimal interest in the upside.  *Reuters* cites numerous experts, analysts, and investors who expressed surprise and concern regarding the nature and extent of these loans, as well as the threat they pose to the Company.

7.      These new loans present a serious conflict of interest between defendant McClendon and the Company, whose interests McClendon is duty bound to put before his own.  Some of McClendon's lenders are providing financing to the Company, but at

rates that are lucrative to the lenders, while unfair to the Company. For example, while McClendon bought back his map collection at only 2.28% interest (the Company's purported average borrowing cost), one of McClendon's lenders bought preferred stock from the Company that pays an annual dividend of 7%, plus royalty interest from Chesapeake's oil and gas wells. McClendon's massive leveraging of his FWPP interests also runs the serious risk that an imminent default by the CEO could, among other things, ensnare Chesapeake in litigation with McClendon's lenders.

8. Defendant McClendon's use of his FWPP interests presents an additional conflict of interest as he competes with the Company to sell gas. According to *Forbes*, McClendon has personally collected more than $130 million from Volumetric Production Payment ("VPP") contracts, by which he has promised to deliver certain pre-arranged amounts of gas for a certain period of time, in exchange for an upfront payment. Chesapeake, however, is in no position to be competing with McClendon in the sale of gas. The Company has a debt load of $10 billion and has been scraping for money and liquidating assets to maintain cash flows.

9. The revelations of defendant McClendon's loans and VPP contracts has exposed the FWPP as simply a conduit for McClendon to enrich himself despite the consequences to the Company. He shares very little risk because he is using other people's money to buy into the FWPP, while at the same time he has a low chance of seeing any profits because his lenders will take practically any profits the wells are likely to generate. Defendants' repeated statements to shareholders, year after year, that the FWPP aligns McClendon's interests with those of the Company's, were clearly meant to

distract shareholders from discovering the entire slate of McClendon's financial transactions.

10.    Indeed, defendants do not hide the fact that the Board was aware of defendant McClendon's financing transactions, and they were quick to partially disclose the deals in the Company's latest Proxy Statement – that is, once the media already broke the news of what had been going on behind the scenes.  Defendants' improper and incomplete disclosures are also wrongful because many of them were made in connection with annual Proxy Statements soliciting shareholder votes *for* various compensation proposals that benefitted McClendon and *against* other shareholder-sponsored proposals that sought to limit the extent of McClendon's ability to personally profit at the expense of the best interests of Chesapeake.

11.    On top of a reopened investigation by the SEC, the Internal Revenue Service ("IRS") is also investigating potential wrongdoing in connection with the FWPP. A U.S. Senator is also calling for an investigation by the U.S. Department of Justice. These investigations mean the Company may face substantial costs in connection with investigating and defending itself – and potentially pay steep penalties or fines – as a result of defendants' wrongdoing.

12.    Furthermore, *Reuters* has revealed that between approximately 2004 and 2008, while defendant McClendon was also supposed to be the full time CEO of Chesapeake, he operated a $200 million hedge fund.  If the distraction from his duties at Chesapeake (if not potential violation of his employment agreement) was not problematic enough, the CEO's hedging activities involved bets on commodities that Chesapeake

produces.  Despite the serious conflicts of interest presented by McClendon's hedging activities, the Board amended his employment agreement to make it easier for him to engage in these activities.  At the same time, the Board utterly failed to disclose any material facts relating to the hedge fund to shareholders.

13.    In light of these facts and the facts alleged below, Plaintiff brings this derivative action on behalf of the Company.

## II.    JURISDICTION AND VENUE

14.    This Court has jurisdiction in this case arising under Article III of the United States Constitution and 28 U.S.C. §1331 because of claims arising under sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act").  This Court also has supplemental jurisdiction pursuant to 28 U.S.C. §1367(a) over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.  This Court also has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1332 because Plaintiff and defendants are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs. This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

15.    Venue is proper in this District pursuant to 28 U.S.C. §1391(a).  The acts and transactions that gave rise to the violations of law asserted in this complaint occurred in this District.  The misconduct complained of herein occurred in substantial part in this

District, including the preparation and dissemination of materially false and misleading statements and the omission of material information complained of herein.

## III.   THE PARTIES

### A.   Shareholder Plaintiff

16.   Plaintiff Greg Erickson is a current shareholder of Chesapeake and has continuously held Chesapeake stock since at least October 2005.  Plaintiff Erickson is a citizen of Wisconsin.

### B.   Nominal Defendant

17.   Nominal defendant Chesapeake is an Oklahoma corporation headquartered in Oklahoma City, Oklahoma.  The Company's principal executive offices are located at 6100 North Western Avenue, Oklahoma City, Oklahoma.  Chesapeake's shares trade on the New York Stock Exchange.

### C.   Director Defendants

18.   Defendant McClendon ("McClendon") has served as CEO of the Company since 1989, when he co-founded the Company.   Until recently, he also served as Chairman of the Board of Directors ("Board").  Defendant McClendon is a citizen of Oklahoma.

19.   Defendant Richard K. Davidson ("Davidson") served as a director of the Company from 2006 until he resigned on June 8, 2012.  Before his resignation, Davidson served as a member of the Board's Audit Committee since March 2006.  Davidson is a citizen of Florida.

20.     Defendant V. Burns Hargis ("Hargis") has served as a director of the Company since September 2008.  In addition, Hargis has served as Chairman of the Audit Committee since at least April 2010 and a member of that committee since September 2008.  Hargis is a citizen of Oklahoma.

21.     Defendant Frank Keating ("Keating") served as a director of the Company from 2003 until he resigned on June 8, 2012.  Before his resignation, Keating served as Chairman of the Compensation Committee from at least April 2011 and a member of that committee since March 2005.  Keating was also a member of the Audit Committee from at least April 2004 to March 2005.  Keating is a citizen of Virginia.

22.     Defendant Breene M. Kerr ("Kerr") served as a director of the Company from 1993 until June 12, 2009.  In addition, Kerr served as Chairman of the Audit Committee from at least April 2004 to June 2009.  Kerr is a citizen of Maine.

23.     Defendant Charles T. Maxwell ("Maxwell") served as a director of the Company since 2002 until he resigned on June 8, 2012.  Before his resignation, Maxwell served as a member of the Compensation Committee beginning in March 2007 and from at least April 2004 to March 2005.  Maxwell also served as a member of the Audit Committee from at least April 2004 to March 2007.  Maxwell is a citizen of New York.

24.     Defendant Don Nickles ("Nickles") served as a director of the Company from 2005 until he resigned on June 8, 2012.  In addition, before his resignation, Nickles served as a member of the Audit Committee from March 2005 to December 2008.  Nickles is a citizen of Virginia.

25.     Defendant Frederick B. Whittemore ("Whittemore") has served as a director of the Company from 1993 until June 2011.  In addition, Whittemore served as Chairman of the Compensation Committee from at least April 2004 to at least April 2010 and a member of that committee from at least April 2004 to at least April 2011. Whittemore is a citizen of New York.

26.     Defendant Merrill A. Miller, Jr. ("Miller") has served as Lead Independent Director of the Company since March 2010 and a director since 2007.  In addition, Miller has served as a member of the Audit Committee since March 2007.  Miller is a citizen of Texas.

27.     Defendant Kathleen M. Eisbrenner ("Eisbrenner") served as a director of the Company from December 2010 until she resigned on June 8, 2012.  Before her resignation, Eisbrenner served as a member of the Compensation Committee since at least April 2011.  Eisbrenner is a citizen of Texas.

28.     Defendant Louis A. Simpson ("Simpson") has served as a director of the Company since June 2011.  Simpson is a citizen of Florida.

29.     Collectively, defendants McClendon, Davidson, Hargis, Keating, Kerr, Maxwell, Nickles, Whittemore, Miller, Eisbrenner, and Simpson are referred to herein as the "Individual Defendants."

30.     Collectively, defendants Maxwell, Keating, and Eisbrenner are referred to herein as the "2012 Compensation Committee Defendants."

31.     Collectively, defendants Davidson, Hargis, and Miller are referred to herein as the "2012 Audit Committee Defendants."

32.     Collectively, defendants McClendon, Davidson, Hargis, Keating, Kerr, Maxwell, Nickles, Whittemore, and Miller are referred to herein as the "2008 Director Defendants."

## IV.     THE INDIVIDUAL DEFENDANTS' DUTIES

33.     By reason of their positions as officers, directors, and fiduciaries of Chesapeake and because of their ability to control the business and corporate affairs of Chesapeake, the Individual Defendants owed and owe Chesapeake fiduciary obligations of good faith, loyalty, and candor, and were and are required to use their utmost ability to control and manage Chesapeake in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Chesapeake and its shareholders so as to benefit all shareholders equally and not in furtherance of their own personal interest or benefit.

34.     Each director and officer of the Company owes to Chesapeake and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.  In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's operations, performance, management, projections, and forecasts so that the market price of the Company's stock would be based on truthful and accurate information.  The Individual Defendants are also required to disclose fully and fairly all material information within their control when they seek shareholder action.

35.    The directors also have a duty to inform themselves of all material information reasonably available to them prior to making a business decision.   Upon receipt of a litigation demand, the directors must investigate and evaluate the charges in order to discharge their duty to the shareholders and the Company.   The directors must review all information necessary to objectively and meaningfully evaluate the demand.

36.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of Chesapeake, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein. Because of their advisory, executive, managerial, and directorial positions with Chesapeake, each of the Individual Defendants had knowledge of material, non-public information regarding the Company.

37.    To discharge their duties, the officers and directors of Chesapeake were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the Company.   By virtue of such duties, the officers and directors of Chesapeake were required to, among other things: (i) exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner and provide the highest quality of performance; (ii) exercise good faith to ensure that the Company was operated in a diligent, honest, and prudent manner and complied with all applicable federal and state laws, rules, and regulations, and all contractual obligations, including acting only within the scope of its legal authority; (iii) ensure that the Company is operated in a diligent, honest, and prudent manner in compliance with all applicable laws, rules, and regulations; (iv) ensure that the purposes and goals of the

Company's FWPP are served at all times and are not compromised in order to serve the interests of any of Chesapeake's executive officers; (v) ensure that the Company not waste its corporate assets by conferring personal benefits on its executives or other employees, with no corresponding benefit to the Company; (vi) ensure that the Board and any of its committees, including the Compensation Committee and Audit Committee, fulfill their respective duties, including by ensuring that the Board and its committees become reasonably informed before making any decisions on the Company's behalf; (vii) ensure that the Company's public disclosures do not contain false or misleading statements or omissions of material facts; and (viii) identify and mitigate conflicts of interest and other risks to the Company.

38.     Furthermore, Chesapeake's current Code of Business Conduct and Ethics (the "Code") provides that "[a]ll directors, officers and employees of the Company must avoid situations that create a conflict of interest or the appearance or potential for a conflict of interest." The Code defines a conflict of interest as occurring when personal interests are either in conflict with the Company's interest or interfere with one's ability to perform his or her duties to the Company or responsibilities at work. The Individual Defendants are also expected to recognize situations where a conflict of interest has occurred, or has the potential to occur, and take the necessary actions to eliminate or mitigate such conflict, including, if necessary, enlisting the assistance of management. Upon information and belief, the forgoing or its substantial equivalent was required by the Code throughout the Relevant Period.

39.    The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Chesapeake, the absence of good faith on their part, and a disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.  The Individual Defendants breached their duties of loyalty, care, and good faith by allowing defendants to cause, or by themselves causing, the wrongdoing alleged herein.

## V.    BACKGROUND OF CHESAPEAKE'S DISASTROUS FWPP

### A.    Shareholders Adopt the FWPP under the Pretext It Would Align Defendant McClendon's Interests with Those of the Company

40.    While the FWPP was not approved by shareholders until June 10, 2005, the FWPP was a continuation of a well participation program that was initiated with Chesapeake's IPO in 1993 for its two founders, including defendant McClendon.  The FWPP permits McClendon to participate in all of the wells drilled by or on behalf of Chesapeake during each fiscal year.

41.    The FWPP operates on an all-or-nothing basis, meaning that if defendant McClendon elects to participate, he must participate in every well drilled by Chesapeake during that participation period.  However, McClendon's participation percentage may not exceed a 2.5% working interest in a well and is not effective for any well where the Company's working interest (after elections by the founders to participate) would be reduced to below 12.5%.  For each well in which defendant McClendon participates, the

Company will bill him, on a monthly basis, an amount equal to his participation percentage multiplied by the costs incurred in drilling the well.[1]

42.   When shareholders were asked to approve the FWPP in 2005, they were told in Chesapeake's April 29, 2005 Proxy Statement ("2005 Proxy") that the purpose of the FWPP was to align the interests of defendant McClendon and his co-founder with those of the Company.  Per the 2005 Proxy and the terms of the FWPP itself, the purpose of the FWPP is to foster and promote the development and execution of the Company's business by: (i) retaining and motivating the principal executive officers who founded the Company; (ii) aligning the financial rewards and risks of the founders with the Company more effectively than overriding royalty, carried interest or other performance incentive programs maintained by many of the Company's peers; and (iii) imposing on the founders the same risk incurred by the Company in its core operations.

43.   To encourage shareholders to vote to approve the FWPP, the Company presented the program's benefits as follows:

- Since the long-term success of the Company is dependent on its ability to conduct oil and gas exploration and production profitability, the participation program instills discipline in the Company's long-term strategy by imposing risks on the Founders which are identical to the risks incurred by the Company.

- The Company's stock price fluctuates based on many industry-related factors that are not within the control of our management, including volatility of oil and gas prices and global supply/demand trends for natural resources.  The participation program provides an additional mechanism for providing direct incentives to the Founders

---

[1] The terms of the FWPP are essentially the same as the prior well participation program.

to create long-term value through the efficient development of the Company's resource base.

- Our founders are personally and professionally incentivized to maintain their focus on the growth, success, and profitability of the Company's operations since such operations have a direct impact on the Founders.

44.    The terms of the FWPP provide that a founder (including defendant McClendon) who participates in the program for a particular participation period agrees to pay all joint billings "immediately on receipt of the Company's invoice" and agrees to prepay to the Company amounts attributable to the founder's interest to the extent a Company entity is required to prepay costs in connection with a well spudded during that participation period. The 2005 Proxy reinforced these terms in greater detail:

> For each well in which a Founder participates, *the Company will bill the Founder, on a monthly basis,* an amount equal to the Founder's participation percentage multiplied by the drilling and operating costs incurred in drilling the well. Leasehold costs associated with each new well will be billed in the first invoice for the well based on an amount determined by the Company to approximate the Company's average cost in the Company's pool of acreage. *Payment is due for all such costs promptly upon receipt of an invoice.*

45.    The FWPP, as presented to and approved by shareholders in 2005, further provides that: "Notwithstanding anything herein to the contrary, in each case the Founder's participation in a Program Well will be on no better terms than the terms agreed to by unaffiliated third party participants in connection with the participation in such Program Well or similar wells operated by the Company Entities."

46.    In February 2006, within a year of the FWPP's approval by Chesapeake shareholders, defendant McClendon's co-founder left the Company.  As a result, since February 2006, the FWPP has only been available and applicable to McClendon.

**B.    Defendant McClendon and Chesapeake's Dreadful 2008 Performance Leads to Margin Calls for McClendon and the Forced Sale of 94% of His Chesapeake Stock**

47.    The year 2008 was rough for Chesapeake by any measure.  Earnings per share ("EPS") in 2008 fell to $1.16 compared to $2.69 in 2007, and the Company's EPS growth rate for year-end 2008 (-56.4%) was significantly worse than the preceding two years:  2007 (-39.85%) and 2006 (73.55%).  The Company's net income for 2008 was only $723 million, compared to $1.45 billion recorded in 2007, and $2 billion in 2006. Bloomberg.com dubbed Chesapeake the worst-performing oil and gas producer in the S&P 500 for the year 2008.  The Company lost $860 million in the 4Q:08, compared with a $303 million profit for the same period in 2007.   The Company's stock fell from $74 per share in July 2008 to less than $10 per share in December 2008.  By way of comparison, Chesapeake performed worse in 2008 than other large independent energy companies,  including  Devon  Energy  Corporation  ("Devon"),  Anadarko  Petroleum Corporation ("Anadarko") and XTO Energy Inc.

48.    The Company's poor financial performance put enormous strain on its cash flow.  To raise cash, the Company issued twenty-three million shares and sold more than $1 billion in senior notes in the spring of 2008, put forth a stock offering of 28.75 million shares on July 15, 2008, and later, in the fall of 2008, announced a plan to sell fifty million additional shares, which caused Chesapeake's stock price to immediately drop by

40% on concerns that the Company's stock was being severely diluted.  The Company later canceled most of the latter offering due to the market's strong negative reaction. CEO defendant McClendon personally apologized to analysts and investors during a conference call in November 2008, for inadvertently causing the Company's stock price to drop because of dilution concerns.  The lack of operating cash led the Company to sell off many of its key assets.  In 2008, the Company sold off more than $11 billion worth of assets, which represented approximately one-third of the total assets owned by the Company.  Some of these sales were completed at prices that were disadvantageous to Chesapeake and reflected the Company's need for immediate infusions of cash.  For example, McClendon stated that one transaction with Statoil occurred at prices that were very favorable to the foreign energy conglomerate.

49.    Chesapeake struggled for cash when the price of natural gas reached unprecedented highs in the summer of 2008.  The Company routinely withdrew all of its $3.5 billion revolving credit facility.  The proceeds from the stock offering were intended to be used to temporarily pay down the revolving credit facility.

50.    Chesapeake's ongoing cash flow concerns caught the attention of the SEC. In a letter dated May 30, 2008, the SEC requested additional disclosures regarding the Company's negative cash flow and liquidity problems.  The Company responded by stating, in effect, that it planned to sell significant assets to raise new working capital and to temporarily resolve their cash problems.

51.    Defendant McClendon stated in a conference call in the last quarter of 2008 that concerns over whether the Company had sufficient operating capital caused the

Company's stock to trade at a significantly reduced level. Several analysts who track Chesapeake have confirmed his statement. An analyst report published by J.P. Morgan Securities Inc. ("J.P. Morgan") on November 28, 2008, stated that Chesapeake is the "riskiest of the large cap group because of the corporate strategy and operating and financial leverage." Others indicated that Chesapeake traded at reduced multiples because of its liquidity concerns.

52.   The selling of senior notes continued at a rapid pace in 2009, raising nearly $1.5 billion to repay "outstanding indebtedness." But the Company is still not out of the clear. More recently, in January 2012, the Company's capital needs forced it to enter into a joint venture with Total S.A., a French energy company, for access to Chesapeake's 619,000 acres in Ohio, including a 25% ownership interest, in exchange for $610 million in cash up front and $1.42 billion by the end of 2014.

53.   As Chesapeake's stock value plummeted, defendant McClendon faced margin calls requiring him to unload nearly all of his Chesapeake stock. Specifically, on October 8, 9, and 10, 2008, McClendon received three consecutive margin loan calls, forcing him to sell 94% of his Chesapeake stock for proceeds of over $569 million. Chesapeake announced this on October 10, 2008, informing the public that McClendon had "involuntarily sold substantially all of his shares of Chesapeake common stock over the past three days in order to meet margin loan calls." Specifically, over those three days, McClendon sold 31,522,923 shares of Chesapeake's common stock, and was left with 1,947,959 shares on October 10, 2008.

54.    Just days prior to the October disclosure, defendants Whittemore, Nickles, and Maxwell sold over $5.2 million worth of Chesapeake stock with knowledge of McClendon's impending margin calls.

55.    In a Form 8-K filed with the SEC on January 7, 2009, the 2008 Individual Defendants in essence admitted that defendant McClendon breached the 500% stock investment requirement in his 2008 Employment Agreement, stating: "As a result of the forced liquidation of a substantial portion of Mr. McClendon's stock holdings in the Company during October 2008, Mr. McClendon's stock ownership fell below the required amount."

### C.    The SEC Investigates Defendant McClendon's Compensation in Connection with the FWPP

56.    Even before the margin calls and $75 million incentive award, the SEC had expressed concern about defendant McClendon's benefits in connection with the FWPP, and the 2008 Individual Defendants' disclosures related thereto, at least as early as August 2007.  In a letter dated August 21, 2007, the SEC recommended, among other things, that Chesapeake disclose whether the founders' total compensation was significantly higher or lower than income they earned from their participatory working interests granted under the FWPP.

57.    One year later, on August 19, 2008, the SEC sent Chesapeake a letter inquiring as to, among other things, whether the revenues defendant McClendon receives from the FWPP constitute "compensation" for purposes of Item 402 of Regulation S-K. The 2008 Individual Defendants responded on September 5, 2008, and agreed to disclose

in future annual meeting Proxy Statements the amounts of oil and natural gas production revenues distributed to McClendon in connection with his FWPP interests. The SEC responded again on October 1, 2008, stating that it was still unclear whether McClendon's revenues from the FWPP should be treated as compensation. In letters dated November 7 and December 2, 2008, the 2008 Individual Defendants informed the SEC that the Company would disclose the present value of future net revenue of the estimated proved developed producing oil and natural gas reserves associated with the FWPP interests owned by McClendon.

58. Then, after the 2008 Individual Defendants caused Chesapeake to file its Form 8-K on January 7, 2009, announcing defendant McClendon's new five-year employment agreement, the SEC sent the Company another letter on January 30, 2009, expressing concerns about the $75 million "incentive award" granted to McClendon. Specifically, the SEC requested that Chesapeake, among other things, explain why the Board determined to enter into a new five-year employment agreement with McClendon with the $75 million bonus at that time and address whether the forced liquidation of his holdings was a factor. The Company's response included the same purported justifications cited above, and they fail for the same reasons.

### D. The IRS Investigates the FWPP

59. Adding to the Company's growing list of woes, thanks to the Individual Defendants' disloyalty and mismanagement, the IRS is now investigating perks that defendant McClendon received in connection with the FWPP. According to a April 30, 2012 *Reuters* article:

Chesapeake Energy Corp ... said on [April 30, 2012] the Internal Revenue Service was reviewing issues related to the company's perk that grants its chief executive officer a stake in thousands of wells the company drills, according to a regulatory filing.

In a filing with the U.S. Securities and Exchange Commission, Chesapeake disclosed 'the IRS is reviewing certain issues' related to its Founders Well Participation Program (FWPP) granting CEO Aubrey McClendon the right to take a 2.5 percent interest in every well the company drills.

\*       \*       \*

Chesapeake, based in Oklahoma City, Oklahoma, said the IRS review relates to its 2008 and 2009 tax returns and the company believes 'that resolution of these issues will not have a material impact on the company,' the filing said.

A spokesman for the company said Chesapeake's talks with the IRS are ongoing.

60.     It remains to be seen whether this latest government inquiry will result in substantial costs to the Company in connection with investigating and defending itself, if not pay fines and penalties.   If the Company has in fact improperly paid taxes in connection with the FWPP, it would signify further breaches of fiduciary duty and mismanagement by the Individual Defendants.

## VI.   DEFENDANTS CONCEAL MASSIVE FINANCING TRANSACTIONS BY DEFENDANT MCCLENDON IN VIOLATION OF THE FWPP'S STATED PURPOSE AND CONTRARY TO THE COMPANY'S BEST INTERESTS

### A.   Defendant McClendon Borrows over $1 Billion from Chesapeake's Lenders Using His FWPP Interests as Collateral to Continue Participating in the FWPP

61.     Contrary to the stated purposes for which shareholders approved the FWPP, from 2009 to 2012, defendant McClendon has borrowed approximately $1.1 billion (and potentially more) to fund his participation in the FWPP, while at the same time using his

personal stake in Chesapeake's wells to secure the loans.[2] Most of what is so far publicly known about these loans was revealed by *Reuters* on April 18, 2012, in a special report titled: "The Energy Billionaire's Shrouded Loans."

62.    As discussed above, the FWPP is premised on the idea that defendant McClendon's interests will be aligned with Chesapeake's because he will bear his proportionate share of costs (and risks) from drilling new wells in addition to any profits from their success. However, from at least 2009 to 2012, McClendon did not contribute his own cash or assets to pay for his share of the Company's wells. Instead, he used loans secured by his 2.5% interest in others wells that he acquired through the FWPP. McClendon pledged almost his entire interest in these wells as collateral that would be seized if he defaults on the loans.

63.    Defendant McClendon obtained approximately $1.1 billion in loans through three companies that he controls: Chesapeake Investments LP, Larchmont Resources LLC, and Jamestown Resources LLC. Each of these companies lists Chesapeake's headquarters as their address.

64.    The more than $1 billion in loans consists of three separate loans secured by defendant McClendon's 2.5% interest in Chesapeake's wells. In June 2009,

---

[2] Interestingly, *Forbes* estimated defendant McClendon's net worth to be $1.1 billion as of March 2012.

McClendon borrowed $225 million from Union Bank.[3]  In December 2010, he borrowed $375 million from TCW Asset Management.  Finally, in January 2012, he borrowed at least $500 million from a $1 billion line of credit with EIG Global Energy Partners ("EIG").

65.    This ever-growing scale of defendant McClendon's borrowing is troubling, especially when taken in context of smaller borrowing in the past.  From 1989 to the present, McClendon has frequently borrowed on a much smaller scale.  For example, Oklahoma records indicate that Chesapeake Investments took out a $2.9 million loan in 1992.  As *Reuters* observes, Chesapeake released a statement indicating that "McClendon's securing of such loans has been 'commonplace' during the past 20 years." With the most recent loan up to or exceeding $500 million, McClendon's increases in borrowing appear dangerously unsustainable.    Reflecting this unsustainability, McClendon has even shown willingness on his part to terminate the FWPP before it is set to expire on December 31, 2015.

66.    An examination of cash flows from defendant McClendon's FWPP participation confirms that McClendon may not only be cash-poor, but that he is on course to default on his monstrous loans.  Since at least 2009, McClendon's FWPP interests have required him to find millions (if not hundreds of millions) of dollars of cash to cover his allotment of expenditures.  Meanwhile, McClendon's FWPP interests

---

[3] Based on an investigation by Plaintiffs' counsel, this $225 million loan referenced by *Reuters* appears to have been amended at some point to allow defendant McClendon to draw up to $250 million.

have generated only nominal revenues.  This pattern is illustrated in the following table

that the Company published in the Proxy Statement filed with the SEC on April 20, 2012:

| | First Quarter 2012 | 2011 | 2010 | 2009 |
|---|---|---|---|---|
| Natural gas and oil revenues | $     53,103,173 | $  184,270,948 | $  127,064,861 | $    87,856,431 |
| Lease operating expenditures | (13,203,805) | (42,457,253) | (26,102,787) | (19,481,167) |
| Net cash flow | 39,899,368 | 141,813,695 | 100,962,074 | 68,375,264 |
| Capital expenditures | (127,982,572) | (457,151,007) | (242,839,086) | (184,468,839) |
| Net after capital expenditures | $  (88,083,204) | (315,337,312) | $(141,877,012) | $(116,093,575) |

67.    There is also a grave risk that defendant McClendon's overleveraging of his

well interests (like his overleveraging of Company stock in 2008) will negatively impact

Chesapeake.  According to *Reuters*, these loans required McClendon to "'take all

commercially reasonable action' to ensure that other owners and operators of the wells –

including Chesapeake – 'comply with ... covenants and agreements' of the loans."

Thomas O. Gorman, a partner at Dorsey & Whitney in Washington, D.C., commented

that, because of this clause, these private loans had the potential to impact Chesapeake.

The Individual Defendants rushed to essentially argue that the Company is immune to

any claims by McClendon's lenders in connection with his personal loans.  Defendants

have since admitted that they were not aware of the terms of McClendon's financing

transactions.  Moreover, their wishful thinking will not prevent the Company from being

ensnared in litigation with the lenders who will undoubtedly resort to aggressive tactics to reclaim the vast amounts of money they have lent to McClendon. After all, McClendon's lenders have the capability to bring incredible pressure to bear upon the cash-strapped Company, because these same lenders provide much needed financing to Chesapeake as well. This presents a serious conflict between McClendon and the Company.

68.    Defendant McClendon's out-of-control borrowing has also created another serious conflict of interest that has harmed and will continue to harm the Company. McClendon's largest financer, EIG, has provided financing for Chesapeake at a steep price for the Company. Presumably speaking on McClendon's borrowing from EIG, *The Wall Street Journal* reported that McClendon "borrow[ed] up to $1.4 billion from a private-equity firm that has done hundreds of millions of dollars with [Chesapeake] in the past year." In November 2011, EIG was part of a group of investors that bought $1.25 billion worth of "perpetual preferred shares" in Chesapeake Utica LLC, a newly formed entity. Notably, the investment rewarded EIG investors with *an annual dividend of 7% in addition to royalties from oil and gas wells*. On April 9, 2012, the Company announced plans to raise another $1.25 billion from investors including EIG, through CHK Cleaveland Tonkawa, another new subsidiary.

69.    EIG has been closely tied to defendant McClendon and Chesapeake for years. In February 2011, EIG met with the New Mexico State Investment Council ("NMSIC"), the state's public investment fund. The fund asked EIG's COO, Randall Wade ("Wade"), about the company's prior investments in McClendon's well interests. Wade told NMSIC that "EIG had known Chesapeake for more than 25 years and

'provided pre-IPO financing for them in the late 1980's.'" He also told the NMSIC that this ongoing relationship provided opportunities to EIG that were not available to other investors. For example, in 2008 when McClendon did not have the resources to participate in the FWPP, EIG stepped in to provide financing.[4] After negotiations with McClendon, EIG formed a special purpose vehicle, Larchmont Resources, LLC, through which EIG acquired McClendon's well rights for 2009 and 2010. EIG later formed a second special purpose vehicle, Jamestown Resources LLC, which it used to control McClendon's well rights in 2011, with rights to control his interests in 2012 as well.

70.    EIG's investments in defendant McClendon and in Chesapeake have been very lucrative. The *7% **annual dividends*** that are paid by Chesapeake represent very favorable terms to EIG because the dividends on preferred shares get paid first, before the dividends on regular shares.[5] In stark contrast, as part of the proposed settlement, McClendon agreed to buy back his map collection from the Company and pay interest at the paltry rate of 2.28%, which (according to the terms of the proposed settlement) equals Chesapeake's average borrowing rate from approximately January 2009 to July 2011.

---

[4] The fact that defendant McClendon sought financing from EIG in 2008 does not preclude the possibility that McClendon used his $75 million "incentive" award to pay past due expenses. McClendon's net expenditures in 2008 with regard to the FWPP were approximately $64 million. The after-tax amount of McClendon's $75 million "incentive" award was approximately $44 million. Thus, this means that, assuming all the credits from the incentive award were applied to cover the $64 million in net expenditures, McClendon would still have needed to raise approximately another $20 million.

[5] On top of dividends, EIG and the other private placement investors received a 3% "overriding royalty interest" in up to 1,500 wells to be drilled.

*Reuters* quoted Mark Hanson, an analyst with Morningstar in Chicago, speaking on preferred shares: "'Basically it's a form of more expensive debt.'" He adds: "'It makes it appear that it's not debt, but it sits on top of obligations to the common shareholder.'"

71.     At the same time, EIG's arrangements with defendant McClendon himself are similarly very profitable for EIG and deprive McClendon of substantially all of his future interest in profits from his FWPP participation.  Under the deal with McClendon, EIG receives the entirety of the cash flow from the wells McClendon is participating in until EIG recoups its investment, plus a 13% realized return.  On top of all that, EIG is entitled to a perpetual 42% share of McClendon's profits from the FWPP.  This means that not only is McClendon not exposed to the down-side risks of investing in the FWPP, but he also stands to receive only a small portion of the upside, if any.  Without directly sharing the costs and potentially the revenues from his FWPP interests, it is difficult to say that McClendon has much of any remaining interest in the wells.  Thus, the FWPP, rather than aligning McClendon's interests with the Company, has provided McClendon with a means to gamble with other peoples' money, a situation strikingly similar to when McClendon gambled (and lost) with bets he made using his shares of Company stock.

72.     According to *Reuters*, citing as its source Henry Hood ("Hood"), the Company's general counsel: "Chesapeake's board of directors is aware that McClendon has borrowed against his share of company wells."  In response to the *Reuters* article, the Individual Defendants caused the Company to issue a press release on April 18, 2012 ("April 18 Response"), that quoted Hood making a similar admission that "'[t]he Board of Directors is fully aware of the existence of Mr. McClendon's financing transactions.'"

Mr. Hood's comments were immediately met with disbelief. In fact, one analyst said Hood's position is "not only disingenuous it's borderline delusional." Realizing the seriousness of this admission, the Individual Defendants have backtracked on their earlier statement. They caused the Company to issue a press release on April 26, 2012, to "clarify" their April 18 Response, stating:

> 'The Board of Directors is fully aware of the existence of Mr. McClendon's financing transactions' was intended to convey the fact that the Board of Directors is generally aware that Mr. McClendon used interests acquired through his participation in the FWPP as security in personal financing transactions. The Board of Directors did not review, approve or have knowledge of the specific transactions engaged in by Mr. McClendon or the terms of those transactions.

73.    The Board further backtracked from its earlier statements when, on or around April 26, 2012, the Board removed a disingenuous question and answers exchange between *Reuters* and defendants (the "Q&A"), described further below, from the Company's website that had originally been posted as the Company's response to the *Reuters* investigative report.

74.    Unlike the Individual Defendants, the public was not aware of the existence of defendant McClendon's loan transactions, let alone the nature and extent of these transactions. To the extent the Individual Defendants may have mentioned the loans at all in their public statements, they did so by issuing, at best, passing references that failed to provide shareholders with adequate information regarding the nature and extent of these transactions and/or their connection to McClendon. In fact, *Reuters* disclosed that even some industry analysts who were experienced with the Company were not aware of the existence of McClendon's loans until they were contacted for the article.

- 28 -

75.   Defendants have failed and continue to fail to disclose key aspects of defendant McClendon's loans, which remain hidden from shareholders even despite diligent efforts. A preliminary investigation by Plaintiff's counsel confirms descriptions by *Reuters* concerning the difficulty involved in following the chain of transactions and business entities, as is required to determine that McClendon has borrowed approximately $1.1 billion to buy into the FWPP using his other FWPP interests as collateral. Even an exhaustive, time-consuming investigation following the trail of various liens, deeds, and other public records can only go so far. Because the loans consist of private promissory notes, the interest rate, the exact amount borrowed, and other details of the transaction remain private. It thus appears difficult, if not virtually impossible, for individuals outside of Chesapeake or McClendon's financiers to determine the exact terms and size of McClendon's loans.

76.   Despite the impracticality (if not impossibility) for shareholders to connect the dots on their own, the Individual Defendants refuse to provide adequate disclosure in the Company's Proxy Statements, including disclosures concerning the number, amounts, or terms of defendant McClendon's loans. Granted, to quell growing shareholder furor at the lack of adequate disclosures, on April 26, 2012, McClendon belatedly released aggregated information regarding the amounts of his outstanding debt and the value of his interests in Company wells. But this partial disclosure still falls well short of the material information shareholders require for their investment decisions, including to properly assess material conflicts of interest presented by the loans or the risks associated with a default by McClendon.

77.   The Individual Defendants failed to provide adequate disclosures to shareholders.   The consensus among the academics, attorneys, and analysts *Reuters* worked with, who personally reviewed the loan transactions, was that Chesapeake should fully disclose the details of defendant McClendon's loan transactions.   David F. Larcker, a professor of accounting at Stanford University's Graduate School of Business, said that given the size, scope, and complicated terms of the loans, the details of these transactions are key information for shareholders to have in evaluating the Company and, thus, they should be fully disclosed.   Mike Bread, an oil and gas research analyst at Hodges Capital Management in Dallas, a company that owns Chesapeake shares, agreed that the loans should be disclosed, citing the facts that they are large and related to the oil and gas business.   Other analysts seeking disclosure cited the potential conflict created by the fact that McClendon's largest source of loans, EIG, is also an investor in Chesapeake.   Joseph Allman, an oil and gas industry analyst at J.P. Morgan in New York, reviewed the loan agreements and concluded that the Company should disclose the details of the loan transactions because of the potential for a conflict with EIG.

78.   Notwithstanding the above, the Individual Defendants rushed to defend their concealment of defendant McClendon's leveraged participation in the FWPP.   For example, in the April 18 Response, they claim, among other things, that: (i) they have disclosed the fact that McClendon's financing transactions occurred; (ii) the terms and procedures for the FWPP "are clear and detailed in every proxy for all shareholders to see"; (iii) McClendon's interests and Chesapeake's are "completely aligned"; and (iv) the "suggestion of any conflict of interest is unfounded."   These statements confirm that the

Individual Defendants prejudged the appropriateness of McClendon's financing and determined to take no action.

79.     In preparation for its article, *Reuters* spoke with over a dozen academics, analysts, and attorneys who were given defendant McClendon's loan agreements to review.  Many of these professionals disagreed with McClendon and the Board's view that the loans do not create any possibility of a conflict of interest and need not be disclosed.  Joshua Fershee, an associate professor of energy and corporate law at the University of North Dakota, told *Reuters* that McClendon's $1.1 billion in loans through his own companies, which operate in the same industry as Chesapeake, could lead to a high risk for conflicts of interest.  Similarly, McClendon's supposed "alignment" of interests was challenged by Mark Hanson, an analyst with Morningstar in Chicago. Hanson noted that because McClendon has financed his participation in the FWPP without putting up any of his own money, the intended alignment of interests is lacking. Chesapeake's general counsel Hood, speaking on behalf of defendants, has even acknowledged that McClendon's loans with EIG could result in "some theoretical possibility of a conflict of interest," given that the Company is also borrowing from EIG.

80.     Also contradicting defendants' assertion that they have properly disclosed defendant McClendon's financing, *Reuters* reported that its April 18, 2012 report "drew swift reaction from investors, who pushed the stock down 5 percent the day it was published."  Confirming the seriousness of the Individual Defendants' misconduct, U.S. Senator Bill Nelson ("Nelson") plans to formally request the U.S. Department of Justice (the "DOJ") to investigate potential fraud and price manipulation at Chesapeake.

81.     Further demonstrating the inadequacy of the Individual Defendants' earlier public statements, on April 20, 2012, the Individual Defendants issued a preliminary Proxy Statement that added the following new language regarding defendant McClendon's FWPP financing that was not present in earlier Proxy Statements:

> Additionally, over the life of the FWPP, Mr. McClendon has typically mortgaged his interests acquired under the FWPP with one or more lenders, some of which also have lending, investment or advisory relationships with the Company. Mr. McClendon's mortgages with these lenders secure loans used in whole or in part to fund Mr. McClendon's well costs.  The Company does not extend loans to Mr. McClendon for participation in the FWPP or any other purposes. The Company does not review or approve financings of Mr. McClendon's personal assets, including his FWPP interests.  In addition, the Company has no obligation to repay any loans Mr. McClendon may obtain nor are any of the Company's interests in any assets exposed to such loans or the mortgages securing them.

82.     The Board initially took the position that it was not required to look into the loans.  Chesapeake's general counsel, Hood, admitted that "the board did not review or approve the transactions."  Further, the Board has failed to engage in any analysis of the potential conflicts of interest caused by defendant McClendon's financing.  The Board attempted to justify this inaction by claiming that McClendon's financing of his well interests is a personal matter.  Instead, the Board took a "wait and see" approach.  Hood claimed that "[i]f there were any conflicts of interest ... they would have surfaced by now."  However, the Board's (especially that of the 2012 Compensation Committee Defendants) decision to bury its head in the sand is contrary to the terms of the FWPP, which requires the Compensation Committee (if not the whole Board) to administer the program.  (As discussed below, the Board has recognized their position to be erroneous, and claims it has begun to investigate McClendon's financing transactions.)  This

conscious disregard of or, at a minimum, participation in false statements relating to the FWPP and McClendon's participation therewith, further constitutes a breach of the Individual Defendants' fiduciary duties.

83.     Contrary to their assertion that they are properly disclosing information regarding the FWPP, the Individual Defendants have historically resisted attempts to get more information regarding defendant McClendon's participation in the FWPP.  For example, in 2008 when the SEC requested information regarding McClendon's interests in the FWPP, the request was initially rebuked.  As detailed below, after numerous letters between the SEC and Chesapeake and negotiations on the subject, the Company agreed to provide shareholders with a chart showing the costs and revenues for the wells in the program.

**B.    Defendant McClendon's VPP Contracts Threaten Chesapeake's Ability to Raise Much Needed Cash**

84.     Following the *Reuters* article, on April 19, 2012, *Forbes* published an article entitled "Why Chesapeake Shareholders Should Worry About McClendon's Big Borrowing," which revealed more details regarding his clandestine financing.  *Forbes* revealed that, in addition to the $1.1 billion in loans that defendant McClendon has taken out, he has also entered into several other private contracts with lenders.  These contracts involve volumetric production payments, by which McClendon has promised to deliver certain pre-arranged amounts of gas for a certain period of time, in exchange for an upfront payment.  He has collected more than $130 million so far from these transactions.

Chesapeake, however, routinely relies on VPPs to generate cash, pitting McClendon in direct competition against the Company.

85.    *Forbes* also details in its article why defendant McClendon's financing efforts are particularly significant given the financial state of Chesapeake. Due in large part to very low gas prices, Chesapeake has struggled in recent years and has taken on a lot of debt.   The Company has sold substantial stakes in Chesapeake and borrowed massively in recent years to alleviate the financial stress on the Company.   Chesapeake currently has a debt load of $10 billion.   McClendon's own efforts to obtain financing, including from lenders to Chesapeake, creates – at the very least  – the potential for a conflict of interest as McClendon may be competing against the Company for financing (including for VPPs from the same purchasers).   If nothing else, this conflict of interest needs to be fully disclosed to shareholders.  The lack of disclosure is particularly problematic because the message defendants have repeatedly communicated to shareholders is that the FWPP aligns McClendon's interests with the Company's, whereas in reality, it appears that the FWPP creates the potential for a serious conflict of interest when McClendon and the Company compete to sell gas and obtain financing.

86.    Confirming the materiality of defendant McClendon's VPP transactions, after *Forbes* revealed these transactions, the Company mentioned the transactions in the Company's April 20, 2012 Proxy Statement.  This disclosure is quite late in coming, however, because defendants never announced the deals when they were entered.  The disclosures in the Proxy Statement are also woefully inadequate, as the dollar values

involved are not disclosed, nor do defendants address whether McClendon has competed with the Company for VPP contracts.

### C.   Defendants' Struggle with the SEC to Keep Information Regarding Defendant McClendon's Participation in the FWPP Concealed

87.    Defendants' efforts to suppress information regarding defendant McClendon's participation in the FWPP are reflected in exchanges they have had with the SEC. For example, on August 21, 2007, the SEC wrote to Chesapeake seeking additional information in relation to its Proxy Statement on Form DEF 14A that the Company filed on April 30, 2007. The SEC requested additional information, including information relating to whether McClendon's total compensation was significantly higher or lower than income earned prior to the implementation of the FWPP. The SEC noted that, due to the "material manner in which [the founding executives] have benefited from working interests in properties drilled by the company," the Company should "consider revising [its] disclosure to provide greater balance and context." Chesapeake's response to this request on August 31, 2007, declared that it would be "inappropriate" to compare McClendon's compensation to the income he received from his FWPP interest, and that "[a]nother reason we have not disclosed Mr. McClendon's annual FWPP revenue is that it flows from property that belongs to him, not the company."

88.    On May 30, 2008, the SEC wrote to Chesapeake regarding its Form 10-K for fiscal year ending December 31, 2007, again requesting additional information. For example, the SEC once again requested more detail regarding defendant McClendon's benefits from the FWPP. On June 13, 2008, the Company reiterated that "it was

inappropriate to disclose revenues received by Mr. McClendon from his participation in the FWPP."

89.    From July 16, 2008 to October 1, 2008, the SEC sent Chesapeake three more letters requesting additional information, including information related to defendant McClendon's participation in the FWPP.  In fact, the SEC's letter from October 1, 2008, consisted solely of a request for more information regarding McClendon's revenues from the FWPP.  The SEC declared that "[i]t is still unclear whether the revenues that Mr. Aubrey McClendon receives from his FWPP participation constitute compensation for Item 402 of Regulation S-K purposes."  It was only after these repeated attempts at obtaining additional disclosures that the SEC was successful in getting Chesapeake to agree to provide some additional information.   In the Company's response from November 7, 2008, the Company proposed that it would provide shareholders with a table of "annual revenues, lease operating expenses, the resulting net cash flow before capital expenditures and then capital expenditures." A sample of this table from the Company's April 20, 2012 Proxy Statement is reproduced above in ¶153.

90.    In the aftermath of the April 18, 2012 *Reuters* article and other revelations, the SEC has reopened its investigation into the FWPP.  *Reuters* reported on April 26, 2012, the following:

> The U.S. Securities and Exchange Commission has opened an informal inquiry into Chesapeake Energy Corp's well participation program with Chief Executive Officer Aubrey McClendon, a source familiar with the matter said on Thursday.
>
> The SEC inquiry is being led by its Fort Worth, Texas, regional office, the source said. The inquiry comes after *Reuters* exclusively reported about

loans McClendon had obtained to participate in a co-investment deal with Chesapeake.

**D.     The Board Rushes to Defendant McClendon's Defense Before Any Investigation**

91.     Immediately following the release of the *Reuters* article, Chesapeake received so much attention from shareholders, investors, analysts, and industry commentators that the Individual Defendants decided to respond to the article and post on the Company's website a "Q&A" exchange between *Reuters* and defendants.   The Company's response, however, provides only piecemeal information and generally fails to address the lack of transparency to Chesapeake's shareholders and the investing public as a whole.   The Q&A was, in fact, so misleading that the Individual Defendants were ultimately forced to remove it from the Company's website.

92.     The Individual Defendants asserted in their Q&A that "the FWPP still effectively aligns Mr. McClendon's interests with the interests of Chesapeake's shareholders during any period that Mr. McClendon participates in the FWPP."   Rather than acknowledge the concerns presented by the article, the Board further maintained that its disclosures related to the FWPP were "extensive."   Further, despite apparently not engaging in a formal review of potential conflicts, the Individual Defendants insisted "[w]e do not believe any conflicts of interest exist."

93.     The Individual Defendants attempted to explain in their Q&A with *Reuters* that they (as the Board) have already determined, without analysis or investigation, that there is no conflict of interest because of defendant McClendon's loans.   As explained herein, this rush to judgment and utter failure to implement relevant internal controls flies

in the face of the many duties and responsibilities imposed on the Board and its

constituent committees under state law.  The Q&A stated, in part:

> Q:     Has Mr. McClendon obtained any other loans in the last three years
> for which he pledged his share of company wells as collateral?

> [A:]    Whether Mr. McClendon has obtained other loans concerns his
> personal finances unrelated to the company. *It is not a matter* for
> review or monitoring by the company or *for public comment.*
>
> * * *

> Q:     What are the other terms of Mr. McClendon's loans - such as interest
> rate and fee structure – contained in the underlying promissory notes
> referred to in the loan agreements? Please provide the underlying
> promissory notes.

> [A:]    Again, *any loans are Mr. McClendon's personal business and not
> appropriate* for review or monitoring by the company or *for public
> comment.*

Furthermore, the Company's Code discourages even the appearance of potential conflicts

of interest and requires the Board (as well as officers and employees) to take the

necessary actions to eliminate or mitigate a conflict of interest.

94.     The Individual Defendants also contended that "the lending market is

transparent, with both lenders and borrowers possessing detailed knowledge of available

and actual terms."  This response, however, generally failed to address the lack of

transparency to Chesapeake's shareholders and the investing public as a whole.  At best,

the Individual Defendants claimed (without citing any examples) that they have

"disclosed that Mr. McClendon pledged his oil and gas interests as collateral in financial

transactions," which they believed was sufficient.  Even assuming defendants made such

disclosures, they would hardly be sufficient, for reasons stated above and below.

95.   The Board further attempted to justify defendant McClendon's FWPP-backed loans by claiming that such loans are industry standard, and that "it is not surprising that financial institutions have relationship with both Mr. McClendon and Chesapeake," as there is a "finite group" of financial institutions making oil and gas loans and "virtually all (if not all) have a lending or other economic relationship with Chesapeake." First, even if it may be industry standard for energy companies to take out loans collateralized by well interests, that is different than saying that CEOs of other energy companies participate in their company's wells as McClendon can.  In fact, the very terms of the FWPP tout the uniqueness of the program, stating that it helps "align[] the financial rewards and risks of the Founders with the Company more effectively than overriding royalty, carried interest or other performance incentive programs maintained by many of the Company's peers."  Second, the fact there is a small universe of lenders cannot serve as an excuse for McClendon to obtain financing from the same sources as the Company.  Rather, the Individual Defendants' statement that there are only a few possible lenders confirms that McClendon's financing transactions present a real conflict of interest and a serious threat to the Company.  The risk is very high that McClendon has already arranged financing on terms beneficial to himself in return for assurances that he would cause Chesapeake to borrow on terms more favorable for the lenders.  Indeed, because the FWPP does not appear to generate significant profits for McClendon, it is difficult to understand why lenders would loan vast amounts of money to him with only his FWPP interests as collateral unless McClendon is offering them something else in return – such as lucrative financing terms for the lenders at Chesapeake's expense.

Alternatively, should McClendon default on his massive loans, as is likely, these lenders could bring significant pressure on the Company to get their money back because Chesapeake might cave to their demands to secure much needed financing, if only to avoid a costly litigation battle over interests in the wells.

96.     Not surprisingly, public outrage continues to mount.  In its April 20, 2012 article, *Reuters* reported that Phil Weiss, an oil analyst at Argus Research, told its clients: "'When we consider the full financial picture at Chesapeake, including its high debt levels, its use of financial engineering, the relatively low quality of its financial data, the questionable nature of some of the CEO's transactions with the company ... we believe the best thing for investors would be to replace the board and/or the CEO.'"   Similarly, David Dreman, chairman of Dreman Value Management LLP, said Chesapeake's management "'has to be cleaned up.'"

**E.    Defendant McClendon and the Board Scramble to Control the Continuing Fallout**

97.     The knee-jerk reaction by the Board to defend defendant McClendon's' financing efforts failed horribly and exposed the Individual Defendants' tortious oversight failures.  Faced with an unrelenting barrage of reporters, analysts, and shareholders poking holes in the Board's response to *Reuters* April 18 report, the Individual Defendants began backtracking from their prior positions.

98.     For example, recognizing the numerous fallacies – if not outright misstatements – contained in the Q&A, the Individual Defendants caused Chesapeake to remove the disingenuous Q&A from its website on or around April 26, 2012.

99.    That same day, the Individual Defendants caused the Company to issue a carefully crafted press release that, at first blush, might seem to announce concessions by the Board and defendant McClendon.  The Individual Defendants announced that the "Board of Directors has determined that it does not *intend* to extend" the FWWP beyond its current term ending December 31, 2015.  Similarly, the Individual Defendants added that, "[t]he Board of Directors and Mr. McClendon have *committed to negotiate* the early termination of the FWPP and the amendment to Mr. McClendon's employment agreement necessary to effectuate the early termination."  It is quite evident that the rushed, yet word-smithed, April 26, 2012 press release was designed to curry favor with shareholders ahead of the Company's upcoming annual meeting for 2012.

100.    The Individual Defendants also used the April 26, 2012 press release to "clarify" their previous statements regarding being "fully aware" of the existence of defendant McClendon's financing transactions.  However, in making their clarification that the Board was instead "generally aware" of the transactions, the Individual Defendants revealed that the Individual Defendants had previously chosen to bury their head in the sand regarding the terms of McClendon's financing.  The Individual Defendants stated in the April 26, 2012 press release:

> Chesapeake also wishes to clarify a statement appearing in its April 18, 2012 press release captioned "'Chesapeake Energy Corporation General Counsel Henry J. Hood Issues Statement.'" The statement that "'the Board of Directors is fully aware of the existence of Mr. McClendon's financing transactions'" was intended to convey the fact that the Board of Directors is generally aware that Mr. McClendon used interests acquired through his participation in the FWPP as security in personal financing transactions. The Board of Directors did not review, approve or have knowledge of the

specific transactions engaged in by Mr. McClendon or the terms of those transactions.

101.   Recognizing that defendant McClendon's financing transactions pose serious conflicts of interest that cannot be disregarded, the Individual Defendants also announced in the April 26, 2012 press release that they are investigating McClendon's financing arrangements.  Specifically, they announced that "the Board of Directors is reviewing the financing arrangements between Mr. McClendon (and the entities through which he participates in the FWPP) and any third party that has had or may have a relationship with the company in any capacity."  This purported investigation, however, comes years too late.  Given the fact that the Board has been "generally aware" of the existence of these transactions, and in light of the various duties of the Board and its standing committees, the Individual Defendants knew or should have known that McClendon's financing activities present actual and potential conflicts of interest that have harmed or could harm the Company.  For similar reasons, they also knew or should also have known that the FWPP was not aligning McClendon's interests with the Company's, but rather creating conflicts of interest.  The Individual Defendants' prior failures to investigate, disclose, and remedy with internal controls these conflicts of interest is inexcusable.

102.   In a supplemental disclosure filed on April 26, 2012, defendant McClendon belatedly disclosed in general terms the total extent of his current outstanding debt and the estimated value of his collateral as of December 31, 2012.  He disclosed that, as of December 31, 2012, he still owed a total of $846 million in loans relating to his FWPP

interests. Meanwhile, his FWPP interests themselves, in terms of estimated proved reserves, may be valued at approximately $862 million. Because these figures are only dated as of December 31, 2012, it does not appear that they reflect McClendon's $500 million or so of borrowing in January 2012. At the same time, McClendon does not identify any of the specific loans or amounts of those loans he has taken out, the lenders involved, nor the material terms of the loans. Thus, the April 26, 2012 supplemental disclosure is woefully incomplete with partial disclosures that fall well short of meeting McClendon's (if not the Individual Defendants') obligation to adequately inform shareholders of material facts ahead of the upcoming annual meeting. McClendon stated the following in his April 26, 2012 supplemental disclosure:

**SUPPLEMENTAL DISCLOSURE REGARDING AUBREY K. MCCLENDON'S INTERESTS IN CHESAPEAKE ENERGY CORPORATION'S FOUNDER WELL PARTICIPATION PROGRAM**

**OKLAHOMA CITY, OKLAHOMA, APRIL 26, 2012** – After consultation between the Board of Directors of Chesapeake Energy Corporation (NYSE:CHK) and Aubrey K. McClendon, Chairman and Chief Executive Officer of Chesapeake, Mr. McClendon's companies, Arcadia Resources, L.P., Larchmont Resources, L.L.C. and Jamestown Resources, L.L.C. are providing supplemental information regarding the interests in oil and gas acquired under Chesapeake's shareholder-approved Founder Well Participation Program (FWPP). Since 1993, Mr. McClendon has possessed the contractual right under the FWPP or his employment agreement to participate with up to a 2.5% working interest in the oil and gas wells assigned under the FWPP (FWPP Wells). Arcadia, Larchmont and Jamestown are each approved as "Founder Affiliates" under the FWPP and in the aggregate hold all of Mr. McClendon's interests in the FWPP Wells. In order to address questions generated by various media reports in the past week, the Founder Affiliates are providing the following information:

**Outstanding Founder Affiliate Loans**: On December 31, 2011, the aggregate principal amount owed under loans secured by the FWPP Wells was $846 million allocated among the Founder Affiliates as indicated in the summary table below. All of the loans were from third parties and none of them were from Chesapeake or its affiliates.

**Estimated Founder Affiliate Proved Reserve Volumes**: As of December 31, 2011, the total proved reserves associated with the FWPP Wells were estimated to be approximately 810 billion cubic feet of natural gas equivalent (bcfe), of which approximately 45% were proved developed reserves (37% proved developed producing), approximately 55% were proved undeveloped reserves and approximately 87% were natural gas. These calculations do not include interests in FWPP Wells that are categorized as unproved reserves (i.e., probable and possible) and wells in process for which costs have been expended and monies borrowed, but for which no proved reserves have yet been booked. The estimated proved reserves are allocated among the Founder Affiliates as indicated in the summary table below.

**Estimated Daily Production Rates**: As of December 31, 2011, the estimated average daily production from the FWPP Wells in the aggregate was 147 million cubic feet of natural gas equivalent (mmcfe) allocated among the Founder Affiliates as indicated in the summary table below.

**Estimated PV9 of Founder Affiliate Proved Reserves**: As of December 31, 2011, the estimated present value of the future net revenue (pre-tax) of the estimated proved reserves attributable to the FWPP Wells discounted at 9% per year and based on NYMEX strip prices at that time (PV9) was approximately $852 million in the aggregate allocated among the Founder Affiliates as indicated in the summary table below. This does not include any value for unproved reserves (i.e., probable and possible) or lease hold. A subset of the proved reserves attributable to the FWPP Wells, proved developed producing reserves (PDP), has been reported in Chesapeake proxy statements based on an annual discount rate of 10% and the unweighted arithmetic average of prices on the first day of each month within the 12 months of the reporting period (SEC PV10). On this basis, the aggregate PDP reserve value for the FWPP Wells was $409.6 million. At PV9, these same PDP reserves would be valued at $447 million. These PDP reserve valuations do not include any value for (a) unproved reserves (i.e., probable and possible); (b) leasehold or (c) proved developed non-producing or proved undeveloped reserves. Proved reserves at PV9 values are used frequently by lenders in the oil and gas industry.

<u>Summary Table</u>

| Founder Affiliate | Loan Inception | Principal Amount | Proved Reserves | Average Daily Production | PV9 Proved | SEC PV10 PDP |
|---|---|---|---|---|---|---|
| Arcadia | Aug. 1993 | $181 mm | 239 bcfe | 35 mmcfe | $234 mm | $117 mm |
| Larchmont | Dec. 2008 | $375 mm | 433 bcfe | 87 mmcfe | $422 mm | $217 mm |
| Jamestown | Jun-10 | $291 mm | 138 bcfe | 25 mmcfe | $196 mm | $ 76 mm |
| Totals | | $846 mm[1] | 810 bcfe[2] | 147 mmcfe | $852 mm[3] | $410 mm[4] |

(1) Includes amounts borrowed to pay well costs incurred on wells or leasehold for which no proved reserves have been booked.

(2) This does not include unproved reserves (i.e., probable and possible).

(3) This does not include any value for unproved reserves (i.e., probable and possible) or leasehold.

(4) Based on reporting rules of the Securities and Exchange Commission, calculated using an annual discount rate of 10% and the unweighted arithmetic average of prices on the first day of each month in 2011. At PV9, the value would be $447 mm. This does not include any value for (a) unproved reserves (i.e., probable and possible); (b) proved undeveloped reserves or (c) leasehold.

**2011 Asset Sales**: During 2011, the Founder Affiliates sold interests in the FWPP wells for approximately $108.6 million in the aggregate resulting in an aggregate net gain of approximately $61 million (pre tax).

103.   The Individual Defendants caused the Company to issue a press release at 4:00 a.m. on May 1, 2012, announcing that the Board and defendant McClendon renegotiated the terms of the FWPP to cause the program to expire eighteen months early on June 30, 2014, instead of December 31, 2015.   This decision by the Individual Defendants and McClendon to terminate the FWPP only a year-and-a-half early is intended only to avoid a shareholder revolt at the upcoming annual meeting and has nothing to do with the impropriety of the FWPP.   Indeed, the Board is still purportedly

investigating McClendon's financing transactions with regard to the FWPP, meaning that the Board could not have assessed the many conflicts of interest and other risks presented by the FWPP before agreeing to shorten the life of the FWPP by little.[6] If McClendon and the rest of the Board truly had the Company's best interests in mind (as opposed to their own), they would have agreed to immediately terminate the FWPP.

104.   The early – yet still delayed – termination of the FWPP will likely only accomplish the inevitable, and thus, does not constitute any concession by defendant McClendon.  In light of McClendon's enormous indebtedness and the negative publicity from his financing efforts, McClendon likely will not be able to secure the necessary financing to enable him to continue participating in the program until 2015.  However, because the Individual Defendants refuse to immediately terminate the FWPP, McClendon can continue to push himself to the brink of insolvency by drawing on whatever lines of credit he has remaining.

105.   Also in the May 1, 2012 press release, the Individual Defendants caused the Company to announce that the Board will name a new Chairman to replace defendant McClendon "in the near future."  McClendon will, however, continue as CEO and apparently remain as a director on the Board.

---

[6] In the May 1, 2012 press release, the Individual Defendants confirm that they have not yet concluded their purported investigation, reiterating that they are still "reviewing the financing arrangements between Mr. McClendon (and the entities through which he participates in the FWPP) and any third party that has had or may have a relationship with the company in any capacity."

106.   Defendant Miller essentially concedes that the early termination of the FWPP was to appease angry shareholders and help improve the Company's languishing corporate governance.   The May 1, 2012 press release quotes Miller as saying in part: "'We believe separation of the Chairman and CEO roles will improve Chesapeake's corporate governance and the early termination of the FWPP will eliminate a source of controversy, both of which should send a positive signal to the market and improve shareholder value.'"

107.   Reflecting the materiality of defendant McClendon's financing related to the FWPP and the need for governance changes, the price of Chesapeake's shares soared more than *9%* in premarket trading after the Individual Defendants caused the Company to issue the May 1, 2012 press release.   The Company's stock retained most of that boost throughout the day, closing at 6% higher than the day before.

108.   Unfortunately for the investors who fell for the Board's bait by rushing to buy Chesapeake stock after the May 1, 2012 press release, it was a well-timed ploy to bury abysmal financial news with defendants' self-serving good news.   At 11:07 a.m. on May 1, 2012, after the markets and media had seven hours to digest the May 1, 2012 press release, Chesapeake posted on its website a press release announcing shocking financial results for first quarter 2012, which highlight the Company's ill-fated trajectory. In an article published that day titled "Chesapeake Profits Slump Amid Top Level Upheaval, *The Financial Times* discussed the dismal news that the Company is reporting an 82% drop in adjusted post-tax profits (calculated to be $94 million after excluding certain items that otherwise drove these meager earnings to a net loss) compared to

adjusted post-tax profits of $518 million in first quarter of 2012.  Including write downs

and other extraordinary items, Chesapeake reported a net loss of $71 million for the first

quarter of the year.  According to *The Financial Times*, analysts were anticipating bad

results but were caught off guard.  The stock market similarly reflected surprise, as the

Company's stock price fell after the good news from earlier in the day. *The Financial*

*Times* also noted that analysts predict the Company faces a struggle to make ends meet in

light of falling natural gas prices. *The Financial Times'* May 1, 2012 article states in part:

> ***Chesapeake Energy, the US gas producer that has been dragged into***
> ***controversy over its chief executive's personal finances, has reported an***
> ***82 per cent drop in underlying post-tax profits, with revenues and***
> ***earnings below analysts' expectations.***
>
> ***The slump in first-quarter profits was reported on the same day that the***
> ***company said it would appoint a new independent chairman in a bid to***
> ***boost investor confidence.***
>
> Chesapeake is also ending its unusual chief executive pay plan which gives
> Aubrey McClendon, its co-founder, the right to take a personal 2.5 per cent
> stake in all of the company's wells.
>
> Mr McClendon is to give up the title of chairman, but will remain as chief
> executive. He has also agreed to end the widely criticized "founder well
> participation programmer" 18 months early in June 2014, without any
> compensation.

*   *   *

> ***The news of the changes was welcomed by the market, and Chesapeake's***
> ***shares closed up 6 per cent to $19.60.***
>
> ***However, they lost almost all of that gain in after-hours trading following***
> ***the earnings release.***
>
> **Post-tax net income, excluding the effect of one-off items such as mark-**
> **to-market charges for movements in the value of hedging contracts, fell**
> **to $94m, from $518m in the equivalent period of  2011, Chesapeake**
> **said.**

Revenues rose 50 per cent to $2.42bn, with a rise in Chesapeake's oil production offsetting the slump in natural gas prices, but that was less than the average of analysts' expectations.

The price Chesapeake earns for its gas has plunged as the market hit a 10-year low: it was paid an average of $2.35 per 1,000 cubic feet, including the effect of realized gains on derivatives contracts, down from $5.31 per 1,000 cu ft in the equivalent period of 2011.

In February, Chesapeake predicted that cash from operations would be $4.5bn-$5.2bn this year. In its results release, it cut that projection to $2.7bn-$3bn.

\*    \*    \*

***Analysts have warned that weak natural gas prices are leaving Chesapeake with a large funding gap that it will need to fill this year*** if it is to fulfill its plans for drilling and developing new wells to build up its more lucrative oil businesses.

109.   The Individual Defendants' desperate actions to appease shareholders ultimately seem designed to provide distractions rather than solve problems.  Notably, U.S. Senator Nelson plans to formally request the DOJ to investigate potential fraud and price manipulation at Chesapeake.   The circumstances surrounding defendant McClendon's loans – including, but not limited to, their size, their sources, their purpose, and their seemingly unsustainable velocity – highlight the need for prompt disclosure and implementation of internal controls.  Indeed, the underlying and systemic problems of inadequate disclosures and internal controls remain largely unabated.  Shareholders need to know the full extent of McClendon's financing to the extent it detracts from assurances made concerning the FWPP and the Company's compensation policies.  Shareholders also need to know about McClendon's financing to the extent there are material conflicts of interest that could harm the Company.  Relatedly, shareholders need to be supplied

with adequate information concerning the risk of a default by McClendon on one or more loans collateralized with his interests in Company wells. At the same time, the Board needs to take immediate action to implement internal controls to address these conflicts of interest and other risks presented by McClendon's out-of-control financing – as well as terminate the FWPP (the catalyst for these conflicts of interest and risks) without any further delay.

### F.   S&P Downgrades Chesapeake, Citing Corporate Governance Shortcomings Relating to the FWPP

110.   On April 26, 2012, ratings agency S&P downgraded Chesapeake's debt to "BB" from "BB+." S&P implicated the Individual Defendants' wrongdoing (including defendant McClendon's financing transactions and the Individual Defendants' mismanagement of the FWPP) as the reason for the downgrade. S&P also placed Chesapeake on "CreditWatch with negative implications," hinting that further downgrades are possible. Importantly, S&P suggested that recent developments arising from defendants' wrongdoing "could hamper Chesapeake's ability to meet the massive external funding requirements." S&P additionally concluded that the Board's failure to keep tabs on McClendon's financing represented a "significant governance deficiency." The agency further expressed concerns of the heighted potential for "unmanaged and unmonitored conflicts of interest" posed by McClendon's FWPP-related financing transactions. S&P announced and explained its April 26, 2012 downgrade as follows:

Overview

    -- U.S. natural gas producer Chesapeake Energy Corp. has announced that it is negotiating an early termination of the Founder Well

Participation Program (FWPP) after revelations about the CEO's personal transactions revealed shortcomings in the company's existing corporate governance practices. The board is currently reviewing financing agreements between the CEO and third parties.

*-- Turmoil resulting from these developments could hamper Chesapeake's ability to meet the massive external funding requirements stemming from its currently weak operating cash flow and continuing aggressive capital spending.*

*-- We are lowering our corporate credit and senior unsecured debt issue ratings on Chesapeake to 'BB' from 'BB+',* and lowering the ratings on two affiliates--Chesapeake Oilfield Operating LLC and Chesapeake Midstream Partners L.P.

*-- We are placing all these ratings on CreditWatch with negative implications.*

Rating Action

On April 26, 2012, Standard & Poor's Ratings Services lowered its ratings on Oklahoma City-based Chesapeake Energy Corp., including the corporate credit rating to 'BB' from 'BB+', and lowered ratings on two related entities--Chesapeake Oilfield Operating LLC and Chesapeake Midstream Partners L.P. At the same time, we placed all these ratings on CreditWatch with negative implications.

Rationale

*The downgrade and CreditWatch placement reflect our view that recent revelations about personal transactions undertaken by Chesapeake's CEO relating to the company's unusual FWPP underscore shortcomings in Chesapeake Energy Corp.'s corporate governance practices.* Under the FWPP, Chesapeake's CEO, Aubrey McClendon can, before the beginning of each year, elect to take a small (up to 2.5%, subject to certain restrictions) working interest in all of the wells Chesapeake drills during that year. Recent press reports have revealed that Mr. McClendon has obtained loans to fund his investments under the FWPP from third parties (such as EIG Global Energy Partners LLC) who, at the same time, were also significant participants in financing transactions with Chesapeake. Mr. McClendon has also at times sold his interests in certain fields, in conjunction with asset sales by Chesapeake. *We believe these transactions heighten the potential for unmanaged and unmonitored conflicts of interest, or the perception thereof. Under the terms of the FWPP, there*

*has been no effective mechanism to protect against conflicts of interest, in our view.* Indeed, Chesapeake has previously stated that the company does not review or approve financings of Mr. McClendon's personal assets, including his FWPP interests. It is our understanding that Mr. McClendon has also been under no obligation to disclose his dealings with third parties which also have lending, investment, or advisory relationships with the company.   Chesapeake today has announced that its board and Mr. McClendon have committed to negotiate the early termination of the FWPP, which otherwise would have expired at the end of 2015. The company also announced that the Board is reviewing financing arrangements between Mr. McClendon (and the entities through which he participates in the FWPP) and any third party that has had a relationship with the company in any capacity. The board has also confirmed that it did not previously review, approve, or have knowledge of the specific transactions engaged in by Mr. McClendon or the terms of those transactions. *In our view this represents a significant governance deficiency.*

*Turmoil resulting from these developments--and from potential revelations resulting from the board investigation--could hamper Chesapeake's ability to meet the massive external funding requirements stemming from its currently weak operating cash flow and aggressive capital spending.* Chesapeake's production is heavily skewed toward natural gas, and natural gas prices are severely depressed at this time. Although hedge-related gains had been an important support to Chesapeake's earnings and cash flow in recent years, the company terminated its natural-gas related hedge positions in late 2011. Chesapeake is in the midst of an extensive repositioning of its business mix, placing more emphasis on production of crude oil and natural gas liquids (collectively, liquids). The company's excellent drilling record and large acreage positions in the most promising North American liquids-rich basins afford confidence about its ability to make this transition.

However, *Chesapeake faces very large external funding requirements to sustain the aggressive planned investment needed to effect its strategic shift.* In its investor presentation dated April 17, 2012, Chesapeake gave guidance of total investment of $10.9 billion to $12.4 billion in 2012, and $10.5 billion to $12.3 billion in 2013. This guidance encompasses well costs on proved and unproved properties, acquisition of unproved properties, and investment in oilfield services and midstream assets. Based on our estimates and price deck assumptions (including natural gas price of $2.00/btu in 2012, $2.75 in 2013, and $3.50 thereafter), we expect Chesapeake's funds from operations to total only $3.4 billion to $3.8 billion

in 2012 and $5.4 billion to $5.8 billion in 2013, implying massive internal funding shortfalls.

To help fund its planned investment, Chesapeake has stated that it is targeting sales of proved and unproved properties, and monetization of oilfield services, midstream, and other assets, totaling $10 billion to $12 billion in 2012, and $4.0 billion to $6.5 billion in 2013. *Chesapeake is asset rich, and it has been adept at structuring varied and innovative transactions to generate funds, including outright asset sales, formation of joint ventures (JVs), issuance of securities by a royalty trust and by newly formed subsidiaries, and issuances of volumetric production payment (VPP) obligations. ...*

CreditWatch

As part of our CreditWatch review, Standard & Poor's will take account of the conclusions of the board's investigation; the terms under which the FWPP is terminated; Chesapeake's ongoing capital-raising initiatives; and potential changes to its growth strategy, financial policies, and governance structure. *At this time, we cannot rule out further ratings downgrades of more than one notch*; for example, if we believe that asset monetization actions will fall short of plans and that offsetting actions won't be taken to preserve liquidity and limit the increase in financial leverage.

111.   Also on April 26, 2012, Fitch Ratings lowered its outlook on Chesapeake's BB rating to stable from positive.

## VII.   UNCHECKED HEDGING ACTIVITIES BY DEFENDANT MCCLENDON CONFIRM UTTER FAILURE BY INDIVIDUAL DEFENDANTS TO ADDRESS AND DISCLOSE MATERIAL CONFLICTS OF INTEREST

112.   Unbeknownst to shareholders, in addition to his reckless margining of his Company stock and leveraged participation in the FWPP, defendant McClendon also operated a $200 million hedge fund between at least 2004 and 2008 that traded in the same commodities the Company produces. The facts currently known to the public about this hedge fund were unearthed by *Reuters* in a May 2, 2012, article titled "Special Report: Inside Chesapeake, CEO Ran $200 Million Hedge Fund," which followed in the

wake of McClendon's financing scandal. As is apparent from the *Reuters* report, McClendon's hedge fund management presented a serious distraction, presented further conflicts of interest between McClendon and Chesapeake, and was entirely concealed from shareholders.

**A.   Defendant McClendon Distracts Himself with Hedging Activities in Breach of His Employment Agreement and Fiduciary Duties**

113.   Between approximately 2004 and 2008, while defendant McClendon was also supposed to be the full time CEO of Chesapeake, McClendon operated Heritage Management Company LLC ("Heritage"). McClendon started Heritage with Chesapeake co-founder Tom Ward ("Ward"). Heritage was a hedge fund by which McClendon and others bet on energy markets (including the price of natural gas), as well as goods, such as cocoa and coffee. Heritage also had a cattle trader in Oklahoma.

114.   Defendant McClendon was distracted almost on a daily basis – sometimes for significant amounts of time – with the management of his $200 million hedge fund. According to *Reuters*:

> As chairman and CEO of Chesapeake Energy Corp, Aubrey McClendon has been a powerhouse in the vast U.S. natural gas market, directing the company's multibillion dollar energy-trading operation and setting output targets for America's second-largest producer.

> Behind the scenes, a Reuters investigation has found, McClendon also ran a lucrative business on the side: a $200 million hedge fund that traded in the same commodities Chesapeake produces.

> *          *          *

> ***But for at least four years, from 2004 to 2008, McClendon's attention extended well beyond his job at Chesapeake.***

> During that time, said a veteran trader who helped run McClendon's private hedge fund, *the Chesapeake executive engaged in "near daily" communications and "exhaustive" calls to help direct the fund's trading.*

115. From day one, defendant McClendon and Ward were in charge of Heritage. Sometime around 2004, five commodity traders, including Peter Cirino ("Cirino"), approached McClendon and Ward simply for a capital investment to start a hedge fund. But the two energy tycoons insisted on "full ownership and involvement in the fund's trading strategy." *Reuters* presents the following account on the formation of Heritage:

> Heritage was born when commodity trader Cirino and four other traders went searching for capital to start a hedge fund, Cirino said. Through industry contacts, they landed a coveted audience with McClendon and Ward, already famed Oklahoma drillers before becoming pioneers of the shale-gas boom.

> The Chesapeake founders, Cirino recalled, agreed to seed the fund with a total of $40 million of their own cash. But *McClendon and Ward insisted on full ownership and involvement in the fund's trading strategy*, Cirino said.

> 'They took a leap of faith to invest money in us, so we knew we were on the line,' said Cirino, Heritage's former head trader and risk officer. *'That they were in charge was made very clear.'*

116. Based on Cirino's and Ward's accounts in the May 2, 2012 *Reuters* article, it is evident that defendant McClendon (more so than Ward) spent considerable time communicating with investors about Heritage:

> Cirino and Ward's recollections differ on at least one point. Ward said he didn't interact with the fund's outside investors. *Cirino recalled that 'every investor I was involved with either met with McClendon and Ward or at least spoke with them by phone before investing.'* The hedge fund's healthy gains were a lure, but "the cachet of those two individuals certainly also helped," Cirino said.

*In addition to weekly Monday conference calls and regular emails, the two owners met frequently with traders in New York and occasionally in Oklahoma, Cirino said.*

117.   In 2007, Heritage's traders told defendant McClendon and Ward that they wanted an equity stake in the fund.  As Cirino told *Reuters*, however, "the executives weren't ready to cede control."  So the traders left Heritage to start their own fund.  It is reasonable to infer that McClendon and Ward spent considerable more time managing the fund following these departures.

118.   By the time the trades left Heritage, the fund was managing around $200 million in assets.  Cirino told *Reuters* that "[a]s Heritage racked up stellar returns of between 15 to 25 percent a year, McClendon and Ward decided to open the hedge fund to outside investors, including friends and associates."  Like most other hedge funds, defendant McClendon and Ward further bolstered their profits from Heritage by charging outside investors a 2% of assets management fee and collecting 20% of the fund's profits – also know as "two and twenty."

119.   However, things seemed to go down hill for Heritage once the traders left.  By 2008, defendant McClendon and Ward returned all of the funds' money from external investors.  McClendon and Ward continued to operate the fund during that year.  But by 2009, McClendon and Ward apparently stopped trading with Heritage.

120.   Defendant McClendon's frequent and sustained involvement with Heritage is hard to reconcile with the terms of his employment agreement and his duties and obligations to Chesapeake.  McClendon's Third Amended and Restatement Employment Agreement, which took effect in January 2004 ("2004 Employment Agreement")

provided that McClendon was "employed on a *full-time basis*," and that he would use "*best efforts and due diligence* to assist the Company in achieving the *most profitable operation* of the Company and the Company's affiliated entities consistent with developing and maintaining a quality business operation." This or substantially similar language was contained in each of McClendon's employment agreements effective from 2004 through 2008.

121.   The 2004 Employment Agreement also prohibited defendant McClendon from engaging in business independent of his employment by the Company that requires "*any substantial portion*" of his time, except that he could be involved in "passive investments" as a partner or member of an enterprise if doing so would not violate the terms of employment and "require only a minimal portion" of his time.  McClendon and the Board amended the 2004 Employment Agreement in 2005.  This revised agreement included similar language, but the prohibition against side activities requiring "any substantial portion" of time was changed to only prohibit McClendon from engaging in activities that "require such substantial services" of McClendon that he would be "unable to perform the duties" assigned to him under the agreement. The 2005 amendment also eliminated the language restricting participation in "passive investments."  Instead, it generally provided that McClendon would not be "restricted from maintaining or making investments, or engaging in other businesses, enterprises or civic functions" if doing so would not violate the other restrictions on McClendon's activities.  Despite these somewhat looser restrictions in his later agreements, it still seems possible that he breached the terms of his employment agreement.

**B.    McClendon's Risky Hedging Positions Prove Disastrous**

122.    Although it is not clear what happened to Heritage in 2008, it appears that defendant McClendon made further bad bets that year in addition to his botched margin trading.  Specifically, McClendon and Ward appear to have staked the fate of Heritage (and millions of their own dollars) on the price of natural gas increasing.

123.    As seems to be the repeating pattern, defendant McClendon's bets went horribly wrong.  *Reuters* noted that McClendon's "personal cash crunch" followed the drop in natural gas prices in 2008:

> At Heritage, all of the money from external investors was returned by 2008, Cirino said. McClendon and Ward continued to operate the fund during that year, Ward said, but by 2009, Heritage traded no more.
>
> What happened next to McClendon's commodity-trading ventures is unclear.
>
> By June 2008 - as natural gas and oil prices were peaking, and just before the financial crisis - McClendon and Ward both held huge positions in natural-gas derivatives, according to confidential trading data disclosed last year by U.S. Senator Bernie Sanders, an independent from Vermont.
>
> The trading information was assembled as part of a CFTC inquiry into derivatives markets and their impact on real-world energy prices. McClendon and Ward were among only a handful of individual investors identified by the CFTC. Most of the other players were big corporations.
>
> The data indicated McClendon and Ward were betting that the rally of 2008 would continue. By purchasing derivatives, they controlled nearly identical positions in natural gas worth around $2.3 billion apiece, according to Reuters calculations based on closing futures prices as of June 30, 2008. McClendon held oil contracts worth another $240 million, the CFTC data showed.
>
> ***Of 300 banks, hedge funds, energy companies and other traders identified in the CFTC survey, only four held larger bullish bets in natural gas.***

*Oil fell by more than 75 percent between July and December. Natural gas futures dropped almost 60 percent.*

It isn't clear how McClendon and Ward's investments fared. McClendon would not discuss his trading. Ward said he could not recall the outcome of his own trades in 2008.

McClendon suffered a well-documented personal cash crunch later that year, however.

\*   \*   \*

## C.   The Individual Defendants Disregard Serious Conflicts of Interest and Other Risks Arising from Defendant McClendon's Hedging Activities

124.   On top of distracting defendant McClendon from his executive responsibilities owed to Chesapeake, McClendon's hedge fund activities also posed serious conflicts of interest because his fund was trading in the same commodities that Chesapeake was producing. *Reuters* noted that numerous experts were "stunned" to learn about these hedging activities. These experts observed that hedging activities relating to the Company's line of business, even if legal, would not be tolerated at other energy firms. Unlike Chesapeake, other firms banned such activities to prevent conflicts of interest and other risks, including: (i) the risk that a corporate insider like McClendon might trade on commodities based on non-public, corporate information; (ii) the conflict of interest that arises when a corporate insider might be faced with an operating decision that could affect the commodities markets in which he or she invests; and (iii) the risk of "front-running," which would occur when an insider buys or sells a commodity in advance of the company's orders. Indeed, *Reuters* explained these conflicts of interest and similar risks as follows:

But *experts* on energy trading, corporate governance and commodity-market regulation said they *were stunned by the latest revelation.*

*"An executive's first responsibility is to shareholders and the betterment of their investment,"* said Carl Holland, who ran the trading-compliance department at former U.S. oil major Texaco. *"Personal trading in the commodity around which the CEO's business is based would be a clear no. We would never have tolerated that, ever."*

Thomas Mulholland, a risk-management consultant to oil and gas producers for Golden Energy Services in St Louis, said *such matters are "taken very seriously by energy companies, and there are strict codes against it. Even if there is just a whiff of impropriety,"* he said, *"it can be enough to lead to a termination."*

                    *       *       *

Nonetheless, personal *dealing in energy markets is typically forbidden by oil and gas companies for a variety of reasons.*

In Chesapeake's case, *McClendon would have been aware of major decisions that could affect natural gas prices before that information became public.* Accounting for 5 percent of U.S. natural gas production, Chesapeake holds tremendous sway over markets. On January 23, the company announced sharp output curbs in response to low prices. In response, U.S. natural gas futures surged by 8 percent the same day.

*"If the company needs to make an operating decision which might move the market against the CEO's positions, there's a risk that will influence the decision-making at the top of the company,"* said Jeff Harris, former chief economist at the market's U.S. regulator, the Commodity Futures Trading Commission, and now professor of finance at Syracuse University.

*Another potential problem is known as "front-running." That's when a trader buys or sells a commodity in advance of a client's or his company's orders. In theory, McClendon's first-hand knowledge of Chesapeake's own plans to trade would enable him to profit by trading ahead of Chesapeake - a move that could raise costs for the company.*

*"Advance knowledge of Chesapeake's activities could be perceived as having insight into the movement of commodities prices, which certainly raises conflict-of-interest issues as well as ethical issues about the ability to enrich himself on non-public information,"* said Tim Rezvan, oil and gas industry analyst at Sterne Agee in New York.

125.   The Board at the time – comprised of the 2008 Director Defendants – was likely aware of defendant McClendon's hedging activities through Heritage.  As noted above, both Chesapeake co-founders formed Heritage.  McClendon and Ward opened Heritage to friends and associates, meaning they likely invited the Board to participate in the hedge fund.  McClendon (and perhaps Ward) also spent considerable amounts of time managing Heritage, including weekly conference calls and frequent meetings in New York that would have required McClendon to be frequently (and noticeably) out of the office.

126.   Furthermore, defendant McClendon ran Heritage from Chesapeake's office using Chesapeake's staff and other resources.  Heritage listed Chesapeake's headquarters in Oklahoma as its mailing address in certain documents discovered by *Reuters*.  A number listed for Heritage in several business directories was answered by a person for Chesapeake.   Heritage  also  shared  at  least  one  employee  with  the  Company:  a Chesapeake accountant who also handled the hedge fund's bookkeeping.

127.   Defendant McClendon's use of Chesapeake's resources to run Heritage appears to be consistent with the terms of his employment agreement – further indicating that the Board was well aware of McClendon's hedge fund activities.  Amendments to McClendon's employment agreements between 2004 and 2008, relating to use of Chesapeake staff, highlight other discussions between McClendon and the Board that foreseeably would have prompted members of the Board to inquire into the nature of McClendon's personal business activities.  Consistent with *Reuter's* finding that Heritage and Chesapeake shared an accountant, McClendon's 2004 Employment Agreement

provided that McClendon could, *free of charge*, "utilize the Company's office space, computer facilities and personnel to provide accounting services, records maintenance and tax advice and tax return preparation for the Executive's ... personal business investments and activities." These terms changed slightly in July 2005, at which point McClendon was required reimburse the Company for one-half of 50% of the salaries and bonuses of employees who were primarily engaged in providing support services, other than secretarial or general administrative services, to McClendon for his personal and business activities.   In January 1, 2007, McClendon's employment agreement was amended to require that he was to reimburse the Company for 100% of salaries and bonuses.  McClendon's 2008 Employment Agreement required McClendon to cover even more direct and indirect costs relating to the employees who provided services to McClendon outside his duties as Chairman and CEO of Chesapeake.

128.   Further accommodations by the Board with regard to defendant McClendon's employment agreements confirm the Board was aware of Heritage. McClendon's 2004 Employment Agreement provided that McClendon could be involved with "passive investments" as a partner or member of another enterprise to the extent it would not violate the terms of employment or require only a "minimal portion" of his time.  The agreement also provided that McClendon could not engage in activities that required "any substantial portion" of time.  But the year after McClendon and Ward formed Heritage, McClendon and the Board agree to amend McClendon's employment agreement to eliminate the time restriction on "passive investments" and the general restriction on activities that would require "any substantial portion" of time.  Instead,

from July 2005 through at least 2008, McClendon's employment agreements provided that he could not engage in activities that would "require such substantial services" of McClendon that he was "unable to perform the duties" assigned under the agreement. By eliminating express restrictions on McClendon's ability to engage in time-consuming activities (namely with regard to investments), the Board enabled McClendon to spend more and more time on his hedge fund. In negotiating these new terms and keeping tabs on McClendon to ensure compliance therewith, the Board inevitably must have known about McClendon's activities with Heritage.

129.   Finally, because defendant McClendon's active involvement with Heritage presented conflicts of interest between McClendon and the Company, the Code at the time likely required McClendon to report the conflicts of interest to the Company, and likely required the Board to eliminate or mitigate such conflicts.

130.   Despite presenting serious conflicts of interest, in addition to distracting defendant McClendon from his duties as CEO (potentially in breach of his employment agreement), the Board (including each of the 2008 Director Defendants) failed to put in place adequate and effective internal controls or limitations to restrict McClendon's involvement with Heritage. Rather, the Board agreed to amend the terms of McClendon's employment in such a way that it facilitated McClendon's involvement with Heritage. As a result, the Board breached their fiduciary duties and likely the terms of the Code at the time.

### D.    Defendants Conceal Defendant McClendon's Hedging Activities

131.   Not only did defendant McClendon and the 2008 Director Defendants fail to clamp down on McClendon's involvement with Heritage, but they utterly failed to disclose to shareholders any material facts about McClendon's hedge fund.  According to *Reuters*, "A search of Chesapeake's public filings turned up no disclosure of McClendon's hedge fund, Heritage."

132.   *Reuters* cites several experts who agree that information regarding McClendon's hedging activities were material and should have been disclosed to shareholders:

> "If correct," [Tim] Rezvan said [referring to the possibility McClendon traded on advance knowledge], "these disclosures would be even more alarming than the personal loans."

> A securities law professor said the very existence of the hedge fund could prompt a securities investigation.

> "I would argue, and I think the SEC would argue, that the failure to disclose that you are engaging in this kind of conduct can constitute a securities fraud problem," said Elizabeth Nowicki, a professor at Tulane University. She said a failure by McClendon and Ward to disclose their fund to Chesapeake's shareholders may constitute a "material omission" that could draw SEC scrutiny.

> "A reasonable investor would want to know that the CEO could be in a situation where he's betting against the interests of the company personally," Nowicki said. "That, it seems to me, is a slam dunk."

133.   The failure of the 2008 Director Defendants to disclose defendant McClendon's hedging activities to investors constitutes, at a minimum, a violation of their fiduciary duties of loyalty, good faith, and candor.  The failure further demonstrates that the Board cannot be trusted to monitor and keep tabs on McClendon.

## VIII.  THE INDIVIDUAL DEFENDANTS MAKE IMPROPER STATEMENTS IN THE PROXY STATEMENTS RELATING TO THE FWPP

134.   The course and pattern of concealment by the Individual Defendants included improper statements in the Company's annual Proxy Statements filed with the SEC on Forms DEF 14A.  These Proxy Statements (dating as far back as 2009) failed to disclose material information concerning defendant McClendon's participation in the FWPP.  Namely, these Proxy Statements contained false or misleading statements or omissions of material facts regarding, among other things: (i) the purpose of the FWPP as it related to aligning McClendon's interests with the Company's; and (ii) the nature and extent of McClendon's financing arrangements made in connection with his participation in the FWPP.

135.   The Individual Defendants were members of the Board during the issuance of one or more of these Proxy Statements, and as such, approved and made said statements, which were provided to shareholders in connection with soliciting their votes. Each Proxy Statement between 2005 and the present was signed "By Order of the Board of Directors."

136.   The Individual Defendants have repeatedly informed shareholders in the Company's Proxy Statements that the FWPP was justified because it aligned the interests of the Company with those of defendant McClendon.  These false statements date as far back as the Company's 2005 Proxy in which the Individual Defendants then at the Company (defendants McClendon, Keating, Kerr, Maxwell, and Whittemore) asked shareholders to ratify the FWPP.  The 2005 Proxy, for example, informed shareholders

that: "The Board believed the participation program aligned the interests of the Founders with those of the Company because the Founders were investing, and sharing the risks and rewards of drilling, on the same basis as the Company."

137.   The 2005 Proxy also told shareholders that the purpose of the FWPP was to retain the founders, including defendant McClendon, by "aligning the financial rewards and risks of the Founders with the Company more effectively than overriding royalty, carried interest or other performance incentive programs maintained by many of the Company's peers."   Shareholders were further told that this was to be achieved through "imposing on the Founders the same risk incurred by the Company in its core operations."   These same statements were repeated almost verbatim in every Proxy Statement since then, including Forms DEF-14A filed on April 28, 2006, April 30, 2007; April 29, 2008, April 30, 2009, April 30, 2010, and April 29, 2011, and more recently on Form PRE 14A filed on April 20, 2012.

138.   In the Company's May 4, 2009 Proxy Statement, defendants McClendon, Davidson, Hargis, Keating, Kerr, Maxwell, Nickles, Whittemore, and Miller further declared that "[t]he alignment of risk between Aubrey and the Company is unique and exemplary."   In describing the Company's incentive award to McClendon for 2008, these defendants also told shareholders that "the Board tailored a specific award that aligned Aubrey's interests with the Company and put him at risk if the Company drilled poor wells."

139.   These and similar statements issued in the Proxy Statements on Forms DEF-14A were materially false or misleading because defendant McClendon is not

facing the same risks as the Company, and his interests are not aligned with the Company. Rather, his participation in the FWPP is being funded by his massive, ever-increasing private loans to the same lenders that provide financing to Chesapeake. As a result, McClendon is not sharing the same risk as the Company in any real sense, with only nominal down-side exposure. At the same time, defendant McClendon participates in very little of the upside, because under the terms of his loans, his lenders will collect the vast portion of any profits that would be generated from McClendon's FWPP interests. In addition to the lack of aligning interests, the Individual Defendants' mismanagement of the FWPP has allowed defendant McClendon to create actual or potential conflicts of interest (such as competition with McClendon's VPP contracts) that could already be seriously damaging Chesapeake at a time when it is desperate to maintain adequate cash flows. This is a far cry from the alignment of interests and shared risk that the Individual Defendants repeated to Chesapeake's shareholders.

140. Each of the Proxy Statements from 2009 to 2012 contained a Board-sponsored proposal to increase the amount of shares available to compensate employees through the Company's Long Term Incentive Program ("LTIP"). The Individual Defendants continued their practice of asking for amendments to increase the shares available under this program every year since its inception. The LTIP amendments passed each year from 2009 to 2011.

IX.   **THE INDIVIDUAL DEFENDANTS MAKE ADDITIONAL IMPROPER STATEMENTS REGARDING DEFENDANT MCCLENDON'S FINANCING AND RELATED RISKS**

141.   During at least March 2010 to March 2012, the Individual Defendants (except for defendant Kerr, who was no longer a member of the Board as of June 2009) directly made, signed, approved, or otherwise caused Chesapeake to issue improper statements to the public that were materially false or misleading.   Specifically, these statements, published in Chesapeake's Annual Reports, Proxy Statements, press releases, and other public documents, were materially false or misleading because they, among other reasons:

(a)   suggest to investors that defendant McClendon had been participating in the FWPP using his own cash and that he retained all rights to his interests in the FWPP, when the truth is that McClendon had been resorting to massive borrowing using all (or nearly all) of his interests in the FWPP as collateral and promising to payoff the loans with future FWPP-generated profits (*See, e.g.*, ¶¶230-31, 233-37);

(b)   suggest that, from time to time, defendant McClendon engaged in VPP transactions pursuant to which he owed money to third parties, while the truth is McClendon has raised over $130 million for himself by engaging in multiple VPP contracts (*See, e.g.*, ¶¶231, 234);

(c)   utterly fail to apprise shareholders of the full extent to which defendant McClendon was engaging in financing transactions and the material terms of

those transactions that would have alerted shareholders to the nature and extent of McClendon's material conflicts of interest (*See, e.g.*, ¶¶230-31, 233-37) ; and/or

(d)     utterly fail to apprise shareholders of the risks to the Company presented by McClendon's financing transactions and related conflicts of interest (*See, e.g.*, ¶¶230-31, 233-37).

142.   In Chesapeake's Annual Report filed on Form 10-K on March 1, 2010, the Individual Defendants then at the Company caused Chesapeake to issue the following improper statement:

> Since Chesapeake was founded in 1989, our CEO, Aubrey K. McClendon, has acquired working interests in virtually all of our natural gas and oil properties by participating in our drilling activities under the terms of the Founder Well Participation Program (FWPP) and predecessor participation arrangements provided for in Mr. McClendon's employment agreements. Under the FWPP, approved by our shareholders in June 2005, Mr. McClendon may elect to participate in all or none of the wells drilled by or on behalf of Chesapeake during a calendar year, but he is not allowed to participate only in selected wells. A participation election is required to be received by the Compensation Committee of Chesapeake's Board of Directors not less than 30 days prior to the start of each calendar year. His participation is permitted only under the terms outlined in the FWPP, which, among other things, limits his individual participation to a maximum working interest of 2.5% in a well and prohibits participation in situations where Chesapeake's working interest would be reduced below 12.5% as a result of his participation. In addition, the company is reimbursed for costs associated with leasehold acquired by Mr. McClendon as a result of his well participation.

> \* \* \*

> As of December 31, 2009, we had accrued accounts receivable from our CEO, Aubrey K. McClendon, of $14 million representing joint interest billings from December 2009 which were invoiced and timely paid in January 2010. Since Chesapeake was founded in 1989, Mr. McClendon, has acquired working interests in virtually all of our natural gas and oil properties by participating in our drilling activities under the terms of the

Founder Well Participation Program ("FWPP") and predecessor participation arrangements provided for in Mr. McClendon's employment agreements. Under the FWPP, approved by our shareholders in June 2005, Mr. McClendon may elect to participate in all or none of the wells drilled by or on behalf of Chesapeake during a calendar year, but he is not allowed to participate only in selected wells. A participation election is required to be received by the Compensation Committee of Chesapeake's Board of Directors not less than 30 days prior to the start of each calendar year. His participation is permitted only under the terms outlined in the FWPP, which, among other things, limits his individual participation to a maximum working interest of 2.5% in a well and prohibits participation in situations where Chesapeake's working interest would be reduced below 12.5% as a result of his participation. In addition, the company is reimbursed for costs associated with leasehold acquired by Mr. McClendon as a result of his well participation.

143. In Chesapeake's April 30, 2010 Proxy Statement filed with the SEC on Form DEF 14A, the Individual Defendants then at the Company caused Chesapeake to issue the following improper statement:

Under the FWPP, Mr. McClendon is permitted to participate in all of the wells spudded by or on behalf of the Company during each calendar year. In order to participate, prior to the beginning of each year Mr. McClendon must provide written notice to the members of the Compensation Committee of his election to participate in the FWPP and the percentage working interest which he proposes to participate with during the year. His working interest percentage may not exceed a 2.5% working interest in a well and is not effective for any well where the Company's working interest after Mr. McClendon's participation election would be reduced to below 12.5%.

*  *  *

The right to participate in the FWPP can only be assigned by Mr. McClendon to an affiliate designated as such in accordance with the FWPP.

Under the FWPP, Mr. McClendon cannot change his working interest percentage during any calendar year without the prior approval of the Compensation Committee, and he agrees to pay all joint interest billings immediately on receipt of the Company's invoice and to prepay amounts owing to a third party operator if the Company is required to prepay any such costs. The amount paid by Mr. McClendon for the acreage assigned in

connection with his participation in the FWPP is equal to the following amount computed on a per acre basis: (a) all direct third party costs paid by the Company net of acreage sale proceeds and capitalized in the appropriate accounting pool in accordance with the Company's accounting procedures (including capitalized interest, leasehold payments, acquisition costs, landman charges and seismic charges); divided by (b) the acreage in the applicable pool. The acreage charge amount is recomputed as of the first day of each calendar year and reviewed for adjustment quarterly by the Company and submitted to the Compensation Committee for approval. All other costs are billed in accordance with the Company's accounting procedures applicable to third party participants pursuant to any applicable joint operating agreement or exploration agreement relating to a particular well, and such amounts paid by Mr. McClendon in connection with his participation in a well are on no better terms than the terms agreed to by unaffiliated third party participants in connection with the participation in such well or similar wells operated by the Company.

The following table sets forth, with respect to Mr. McClendon's FWPP interests (including interests from participation programs that were predecessors to the FWPP), the natural gas and oil revenues he received, lease operating expenses he paid, the resulting net cash flow before capital expenditures, capital expenditures he paid and net cash flow after capital expenditures during the first quarter of 2010 and each of the three years in the period ended December 31, 2009.

| | First Quarter 2010 | 2009 | 2008 | 2007 |
|---|---|---|---|---|
| Natural gas and oil revenues | $ 29,174,340 | $ 87,856,431 | $ 171,513,367 | $ 92,817,072 |
| Lease operating expenditures | (6,408,578) | (19,481,167) | (22,617,688) | (13,676,003) |
| Net cash flow | 22,765,762 | 68,375,264 | 148,895,679 | 79,141,069 |
| Capital expenditures | (40,932,863) | (184,468,839) | (212,634,566) | (170,659,274) |
| Net after capital | $(18,167,101) | $(116,093,575) | $ (63,738,887) | $ (91,518,205) |

expenditur
es

The foregoing information has been derived solely from the Company's records. Accordingly, it may not include all revenues and expenses for FWPP interests that are not operated by the Company, and it may include revenues and expenses for previous FWPP interests currently owned by others for which such ownership change has not been communicated to the Company for reflection in the Company's records. *Mr. McClendon's FWPP interests are his personal assets and the Company does not restrict sales, dispositions or financing transactions involving FWPP interests previously assigned by the Company.* Accordingly, *the foregoing amounts include revenue attributable to volumetric production payments owed to third parties under transactions that Mr. McClendon has entered into from time to time. Mr. McClendon pays the Company for lease operating expenses and capital expenditures related to his FWPP interests promptly upon receipt of each invoice. There was no amount owed to the Company by Mr. McClendon for FWPP invoices at any month-end in the first quarter of 2010 or in the three years ended December 31, 2009.*

*While Mr. McClendon's cumulative expenditures under the FWPP and predecessor programs have significantly exceeded cumulative monthly production revenues to date, Mr. McClendon believes the present value of the future net revenue (pre-tax) of the estimated proved developed producing reserves attributable to his FWPP interests in Company wells at December 31, 2009*, discounted at 10% per year and based on prices and costs in effect at such date, was approximately $108 million....

144.   The above statement that the Company "does not restrict sales, dispositions or financing transactions involving FWPP interests" is a prime example of a partial disclosure by the Individual Defendants that – certainly once made – required further disclosure to not be false or misleading. With regard to the aforementioned statement, for example, defendants were required, at a minimum, to reveal that defendant McClendon was in fact engaging in financing transactions involving the FWPP, as well as the nature and extent of those transactions. Because the disclosure only stated the Company did not restrict "*previously assigned*" interests, shareholders would have no reason to believe that

the Board and its committees had abdicated their responsibilities to review transactions *on an ongoing basis* for conflicts of interest and take appropriate steps to deal with associated risks. Thus, by failing to reveal anything further, defendants improperly led shareholders to believe that: (i) McClendon was not engaging in financing relating to his FWPP interests; or (ii) any financing transactions were not material and did not create any conflict of interest.

145.   In Chesapeake's Annual Report filed on Form 10-K on March 1, 2011, the Individual Defendants then at the Company caused Chesapeake to issue the following improper statement:

> Under the FWPP, Mr. McClendon may participate in all of the wells spudded by or on behalf of the Company during each calendar year. Prior to the beginning of each year Mr. McClendon must provide written notice to the members of the Compensation Committee of his election to participate in the FWPP and the working interest percentage that he proposes to participate during the year. His working interest percentage may not exceed a 2.5% working interest in a well and is not effective for any well where the Company's working interest after Mr. McClendon's participation election would be reduced to below 12.5%. Subject to these working interest limitations, if Mr. McClendon elects to participate in the FWPP, he must participate in all wells spudded by or on behalf of the Company during the given calendar year and cannot elect to participate on a well-by-well basis. In September 2010, Mr. McClendon elected to participate in the FWPP for the 2011 calendar year at the maximum 2.5% working interest permitted.

146.   In Chesapeake's April 29, 2011 Proxy Statement filed with the SEC on Form DEF 14A, the Individual Defendants then at the Company caused Chesapeake to issue the following improper statement:

> *As of December 31, 2010, we had accrued accounts receivable from our Chief Executive Officer, Aubrey K. McClendon, of $30 million representing joint interest billings from December 2010 which were invoiced and timely paid in January 2011.* Since Chesapeake was founded

in 1989, Mr. McClendon has acquired working interests in virtually all of our natural gas and oil properties by participating in our drilling activities under the terms of the Founder Well Participation Program (FWPP) and predecessor participation arrangements provided for in Mr. McClendon's employment agreements. Under the FWPP, approved by our shareholders in June 2005, Mr. McClendon may elect to participate in all or none of the wells drilled by or on behalf of Chesapeake during a calendar year, but he is not allowed to participate only in selected wells. A participation election is required to be received by the Compensation Committee of Chesapeake's Board of Directors not less than 30 days prior to the start of each calendar year. His participation is permitted only under the terms outlined in the FWPP, which, among other things, limits his individual participation to a maximum working interest of 2.5% in a well and prohibits participation in situations where Chesapeake's working interest would be reduced below 12.5% as a result of his participation. In addition, the company is reimbursed for costs associated with leasehold acquired by Mr. McClendon as a result of his well participation.

\* \* \*

***Mr. McClendon participates in the FWPP through entities in which all equity interests are owned solely by Mr. McClendon and his immediate family members as approved by the Compensation Committee in accordance with the FWPP.***

Under the FWPP, Mr. McClendon cannot change his working interest percentage during any calendar year without the prior approval of the Compensation Committee, and ***he agrees to pay all joint interest billings immediately on receipt of the Company's invoice and to prepay amounts owing to a third party operator*** if the Company is required to prepay any such costs. Mr. McClendon has never requested, nor has the Committee made, an adjustment to the participation percentage during a participation period. The amount paid by Mr. McClendon for the acreage assigned in connection with his participation in the FWPP is equal to the following amount computed on a per acre basis: (i) all direct third party costs paid by the Company net of acreage sale proceeds and capitalized in the appropriate accounting pool in accordance with the Company's accounting procedures (including capitalized interest, leasehold payments, acquisition costs, landman charges and seismic charges); divided by (ii) the acreage in the applicable pool. The acreage charge amount is recomputed as of the first day of each calendar year and reviewed for adjustment quarterly by the Company and submitted to the Compensation Committee for approval. All other costs are billed in accordance with the Company's accounting procedures applicable to third party participants pursuant to any joint

operating agreement or exploration agreement relating to a particular well, and such amounts paid by Mr. McClendon in connection with his participation in a well are on no better terms than the terms agreed to by unaffiliated third party participants in connection with the participation in such well or similar wells operated by the Company.

The following table sets forth the amounts received from or paid to the Company with respect to Mr. McClendon's FWPP interests (including interests acquired in years prior to shareholder approval in 2005) during the first quarter of 2011 and each of the three years in the period ended December 31, 2010.

| | First Quarter 2011 | 2010 | 2009 | 2008 |
|---|---|---|---|---|
| Natural gas and oil revenues | $ 40,191,374 | $ 127,064,861 | $  87,856,431 | $ 171,513,367 |
| Lease operating expenditures | (8,986,880) | (26,102,787) | (19,481,167) | (22,617,688) |
| Net cash flow | 31,204,494 | 100,962,074 | 68,375,264 | 148,895,679 |
| Capital expenditures | (89,345,128) | (242,839,086) | (184,468,839) | (212,634,566) |
| Net after capital expenditures | $(58,140,634) | $(141,877,012) | $(116,093,575) | $  (63,738,887) |

The foregoing information has been derived solely from the Company's records. Accordingly, it may not include all revenues and expenses for FWPP interests that are not operated by the Company, and it may include revenues and expenses for FWPP interests currently owned by others. *For example, the foregoing amounts include revenue attributable to volumetric production payments owed to third parties under transactions that Mr. McClendon has entered into from time to time. Mr. McClendon pays the related lease operating expenses and disburses revenue to the VPP owners. Mr. McClendon pays the Company for lease operating expenses and capital expenditures related to his FWPP interests promptly*

*upon receipt of each invoice. During the first quarter of 2011 and the three years ended December 31, 2010, Mr. McClendon and Mr. McClendon's affiliates paid all monthly invoices on receipt in accordance with the terms of the FWPP.*

While *Mr. McClendon's cumulative expenditures under the FWPP and predecessor programs have significantly exceeded cumulative monthly production revenues to date*, Mr. McClendon believes the present value of the future net revenue (pre-tax) of the estimated proved developed producing reserves attributable to his FWPP interests in Company wells at December 31, 2010, discounted at 10% per year and based on prices and costs under existing conditions at such date, was approximately $308 million…. The Company's reservoir engineering staff provides data and analysis to Mr. McClendon's affiliates with respect to reserves associated with FWPP interests using the engineering prepared for the Company's interest in the same wells….

Mr. McClendon's interests are his personal assets and the FWPP does not restrict sales, other dispositions or financing transactions involving FWPP interests previously acquired from the Company. From time to time, *Mr. McClendon has sold FWPP interests in conjunction with sales by the Company of its interests in the same properties, and the proceeds related to the properties have been allocated between Mr. McClendon and the Company based on their respective ownership interests*. As a condition to the sale of the Company's Fayetteville Shale assets completed on March 31, 2011, Mr. McClendon's affiliates sold the FWPP interests they held in the Fayetteville Shale on the same terms as those that applied to the Company's developed producing properties included in the sale….

147. In a current report filed by Chesapeake with the SEC on Form 8-K on November 4, 2011, certain defendants then at the Company (including defendant McClendon) caused Chesapeake to issue the following improper statement that discusses financing terms between EIG and Chesapeake, but entirely fails to disclose the material fact that EIG has also been providing McClendon with significant financing, including a loan that helped McClendon to fund some of FWPP-related expenditures in 2008:

On November 2, 2011, the Company completed the sale to EIG Global Energy Partners of $500 million of perpetual preferred shares of a newly

formed entity, CHK Utica, L.L.C. CHK Utica is an unrestricted subsidiary of the Company that owns approximately 700,000 net leasehold acres within an area of mutual interest in the Utica Shale play in 13 counties primarily in eastern Ohio. The Company has retained all the common interests in CHK Utica.

The CHK Utica preferred shares are entitled to receive an initial annual distribution of 7%, payable quarterly. The Company retains an option exercisable prior to October 31, 2018 to repurchase the preferred shares for cash in whole or in part at any time at a valuation expected to equal the greater of a 10% internal rate of return or a return on investment of 1.4x and may repurchase the shares thereafter at a higher valuation. Investors in CHK Utica preferred shares will also receive an overriding royalty interest in the well-bore of the first 1,500 net wells drilled in the area of mutual interest. If an additional $750 million of CHK Utica preferred shares are purchased in the future, holders of the preferred shares would hold an aggregate 3% overriding royalty interest, which is the equivalent of an approximate 0.45% overriding royalty interest across the Company's projected 10,000 net well inventory. The Company's average net revenue interest on its Utica Shale leasehold is approximately 83%. As part of the transaction, the Company has committed to drill a minimum of 50 net wells per year through 2016 in the CHK Utica area of mutual interest, up to a minimum cumulative total of 250 net wells, for the benefit of CHK Utica.

148. Certain defendants then at the Company (including defendant McClendon) also caused the November 4, 2011 Form 8-K to include a press release dated November 3, 2011 that contained the following improper statement, which similarly failed to disclose EIG's financing transactions with McClendon despite disclosing the terms of the arrangement between EIG and Chesapeake:

OKLAHOMA CITY, OKLAHOMA, NOVEMBER 3, 2011 – Chesapeake Energy Corporation (NYSE:CHK) today announced two transactions to monetize a portion of its 1.5 million net acres of leasehold in the Utica Shale play primarily in eastern Ohio. Fully implemented, the transactions would result in consideration to Chesapeake of approximately $3.4 billion.

* * *

Additionally, as a first step in a financial transaction led by EIG Global Energy Partners ("EIG"), Chesapeake has completed the sale to EIG of

$500 million of perpetual preferred shares of a newly formed entity, CHK Utica, L.L.C. Chesapeake expects to sell up to $750 million of additional CHK Utica preferred shares to other investors, including limited partners of EIG, by November 30, 2011. CHK Utica is a wholly owned, unrestricted subsidiary of Chesapeake that owns approximately 700,000 net leasehold acres within an area of mutual interest in the Utica Shale play in 13 counties primarily in eastern Ohio (the "CHKU AMI") that encompasses the JV AMI. Chesapeake has retained all the common interests in CHK Utica.

The CHK Utica preferred shares are entitled to receive an initial annual distribution of 7%, payable quarterly. Chesapeake retains an option exercisable prior to October 31, 2018 to repurchase the preferred shares for cash in whole or in part at any time at a valuation expected to equal the greater of a 10% internal rate of return or a return on investment of 1.4x. Assuming a total of $1.25 billion of CHK Utica preferred shares are purchased, investors in CHK Utica preferred shares will also receive a 3% overriding royalty interest in the first 1,500 net wells drilled on CHK Utica's leasehold, which is the equivalent of an approximate 0.45% overriding royalty interest across Chesapeake's projected 10,000 net well inventory. Chesapeake's average net revenue interest on its Utica Shale leasehold is approximately 83%, which compares favorably to net revenue interests in the Haynesville, Barnett and Eagle Ford shale plays of approximately 75%.

As part of the financial transaction, Chesapeake has committed to drill a minimum of 50 net wells per year through 2016 in the CHKU AMI, up to a minimum cumulative total of 250 net wells, for the benefit of CHK Utica. Chesapeake believes it will have considerable operating and financial flexibility in fulfilling the drilling commitment because the company's planned Utica Shale drilling program for the years ahead involves a significantly higher rig count than the approximate 10-rig drilling program required by the terms of the CHK Utica preferred shares investment.

\* \* \*

Aubrey K. McClendon, Chesapeake's Chief Executive Officer, commented, "We are pleased to announce ... the closing of the $500 million initial investment by the EIG-led investor group. Through the industry JV, we will be able to recover more than our total leasehold investment in the entire Utica Shale play while only selling approximately 142,500 net acres of our 1.5 million net acres of Utica Shale leasehold. Through the financial transaction led by EIG, our drilling program in CHK Utica is almost entirely funded for the foreseeable future (including cash flow from

anticipated production).   We have achieved very strong initial drilling
results in the wet natural gas and dry natural gas areas of our Utica Shale
play and are beginning to accelerate our evaluation of the oil area of the
play, which the EIG transaction will help enable."

149.   In Chesapeake's Annual Report filed on Form 10-K on February 29, 2012,

the Individual Defendants then at the Company caused Chesapeake to issue the following

improper statement:

> As of December 31, 2011 and 2010, we had accrued accounts receivable
> from our Chief Executive Officer, Aubrey K. McClendon, of $45 million
> and $30 million, respectively, representing joint interest billings from
> December 2011 and 2010. These amounts were invoiced and timely paid in
> the following month. Since Chesapeake was founded in 1989, Mr.
> McClendon has acquired working interests in virtually all of our natural gas
> and oil properties by participating in our drilling activities under the terms
> of the Founder Well Participation Program (FWPP) and predecessor
> participation arrangements provided for in Mr. McClendon's employment
> agreements. Under the FWPP, approved by our shareholders in June 2005,
> Mr. McClendon may elect to participate in all or none of the wells drilled
> by or on behalf of Chesapeake during a calendar year, but he is not allowed
> to participate only in selected wells. A participation election is required to
> be received by the Compensation Committee of Chesapeake's Board of
> Directors not less than 30 days prior to the start of each calendar year. His
> participation is permitted only under the terms outlined in the FWPP,
> which, among other things, limits his individual participation to a
> maximum working interest of 2.5% in a well and prohibits participation in
> situations where Chesapeake's working interest would be reduced below
> 12.5% as a result of his participation. In addition, the Company is
> reimbursed for costs associated with leasehold acquired by Mr. McClendon
> as a result of his well participation. From time to time, Mr. McClendon has
> sold his FWPP interests in conjunction with sales by the Company of its
> interests in the same properties, and the proceeds related to those sales have
> been allocated between Mr. McClendon and the Company based on their
> respective ownership interests and on the same terms as those that applied
> to the Company's properties included in the sale.

150.   These misstatements or omissions were material in light of, among other

things: (i) the scale of the loans or VPPs: (ii) the small number of sources for financing;

(iii) defendant McClendon's history of engaging in risky leveraged transactions with assets involving Chesapeake; (iii) Chesapeake's difficulty maintaining cash flows; (iv) Chesapeake's large debt load relative to its market cap and its peers; (v) Chesapeake's exposure to the volatility and uncertainty of the price of natural gas; (vi) the stated purposes of the FWPP; and (vii) McClendon's obvious trajectory toward insolvency. Defendants knew or recklessly disregarded this material information in making or approving the improper statements.

151.   Indeed, recent disclosures by the Individual Defendants, although still deficient and incomplete, help illustrate the type of material disclosures that defendants have long failed to make.  For example, in Chesapeake's April 20, 2012 Proxy Statement, the Individual Defendants for the first time disclosed that: "[O]ver the life of the FWPP, Mr. McClendon has typically mortgaged his interests acquired under the FWPP with one or more lenders, some of which also have lending, investment or advisory relationships with the Company. Mr. McClendon's mortgages with these lenders secure loans used in whole or in part to fund Mr. McClendon's well costs."  Moreover, on April 27, 2012, McClendon released a supplemental disclosure providing a high-level breakdown of his total outstanding debt from loans he took out in connection with the FWPP and the value of his interests in the FWPP.  However, even that supplemental disclosure fails to mention approximately $500 million in loans that McClendon took out in January 2012.

152.   The following chart shows which defendants participated in the dissemination of the improper statements in Chesapeake's Annual Reports on Forms 10-K.  The chart also notes whether defendants signed the statements or additionally

certified pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") that, among other things, the Annual Report "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under such statements were made, not misleading":

| Date | Filing | Person(s) Who Signed and Certified |
|------|--------|-----------------------------------|
| 3/1/2010 | 10-K | McClendon, Davidson, Hargis, Keating, Maxwell, Miller, Nickles, Whittemore SOX CERTIFICATION: McClendon |
| 3/1/2011 | 10-K | McClendon, Davidson, Eisbrenner, Hargis, Keating, Maxwell, Miller, Nickles, Whittemore SOX CERTIFICATION: McClendon |
| 2/29/2012 | 10-K | McClendon, Davidson, Eisbrenner, Hargis, Keating, Maxwell, Miller, Nickles, Simpson SOX CERTIFICATION: McClendon, |

## X.    DAMAGES TO CHESAPEAKE

153.   As a direct and proximate result of the Individual Defendants' improprieties, Chesapeake disseminated improper, public statements concerning, among other things, defendant McClendon's financing in connection with his participation in the FWPP.  These improper statements have devastated Chesapeake's credibility.

154.   Similarly, as a direct and proximate result of the Individual Defendants' wrongdoing, the Company's credit rating has been downgraded, which will cause the Company to experience increased borrowing costs.

155.   Further, as a direct and proximate result of the Individual Defendants' actions, Chesapeake has expended, and will continue to expend, significant sums of money.  Such expenditures include, but are not limited to:

(a)     excessive interest costs due to unfair financing terms with defendant McClendon's lenders;

(b)     increased borrowing costs because of competition or lost financing opportunities due to competition with defendant McClendon's VPP transaction;

(c)     costs incurred in investigating and defending Chesapeake in connection with investigations by the SEC, the IRS and potentially the DOJ, plus potential fines or penalties resulting therefrom; and

(d)     costs incurred in investigating and defending Chesapeake and defendant McClendon in the Securities Class Action (and any later-filed class actions), plus potentially millions of dollars in settlement or to satisfy an adverse judgment.

156.   Similarly, the Individual Defendants' wrongdoing has irreparably damaged Chesapeake's corporate image and goodwill.   For at least the foreseeable future, Chesapeake will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in improper behavior and have misled the investing public, such that Chesapeake's ability to raise equity capital or debt on favorable terms in the future is now further impaired at a time when the Company is already struggling to raise cash.   Furthermore, Chesapeake's reputation and/or relationship with its customer base has been harmed and may adversely affect the Company's future revenues and growth prospects.

157.   The Company may also face substantial costs arising from potential litigation or other actions taken by defendant McClendon's lenders following an

imminent default by McClendon on his loans that are collateralized with his FWPP interests.

## XI.   GENERAL DERIVATIVE ALLEGATIONS

158.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

159.   Plaintiff brings this action derivatively in the right and for the benefit of Chesapeake to redress injuries suffered, and to be suffered, by Chesapeake as a direct result of the violations of law, breaches of fiduciary duty, abuse of control, gross mismanagement, waste of corporate assets, and unjust enrichment, as well as the aiding and abetting thereof, by the Individual Defendants.   Chesapeake is named as a nominal defendant solely in a derivative capacity.   This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

160.   Plaintiff will adequately and fairly represent the interests of Chesapeake in enforcing and prosecuting its rights.

161.   Plaintiff was an owner of Chesapeake common stock throughout the Relevant Period and remains a shareholder of the Company today.

## XII.   DERIVATIVE ALLEGATIONS: DEMAND IS EXCUSED

162.   When Plaintiff Erickson originally filed this lawsuit, the Board of Chesapeake, consisted of the following nine individuals: defendants McClendon, Hargis, Miller, Davidson, Nickles, Keating, Maxwell, Simpson, and Eisbrenner.   Making a demand on such Board to institute claims asserted in this action would be a futile, wasteful, and useless act, as set forth below.

**A.      Demand Is Excused Because the Director Defendants' Conduct Is Not a Valid Exercise of Business Judgment**

163.    Defendants McClendon, Hargis, Miller, Davidson, Nickles, Keating, Maxwell, Simpson, and Eisbrenner directly made and/or caused the Company to disseminate improper, materially false and misleading public statements concerning, among other things, the true nature and extent of McClendon's financing relating to his participation in the FWPP, the lack of alignment of McClendon's interests with those of the Company, as well as the actual and potential conflicts of interest and risks arising from McClendon's financing arrangements.   McClendon, Davidson, Hargis, Keating, Maxwell, Nickles, and Miller also concealed from the public, or caused or allowed the Company to fail to disclose to the public, any information concerning McClendon's hedging activities.   For reasons stated herein, each defendant knew or should have known that the improper statements did not fairly, accurately, or truthfully convey information regarding McClendon's financing, alignment of interests, or conflicts of interest and risks as required by Generally Accepted Accounting Principles, SEC rules and regulations, or other applicable law.   In addition, when deciding whether to sign or approve statements to be publicly disseminated, each defendant was bound by the duty of care to inform himself or herself of all reasonably-available material information.   The Director Defendants admit that they have been generally aware of McClendon's financing in connection with his FWPP interests, and should have, at the very least, inquired further concerning the details of the financing transactions.  Furthermore, because McClendon is a member of the Board and conducts his personal business at Chesapeake's headquarters,

information regarding his financing transactions and hedging activities were reasonably available to each and every one of the Director Defendants. In light of, among other things, the obligations imposed by the Code to address conflicts of interest, the scale of the loans to McClendon, the small number of sources for financing, the Company's cash problems, the stated purposes of the FWPP, McClendon's obvious trajectory toward insolvency, and McClendon's history making bad bets, the details concerning McClendon's financing transactions were material for the Director Defendants in connection with their fulfillment of their duties on the Board (or committees thereof) and their decisions to disseminate public statements. Defendants McClendon, Hargis, Miller, Davidson, Nickles, Keating, Maxwell, Simpson, and Eisbrenner's conduct can in no way be considered a valid exercise of business judgment. Accordingly, demand on the Board is excused.

164. Defendants McClendon, Hargis, Miller, Davidson, Nickles, Keating, Maxwell, Simpson, and Eisbrenner have also acted with at least gross negligence by approving or allowing the Company to enter into tainted transactions on terms disadvantageous to Chesapeake, but lucrative for counterparties affiliated with McClendon. The terms of this financing are particularly egregious in light of the Company's struggle to maintain solvency. Accordingly, McClendon, Hargis, Miller, Davidson, Nickles, Keating, Maxwell, Simpson, and Eisbrenner failed to exercise valid business judgment. Demand on the Board is, therefore, further excused.

**B.    Demand Is Excused Because at least a Majority of the Board Faces a Substantial Likelihood of Liability for Their Misconduct**

165.    McClendon has served as Chesapeake's Chairman and CEO since he co-founded the Company in 1989.    McClendon, by participating in the financing arrangements contested by Plaintiff, has knowingly, recklessly, or at least grossly negligently harmed and will continue to harm the Company.    Moreover, as a member of the Board, McClendon participated in the issuance of the improper statements in the Company's Proxy Statements and other public filings with the SEC since at least 2005. Because McClendon is an officer of the Company, his breaches of the fiduciary duty of care as an officer cannot be exculpated even if the Company has a charter provision that may provide for such exculpation for the directors of the Company.    For these reasons, McClendon faces a substantial likelihood of liability.    Further, he is indisputably interested in the outcome of this litigation that is centered on him, his compensation, and his financing transactions.  Demand is futile against McClendon.

166.    Defendants Davidson, Hargis, and Miller, as members of the Audit Committee, reviewed and approved the improper statements issued in the Company's filings with the SEC.    The Audit Committee's Charter provides that the committee is responsible for, among other things: (i) overseeing the Company's financial reporting; (ii) discussing with management and the outside auditor any major issues as to the adequacy of the Company's internal controls; (iii) reviewing the Company's quarterly statements on Forms 10-Q; (iv) reviewing disclosures made to the committee by the CEO and CFO during their certification process of filings on Forms 10-K and Forms 10-Q; and (iv)

discussing with management the Company's major financial risk exposures and the steps management has taken to monitor and control those exposures, and the guidelines and policies to govern the process by which risk assessment and risk management is undertaken. The Audit Committee's Charter further provides that the Audit Committee is responsible for oversight of legal, regulatory, and compliance matters, and in connection with that responsibility, must: (i) receive reports (including from management) regarding compliance with applicable laws and regulations and with the Company's Code; (ii) discuss with the Company's general counsel any legal, compliance, or regulatory issues that could have a material effect on the Company's financial statements or compliance policies, investigate material matters brought to the committee's attention within the scope of its duties; and (iii) review insider or affiliated party transactions or courses of dealing and related disclosures in the Company's annual Proxy Statements. Moreover, the Charter requires the Audit Committee to prepare the reports required by the SEC to be included in the Company's annual Proxy Statements. As defendants acknowledge even as recently as their April 29, 2011 Proxy Statement, the Audit Committee reviews and assesses ongoing relationships with related parties, and has reviewed and pre-approved certain transactions, including defendant "McClendon's participation in the FWPP." Thus, Davidson, Hargis, and Miller are responsible for allowing the improper statements relating to, among other things, the true nature and extent of McClendon's financing relating to his participation in the FWPP, the alignment of (or lack thereof) McClendon's interests with those of the Company's, as well as actual and potential conflicts of interest arising from McClendon's financing arrangements. These defendants

also caused or allowed the Company to fail to disclose any information concerning McClendon's hedging activities. Defendants Davidson, Hargis, and Miller were generally aware of the existence of McClendon's financing transactions, and aware of McClendon's hedging activities. Despite their knowledge, or with reckless disregard, Davidson, Hargis, and Miller caused these improper statements or omissions. Accordingly, Davidson, Hargis, and Miller breached their fiduciary duties of loyalty, good faith, and candor, as well as their duties assigned to them by the Audit Committee Charter. As a result, Davidson, Hargis, and Miller face a substantial likelihood of liability. Any demand upon them is futile.

167. Defendants Davidson, Hargis, and Miller, as members of the Audit Committee, breached their fiduciary duties of loyalty and good faith and the aforementioned duties assigned to them by the Audit Committee Charter by knowingly or recklessly disregarding material conflicts of interest and other risks arising from defendant McClendon's financing transactions that have harmed and will continue to harm the Company. They also utterly failed to implement internal controls to inform themselves regarding McClendon's financing transactions despite their duties and being generally aware of the existence of the transactions. Nonetheless, they approved or allowed the Company to enter into tainted transactions on terms disadvantageous to Chesapeake, but lucrative for counterparties affiliated with McClendon. Davidson, Hargis, and Miller also consciously disregarded the VPP transactions by McClendon that are competing with efforts by Chesapeake to obtain financing during a time of severe cash flow shortages at the Company. As a result, these transactions threatened and

continue to threaten the Company's very solvency.  Thus, defendants Davidson, Hargis,

and Miller face a substantial likelihood of liability.  Any demand upon them is, therefore,

futile.

168.  Defendants Keating, Maxwell, and Eisbrenner, as members of the

Compensation Committee, reviewed and approved improper statements issued in the

Company's filings with the SEC.  The Compensation Committee's Charter provides that

the committee must establish and monitor the implementation of the Company's

compensation system.    Among other responsibilities, the Charter requires the

Compensation Committee to: (i) review, evaluate, and approve all compensation of

directors and executive officers; (ii) prepare the report required by the SEC to be included

in the Company's annual Proxy Statements; and (iii) review compliance with and make

recommendations to the Board regarding the CEO's participation in the FWPP.  As

provided in the terms of the FWPP, the Compensation Committee administers the FWPP.

As a result of these responsibilities, Keating, Maxwell, and Eisbrenner were required to

inform themselves of, among other material facts, the general nature and extent of

defendant McClendon's financing in connection with the FWPP, the conflicts of interest

and risks McClendon's financing transactions pose to the Company, and harm already

caused therefrom.  In light of their responsibilities, the 2012 Compensation Committee

Defendants also were aware of the need for the Company to fairly and adequately

disclose information regarding, among other things, the FWPP, McClendon's related

financing transactions, and the conflicts of interest and risks associated therewith.

Defendants Maxwell and Keating also caused or allowed the Company to fail to disclose

any information concerning McClendon's hedging activities. Despite their known duties, the 2012 Compensation Committee Defendants knowingly, or with reckless disregard, caused or made improper statements or omissions relating to those material issues. Accordingly, defendants Keating, Maxwell, and Eisbrenner breached their fiduciary duty of loyalty and good faith. Thus, they face a substantial likelihood of liability for their breach of fiduciary duties. Any demand upon them is futile.

169. Defendants Keating, Maxwell, and Eisbrenner, as members of the Compensation Committee, breached their fiduciary duties of loyalty and good faith and the aforementioned duties assigned to them by the Compensation Committee Charter and the FWPP by knowingly or recklessly disregarding material conflicts of interest arising from defendant McClendon's financing transactions that have harmed and will continue to harm the Company. They also utterly failed to implement internal controls to inform themselves regarding McClendon's financing transactions despite their duties and being generally aware of the existence of the transactions. Nonetheless, they approved or allowed the Company to enter into tainted transactions on terms disadvantageous to Chesapeake, but lucrative for counterparties affiliated with McClendon. Keating, Maxwell, and Eisbrenner also consciously disregarded the VPP transactions by McClendon that are competing with efforts by Chesapeake to obtain financing during a time of severe cash flow shortages at the Company. As a result, these transactions threatened and continue to threaten the Company's very solvency. Thus, Keating, Maxwell, and Eisbrenner face a substantial likelihood of liability. Any demand upon them is, therefore, futile.

170.  Further, as alleged above, defendants McClendon, Davidson, Hargis, Keating, Maxwell, Nickles, Miller, Eisbrenner, and Simpson face a substantial likelihood of liability because they approved, caused to be issued, or otherwise participated in the issuance of improper statements in the Company's Proxy Statements and other public statements.  In the Proxy Statements, defendants McClendon, Davidson, Hargis, Keating, Maxwell, Nickles, Miller, Eisbrenner, and Simpson misrepresented certain material facts and failed to apprise shareholders of certain material information, which would have affected their voting decisions regarding the FWPP, the LTIP amendments and the 2010 shareholder proposal regarding annual cash bonuses to the named executives. McClendon, Hargis, Miller, Davidson, Nickles, Keating, Maxwell, Simpson, and Eisbrenner also authorized and/or permitted the issuance of various other improper statements, including in the Company's Annual Reports on Forms 10-K and press releases, regarding or otherwise concealing material information regarding McClendon's financing efforts, conflicts of interest and risks arising therefrom, and the lack of alignment of his interests with the Company's interests.  McClendon, Davidson, Hargis, Keating, Maxwell, Nickles, and Miller also caused or allowed the Company to fail in disclosing any information regarding McClendon's hedging activities.  Each and every member of the Board knowingly or recklessly made or caused improper statements or omissions in one or more Proxy Statements issued between 2005 and the present, the Company's Annual Reports on Forms 10-K, and press releases, thus breaching their fiduciary duties of loyalty and candor.  Additionally, McClendon, Davidson, Hargis, Keating, Maxwell, Nickles, Miller, Eisbrenner, and Simpson at least grossly negligently

made or caused improper statements or omissions in one or more of the Company's 2009, 2010, 2011, and/or 2012 Proxy Statements in connection with soliciting shareholder votes, thereby violating provisions of the Exchange Act.   Their breaches of fiduciary duties and violations of the Exchange Act are independently sufficient to subject McClendon, Davidson, Hargis, Keating, Maxwell, Nickles, Miller, Eisbrenner, and Simpson to a substantial likelihood of liability, rendering a pre-suit demand futile.

171.   Defendants McClendon, Hargis, Miller, Davidson, Nickles, Keating, Maxwell, Simpson, and Eisbrenner (especially Keating, Maxwell, and Eisbrenner, as members of the Compensation Committee; Davidson, Hargis, and Miller, as members of the Audit Committee; and McClendon as the individual involved in the improper financing transactions) failed to implement and maintain adequate internal controls and procedures.   These defendants utterly failed to implement any internal controls or procedures to, among other things: (i) monitor McClendon's financing with regard to the FWPP; (ii) monitor and manage material conflicts of interest and risks arising from the FWPP; and (iii) ensure fairness and accuracy of the Company's public disclosures relating to the FWPP.   McClendon, Hargis, Miller, Davidson, Nickles, Keating, Maxwell, Simpson, and Eisbrenner also failed to implement adequate and effective internal controls to protect against material conflicts of interest, including controls to: (i) prevent transactions beneficial to officers or directors of the Company to the Company's detriment; and (ii) prevent officers or directors from competing with the Company for financing.   McClendon, Davidson, Hargis, Keating, Maxwell, Nickles, and Miller also failed to implement effective and adequate internal controls and limitations to restrict

McClendon's hedging activities. McClendon, Davidson, Hargis, Keating, Kerr, Maxwell, Nickles, Whittemore, Miller, Eisbrenner, and Simpson systematically failed to implement and maintain such internal controls while knowing about, or in reckless disregard of, their duties to do so and while in possession of material facts concerning, among other things, the existence of McClendon's financing transactions related to the FWPP, the stated purposes of the FWPP, the Company's need for financing in light of its cash flow problems, and the low amount of revenues generated by the Company's wells compared to the mounting costs that would be shared by McClendon as part of the FWPP. As a result, McClendon, Davidson, Hargis, Keating, Kerr, Maxwell, Nickles, Whittemore, Miller, Eisbrenner, and Simpson breached their fiduciary duties of loyalty and good faith. Thus, they face a substantial likelihood of liability. Demand is futile.

### C.   Demand Is Excused a Majority of the Board Has Demonstrated It Cannot Disinterestedly or Independently Consider a Demand

172.   The conduct by defendants Davidson, Kerr, Keating, Maxwell, McClendon, Miller, Nickles, Whittemore, Hargis, Eisbrenner, and Simpson with regard to demands made by Arnold and Clem and the proposed settlement demonstrate that they cannot be trusted to independently and disinterestedly consider demands on similar facts, such as a demand relating to McClendon's compensation or financial transactions relating to his interests in the FWPP.

173.   Defendants Davidson, Hargis, Keating, Maxwell, Nickles, Miller, Eisbrenner, and Simpson have rushed to defend their concealment of defendant McClendon's leveraged participation in the FWPP and his other financing efforts related

thereto. Their statements and actions confirm that Davidson, Hargis, Keating, Maxwell, Nickles, Miller, Eisbrenner, and Simpson have prejudged the appropriateness of McClendon's financing and determined to take no action. Davidson, Hargis, Keating, Maxwell, Nickles, Miller, Eisbrenner, and Simpson even took a strong stand that they were not obligated to monitor or inform themselves concerning McClendon's financing relating to the FWPP despite being generally aware of the existence of the transactions. To the extent Davidson, Hargis, Keating, Maxwell, Nickles, Miller, Eisbrenner, and Simpson are now investigating, such investigation comes years too late, is timed to win favor with shareholders ahead of an upcoming (and expectedly contentious) annual shareholders' meeting, and comes only after Davidson, Hargis, Keating, Maxwell, Nickles, Miller, Eisbrenner, and Simpson failed in their defense of McClendon's improper financing and their inaction with regard thereto. The Board's rush to judgment and disingenuous tactics designed to placate shareholders further demonstrate that the Davidson, Hargis, Keating, Maxwell, Nickles, Miller, Eisbrenner, and Simpson cannot be trusted to independently and disinterestedly consider a pre-suit demand by Plaintiff. Making such a demand would, therefore, be futile.

## COUNT I

### Derivatively On Behalf of Chesapeake Against the Individual Defendants for Violations of Section 14(a) of the Exchange Act

174.  Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

175.   The Individual Defendants knowingly, recklessly, or with gross negligence caused to be issued, and participated in the issuance of materially false and misleading statements to shareholders that were contained in the Company's 2009, 2010, 2011, and 2012 Proxy Statements.

176.   Each of the Proxy Statements from 2009 to 2012 contained a proposal to increase the amount of shares available to compensate employees through the Company's LTIP.   Had the shareholders had complete information regarding the true nature of defendant McClendon's participation in the FWPP, they would not have voted to increase his compensation.

177.   Plaintiff, on behalf of Chesapeake, thereby seeks relief for damages caused by the improper approval of the LTIP compensation increases in 2009, 2010, and 2011.

## COUNT II

**Derivatively on Behalf of Chesapeake Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act**

178.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

179.   The Individual Defendants acted as controlling persons of Chesapeake within the meaning of section 20(a) of the Exchange Act as alleged herein.   By virtue of their positions as directors of Chesapeake, and by their participation in and/or awareness of the Company's operations and/or their intimate knowledge of the false statements contained in the 2009, 2010, 2011, and 2012 Proxy Statements filed with the SEC, they had the power to influence and control and did influence and control, directly or

indirectly, the decision-making of the Company, including the content and dissemination of the various false and misleading statements or omissions.

180.  The Individual Defendants were provided with or had unlimited access to copies of the 2009, 2010, 2011, and 2012 Proxy Statements containing the misleading statements or omissions prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause them to be corrected.

181.  In particular, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

182.  In addition, as the 2009, 2010, 2011, and 2012 Proxy Statements set forth at length, and as described herein, the Individual Defendants were each involved in approving and/or acquiescing to the improper statements involving the nature and extent of defendant McClendon's participation in the FWPP and his personal loans funding his participation in the program.

183.  By virtue of the foregoing, the Individual Defendants have violated section 20(a) of the Exchange Act.

184.  As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated section 14(a) of the Exchange Act by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, these defendants are liable pursuant to section 20(a) of

the Exchange Act.  As a direct and proximate result of defendants' conduct, Chesapeake will be irreparably harmed.

## COUNT III

### Against the Individual Defendants for Breach of Fiduciary Duty

185.  Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

186.  The Individual Defendants owed and owe Chesapeake fiduciary obligations.  By reason of their fiduciary relationships, the Individual Defendants owed and owe Chesapeake the highest obligation of good faith, fair dealing, loyalty, and due care.

187.  The Individual Defendants and each of them, violated and breached their fiduciary duties of candor, good faith, and loyalty.  The Individual Defendants failed to implement adequate internal controls to police defendant McClendon's massive loans, which violated the FWPP and were not in the Company's best interest.

188.  Defendants McClendon, Davidson, Hargis, Keating, Maxwell, Nickles, Miller, Eisbrenner, and Simpson, as directors of the Company, owed Chesapeake the highest duty of loyalty.  McClendon, Davidson, Hargis, Keating, Maxwell, Nickles, Miller, Eisbrenner, and Simpson knew or were reckless in not knowing that: (i) McClendon's massive private loans violated the FWPP and the Company's best interests; and (ii) the 2009, 2010, 2011, and 2012 Proxy Statements contained misleading statements or omissions of the Exchange Act.

189.   Audit Committee Defendants Davidson, Hargis, and Miller breached their fiduciary duty of loyalty by reviewing and approving the improper statements alleged herein.

190.   The Compensation Committee Defendants, Eisbrenner, Keating, Maxwell, and Whittemore, breached their fiduciary duty of loyalty by failing to police defendant McClendon's compliance with the FWPP. Furthermore, despite their knowledge, or with reckless disregard, Eisbrenner, Keating, Maxwell, and Whittemore caused the Company to issue improper statements relating to the nature of McClendon's financing in connection with the FWPP, the lack of alignment of McClendon's interests with those of the Company, as well as actual and potential conflicts of interest arising from McClendon's financing arrangements.

191.   Defendants McClendon, Davidson, Hargis, Keating, Maxwell, Nickles, and Miller also breached their fiduciary duties of due care, loyalty, good faith, and candor with regard to McClendon's hedging activities. These defendants failed to implement adequate and effective internal controls to restrict McClendon's hedging activities, and instead agreed to amendments to McClendon's employment agreement that facilitated McClendon's hedging activities. Despite their knowledge, they also concealed or otherwise caused or allowed the Company to fail in disclosing any material information to the public regarding these hedging activities.

192.   As a direct and proximate result of the Individual Defendants' failures to perform their fiduciary obligations, Chesapeake has sustained significant damages, not only monetarily, but also to its corporate image and goodwill.

193.   Plaintiff, on behalf of Chesapeake, has no adequate remedy at law.

## COUNT IV

### Against the Individual Defendants for Unjust Enrichment

194.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

195.   By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Chesapeake. Defendant McClendon was unjustly enriched by securing massive loans to participate in the FWPP, in violation of the intended purpose of the program and the Company's best interests. The rest of the Individual Defendants were unjustly enriched as a result of the compensation and director remuneration they received while breaching fiduciary duties owed to Chesapeake.

196.   Plaintiff, as shareholders and representatives of Chesapeake, seeks restitution from these defendants, and each of them, and seek an order of this Court disgorging all profits, benefits, and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

197.   Plaintiff, on behalf of Chesapeake, has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of Chesapeake, demands judgment as follows:

A.     Against all of the defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the defendants' breaches of fiduciary duties, waste or corporate assets, and unjust enrichment;

B. Directing Chesapeake to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Chesapeake and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote, resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote of the following corporate governance policies: (1) a proposal to establish a method of independent oversight regarding defendant McClendon's borrowings, such that the threats they may represent to the Company can be identified and addressed; (2) a proposal to rescind the FWPP; (3) a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board; (4) a provision to permit the shareholders of Chesapeake to nominate at least three candidates for election to the Board; and (5) a proposal to strengthen Chesapeake's oversight of its disclosure procedures;

E. Extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on, or otherwise restricting their assets so as to assure that plaintiff on behalf of Chesapeake has an effective remedy;

G. Awarding to Chesapeake restitution from defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by the defendants;

H.    Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

I.    Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all claims so triable.

DATED:  June 27, 2012                    DERRYBERRY NAIFEH, LLP


                                  /s/Darren B. Derryberry
                         DARREN DERRYBERRY, OBA No.
                         14542
                         4800 N. Lincoln Blvd.
                         Oklahoma City, OK 73105
                         Telephone: (405) 528-6569
                         Facsimile: (405) 528-6462

                         JOHNSON & WEAVER, LLP
                         FRANK J. JOHNSON
                         BRETT WEAVER
                         110 West "A" Street, Suite 750
                         Telephone: (619) 230-0063
                         Facsimile: (619) 255-1856

                         ROBBINS UMEDA LLP
                         BRIAN J. ROBBINS
                         GEORGE C. AGUILAR
                         JAY N. RAZZOUK
                         LAUREN N. OCHENDUSZKO
                         600 B Street, Suite 1900
                         San Diego, CA 92101
                         Telephone: (619) 525-3990
                         Facsimile: (619) 525-3991

                         HOLZER HOLZER & FISTEL, LLC
                         MICHAEL I. FISTEL, JR.
                         MARSHALL P. DEES
                         200 Ashford Center North, Suite 300
                         Atlanta, GA 30338
                         Telephone: (770) 392-0090
                         Facsimile: (770) 392-0029

                         *Counsel for Plaintiff*

747670

## CERTIFICATE OF SERVICE

I hereby certify that on the 27th day of June, 2012, I electronically transmitted the *Amended Shareholder Derivative Complaint for Breach of Fiduciary Duties, Waste of Corporate Assets, Unjust Enrichment, and Violations of the Securities and Exchange Act of 1934* to the Clerk of the Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to the appropriate ECF registrants.

/s/ Darren B. Derryberry

## VERIFICATION

I, Frank J. Johnson, hereby declare as follows:

I am an attorney with Johnson & Weaver, LLP, counsel for Plaintiff Greg Erickson. I have read the foregoing Amended Shareholder Derivative Complaint for Breach of Fiduciary Duties, Waste of Corporate Assets, Unjust Enrichment, and Violations of the Securities and Exchange Act of 1934, and know the contents thereof. I am informed and believe the matters therein are true and on that ground allege that the matters stated therein are true.

I make this Verification because plaintiff is absent from the County of San Diego, California, where I maintain my office.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 26th day of June, 2012, at San Diego, California.

FRANK J. JOHNSON